# Attachment 1

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  08/08/2003

Gary N. Herbert was interviewed at the United States Attorney's Office (USAO), 1225 Seventeenth Street, Suite 700, Denver, Colorado in the presence of his attorney, David Zisser. Also present during the interview were Pam Jebens, USAO, Assistant United States Attorneys (AUSA) Wyatt Angelo, Juliette LaChapelle, and Jim Russell, Securities Exchange Commission (SEC) representatives' Marshall Gandy and R. Joann Harris. After being advised of the identity of the interviewing agent and the nature of the interview, and after signing a proffer agreement, Herbert provided the following information:

Herbert worked for the Attorney General's Office from 1991 through March 1998. After leaving the Attorney General's Office, he was contracted as a staff attorney and worked in the Human Resources Department. In the Spring of 2000, he began working at a law firm with Marty O'Fallon and John Kusic practicing general civil litigation.

O'Fallon had been a friend of Leon Harte's for 20 years. Harte purchased the Redstone Castle and invited Herbert and his wife to visit the Castle for a weekend. Herbert was asked by Kusic to represent Harte because the Castle had come under litigation. Herbert began representing Harte and the Reserve Foundation LLC (RF). Herbert originally met Harte at O'Fallon's office approximately five years ago.

Three corporations were formed during the purchase of the Redstone Castle. Tranquil Options, LLC, Peaceful Options, LLC, and Serenity Options, LLC were all incorporated by Cynthia Tester, an attorney in Glenwood Springs, Colorado. However, later in the interview Herbert advised that Kusic had prepared the Castle deeds and incorporated the three entities which purchased the Castle.

It was Herbert's understanding that Norman Schmidt owned 50 percent of RF. Herbert believed The Reserve Foundation Trust (TRFT) was located overseas and was defunct. TRFT was set up by Harte and Peter Moss. Herbert believed Moss was Harte's partner who made trades via RF. The profits received from RF were split three ways between Moss, Harte, and Schmidt. Herbert also believed Moss was involved in other ventures with Harte and Schmidt.

Investigation on  07/30/2003  at  Denver, Colorado

File # 196C-DN-60160-302-499    Date dictated  08/01/2003

by  SA Stephanie Ann Hahn:vlp

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

0313954

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On __07/30/2003__ , Page __2__

      Harte said Moss was the approved trader in the investment program, and referred to as the middle man. Moss knew how to do the trades and was characterized as the "go to" guy, or the person who could actually do the trade or had the contacts necessary to execute the trades and was the person providing the timetable for the trades. None of the deals ever happened. On one occasion, Moss referred Herbert to Scott Smith, an attorney from Washington, D.C., and he participated in a three-way conference call. Smith seemed to be familiar with the St. Vincent trust account or TRFT. Moss had previously contacted Herbert regarding TRFT. Herbert knew the TRFT account at one time had a balance of $400,000 to $700,000. Harte and Schmidt claimed they were going to purchase a bank and their money could not be withdrawn.

      Herbert did not know, or understand the nature of the investment program except it reported to have deep discounts and involved prime bank notes. Herbert conducted research on the Internet regarding similar investment programs, overseas investments and prime bank notes. He visited the SEC website where he saw a caution posted warning people against prime bank note investments. When questioned about his research regarding the prime bank investment schemes, Herbert said he determined there were a lot of scams out there.

      In early conversations with Harte, Kusic, and O'Fallon, Herbert was told trades were made every three months. People would pool their money for the investment program and the investments were made when prime bank notes became available. If, however, they missed the trade, the investment program monies would have to wait for another opportunity to invest. Harte, while waiting for the next trade, purchased the Redstone Castle with investors' monies. Harte believed he could buy it for six million and quickly sell it for twelve million dollars making a substantial profit. After selling the castle, they would then use the funds to conduct a trade with the next available prime bank notes.

      The Cooperative Private Placement Agreement (CPPA) given to the investors of RF was put together by Harte and seemed to be "a cut and paste job." Harte had indicated with some pride that he had put the contract together himself. Herbert did not discuss securities with Harte. Herbert has no securities law experience.

      RF also conducted business with SunState FX, a foreign exchange company, with which TRFT invested monies. Herbert later said RF had lost 1.2 million from the SunState FX investment.

0313955

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On 07/30/2003 , Page 3

Herbert believes all the monies returned from SunState FX were used to purchase the Castle, in addition to some of Harte's money. Harte also invested monies from RF in a restaurant called An American Place.

In the Spring of 2000, Herbert met Schmidt in O'Fallon's office and learned about a different investment program. Schmidt told Herbert his new investment program would do it right and he would repay all previous investors from the first program.

Herbert first discovered the RF investment program was a scam during the deposition given by Harte in January 2002. Up to that point, he had only been told by Harte that the money had been delayed. Harte's deposition was taken as a result of divorce proceedings. He learned more about the investment program after reading the Receiver's Complaint from Sunstate FX investments in Florida. All three Colorado suits contained similar allegations; fraud, Ponzi scheme, civil RICO, and that the program allegedly raised money by promising high returns.

After January 2002, Herbert had conversations with Harte about the allegations against Harte contained in the civil suits. They discussed the Ponzi scheme alleged and Harte told him the program was not a Ponzi scheme because he was not taking the money from some investors to pay others. Sometime in July 2002, Herbert discussed the same things with Schmidt, but in general terms only. Harte had not been on speaking terms with Schmidt since the Summer of 2001. They did not see each other much, even though they lived together.

Herbert represented Harte from Fall 2000 through March 2003. Herbert worked on other cases for Kusic and O'Fallon as needed. Harte never paid Herbert and still owed him more than $50,000. Herbert did discuss payment with Harte but Harte kept telling him he would be paid, the funds had just been delayed. Even though, Schmidt was incidental to these suits, Schmidt was paying the legal fees for the Florida suit against Harte and all payments were coming from the same account. Schmidt wrote a check to Herbert in April 2001, for $5,000. Herbert began receiving $5,000 payment each month, which was increased to $10,000 a month in the Summer of 2002. Herbert received his last payment from Schmidt in February 2003.

Herbert did not retain any billing records because he did not send any bills to Harte or Schmidt. He may have notations

0313956

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On __07/30/2003__ , Page __4__

regarding time spent on the cases in his DayTimer. As time went on, his days were consumed with litigation against Harte, to include divorce proceedings involving a deposition, and three civil suits. Herbert did not know the motivation for Schmidt paying Harte's attorney bills because Schmidt had been dismissed from the SunState FX civil suit.

O'Fallon was still working with Schmidt when Herbert began representing him. Herbert created the Colorado corporations Capital Holdings, LLC (CHL), Smitty's MotorSports, and Fast Track. Herbert also had knowledge of the plastics company and the race team Schmidt owned. He believed Smitty's MotorSports was created for the purpose of operating the race team. Herbert had heard the name Smitty's prior to Spring 2002, but did not know it was an investment company.

Herbert created the entity CHL in the late Spring, 2002, for Schmidt. Herbert later discovered CHL was the same type of program as TRFT. Herbert did not conduct any independent investigations regarding TRFT or CHL. Herbert knew the program CHL was promoting involved some sort of investment opportunity and Schmidt had many large investors. He did not know the marketing of the investment program.

Capital Holdings International (CHI) was created prior to CHL and before Herbert's involvement and he did not know who formed CHI. In the late Summer or early Fall of 2002 Herbert found out about Monarch Capital Holdings, an entity he did not create.

What Herbert knew of the Schmidt's operation was that money was being invested and reputable banks were being used, to include the Trust Department at Wells Fargo Bank. Purportedly, the investments were being made through the Wells Fargo bank. Herbert was shown an employment contract from two traders who formerly worked for Wachovia formerly known as (f.k.a.) First Union.

Herbert did not discuss the non-depleting account or the fact that investment monies were to go into a non-depleting account, nor did he know how the money was invested from the non-depleting account. Herbert said the first time he had heard about non-depleting accounts was during the course of this interview. Herbert had not seen any bank documents regarding a non-depleting account.

0313957

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of ____Gary N. Herbert_____, On __07/30/2003__, Page __5__

       In late Spring, 2002, Schmidt told Herbert about George Beros. Beros was described as "the trader" and someone who was knowledgeable about the investment program. He supposedly had a Master's in finance and owned a mortgage company. In late August or early September 2002, Herbert met Beros in Cleveland, Ohio. Beros was introduced as an officer of CHL. While at the meeting, there was a conversation about an office lease in Cleveland. Beros had previously been in Denver and was an associate of Schmidt's son.

       During the Summer of 2002, a Nebraska SEC filing came to Herbert's attention by Jan Mclain, Schmidt's wife. Herbert had a copy of the Nebraska cease and desist order. Mclain grew up in Nebraska and still maintained contact with friends and associates. One such associate, a large wheat farmer, wanted to invest in the program. According to Mclain, the local bank did not want him to invest so the Banker called the Nebraska Securities Commission. They investigated and ultimately ordered a cease and desist on Smitty's Investments, LLC. Mclain believed the bank did not want the prospective investor's money to leave their bank because he was one of their largest depositors.

       Herbert discussed securities issues with Schmidt. In the Summer of 2002, August or September, they went to see Peter Futro (phonetic) to determine if the investment program Schmidt was offering involved securities. Kusic and Herbert spent time explaining the program to Peter Futro. During the conversation Futro asked if it was a Ponzi scheme and requested further information from Herbert which Herbert did not provide at the time of request. Herbert said what prompted them to seek advice from an attorney with experience in securities was an article published in the paper regarding Joe Coors.

       In August or September 2002, Herbert spoke with an attorney Troy Youngman, referred to him by Futro. Futro and Youngman were friends of Kusic and performed the research regarding the securities as a courtesy from one attorney to another. The discussion went back and forth between Beros, Youngman and Herbert. Beros was explaining how a transaction worked or how the trades conceptualized within the investment program. Beros said he was the Chief Financial Officer (CFO) for Schmidt's company. Attorneys in New York and Cleveland were hired by Beros to do the securities work. Herbert assumed the same attorneys prepared the CPPA. Herbert claimed he had only seen drafts of the CPPA.

0313958

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On __07/30/2003__ , Page __6__

    During the same time frame Herbert received an inquiry from Key Bank in Cleveland about the investment program. Key Bank asked if the investment program involved securities and, if so, were the securities registered and were those offering the securities licensed to sell securities. Key Bank was making such inquiries because Beros had requested Key Bank open a non-depleting account for investor funds. Note: Earlier in the interview, Herbert claimed he had not heard of non-depleting accounts before this interview. Herbert was asked by Beros to write a letter to Key Bank on his behalf and Herbert refused. Beros later told Herbert to forget it because he had Norman Sirak (Phonetic) write the letter to Key Bank.

    Herbert recalls a transaction between Schmidt and Beros which occurred last Fall (2002) involving property in Cleveland to be used for the river boat gambling operation.

    Herbert was asked to write the letter regarding insurance coverage for CHL. Schmidt asked Herbert to make sense out of the "insurance policy mess." Herbert, in order to construct the letter, called Alan Weed. Weed, Schmidt and Herbert had a conference call concerning the letter and Herbert received some faxes from Weed. The letter was revised two or three times. The purpose of the letter was to describe the insurance coverage of banks and would only be sent to CHL's internal team. Within the letter, paragraph two, was information about the investment program that was given to him by Schmidt. The information within the letter regarding Securities Investor Protection Corporation (SIPC) came from Weed.

    On June 17, 2002, Herbert wrote the letter to Mclain, Schmidt's wife and investor in CHL. Later, Herbert asked Schmidt about the letter going out to investors and Schmidt was as surprised as he (Herbert) was that the letter had gone out to investors.

    Herbert did not recall seeing a certificate of insurance and did not review the insurance policies but looked at specimens provided by Weed. Herbert did not discuss the insurance program with Weed regarding RF.

    In the late Summer of 2002, Rich Gray from Wells Fargo suggested Schmidt open an escrow account to send investors' money to. Schmidt asked Herbert if he had a trust account and asked how they worked. Herbert told Schmidt he needed an escrow account.

0313959

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of ___Gary N. Herbert_____, On _07/30/2003_, Page __7__

    Herbert opened a Wells Fargo escrow account, and four to five checks came into his account and remained there until Herbert directed Wells Fargo to return the monies to the investors. Schmidt told Herbert he did not have a program ready, so he told Herbert to return the funds.

    One of the checks in Herbert's escrow account was $100,000 from first name unknown (FNU) Bendz (phonetic) living in Switzerland. Another $300,000 to $400,000, was returned to an attorney in Cincinnati, Ohio, or Ithaca, New York. Herbert was to provide documents regarding these investors at a later date.

    After the SEC suit was filed, Herbert and Schmidt went to interview several criminal attorneys, to include Lee Terry. Herbert has met with Harvey Steinberg two times. Schmidt has had discussions about and made references to paying off investors. Schmidt believes he will be found not guilty and his money will be returned. Schmidt sent money to Mark Beinstock, d.b.a. The Federal Recovery Group, to repay investors from RF, because he wanted to make those investors whole. Within the SEC complaint CHL was always presented as different from RF.

    Herbert talked about the mistakes Schmidt had made regarding commissions, finders' fees, and monies used to pay such commissions from investors' money. Herbert and Schmidt had discussions about making such disclosures to investors. Schmidt had asked Herbert what the penalty was for the SEC violation and have had numerous conversations since the SEC filed its complaint. They also discussed the four civil seizures which involved Harte.

    After search warrants were executed on March 7, 2003 Weed referred investors to Herbert. Herbert spoke with four or five of those investors.

    Herbert could provide no specifics on any trades or attempted trades. References were made to Schmidt and Beros being on the verge of making a trade when they were hit on March 7, 2003. He had no knowledge of any trades ever being made with Bear-Stearns, nor was Herbert aware Schmidt was attempting to negotiate a trade with them. Herbert only had a general understanding that trades were made, but had no specific knowledge of any ever being made. Herbert does not believe CHL was a Ponzi scheme and also believed these types of trading programs existed.

0313960

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On __07/30/2003__ , Page __8__

    Herbert was aware of the banking problems with Wells Fargo. Schmidt told him that two checks had been returned to Wells Fargo from a troublesome client and that his account was high maintenance, which caused him (Schmidt) problems at Wells Fargo. Herbert was aware Schmidt had moved his accounts.

    Herbert went to Northern Trust on Schmidt's behalf and met with O'Fallon's nephew, FNU Howard, who was the manager of Northern Trust. Herbert inquired about opening an account for Schmidt to replace the Wells Fargo account. Herbert provided background on Schmidt. He represented Schmidt as a person who owned a race team and was involved in a trading program. Schmidt later went to Northern Trust to open an account on his own.

    Schmidt also had discussions regarding bank accounts with a Senior Vice President from Wachovia Bank f.k.a. First Union.

    Herbert is familiar with Michael Bergman through Schmidt. Bergman called Herbert and asked if he could ask him a question and Herbert refused because he did not represent him. Bergman then asked him to represent him and Herbert declined.

    Herbert had heard of the following individuals and their entities, but does not represent them: Alan Weed, Chuck Lewis, Mike Vallone doing business as (d.b.a.) Heritage America, Cambridge Enterprises and Regency Ventures, or John Schlabach and Michael Smith, d.b.a. Northwest Group and Northwest Marketing Solutions. Schmidt and Herbert have had discussions regarding Michael Smith. Herbert did not know Mark Perrault, Karen Lewis, Mike Lewis, or Lori Lewis.

    Herbert advised the following individuals were currently being represented by criminal attorney Lee Terry: Schmidt, Scott Schmidt, Mclain, Chuck Lewis, and Beros. Terry is also representing the following entities: Capital Holdings LLC, Capital Holdings International LLC, Monarch Capitol Holdings, Fast Track, Smitty's Investments, LLC and Smitty's MotorSports.

    Schmidt's lulling of investors was not made from or by Herbert's office.

    Herbert said he had not reviewed the allegations in the USAO's forfeiture complaints with Schmidt.

0313961

FD-302a (Rev. 10-6-95)

196C-DN-60160

Continuation of FD-302 of __Gary N. Herbert__ , On __07/30/2003__ , Page __9__

    O'Fallon talked with Peter Moss yesterday, July 29, 2003. Moss was in London and was still insisting the trading program was continuing.

    Schmidt called Herbert several times on July 29, 2003. Herbert said Schmidt had asked him to postpone today's meeting at the USAO. Schmidt called Herbert on July 30, 2003, to wish him luck and told him to call him when he was finished.

    Schmidt's current attorney has a meeting with the AUSAs on Friday, August 8, 2003.

0313962