Attachment

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DAVID M. LEVINE, not individually,
but solely in his capacity as Receiver
for SUNSTATE FX, INC.,

Case No. 01-8566-CIV-RYSKAMP

     Plaintiff,

vs.

TRANQUIL OPTIONS, L.L.C., a
Colorado Limited Liability Company,
PEACEFUL OPTIONS, L.L.C., a
Colorado Limited Liability Company,
SERENITY OPTIONS, L.L.C., a
Colorado Limited Liability Company,
RESERVE FOUNDATION, L.L.C., a
Colorado Limited Liability Company,
and LEON HARTE, individually,

     Defendants.

_____/

NIGHT BOX
FILED

N 13 2001

CLERK, USDC / SDFL / WPB

## AMENDED COMPLAINT

Plaintiff, David M. Levine, not individually, but solely in his capacity as receiver (the

"Receiver") for SunState, FX Inc. ("SunState"), sues defendants Reserve Foundation, LLC

("Reserve"), Leon Harte ("Harte"), Tranquil Options, LLC ("Tranquil"), Peaceful Options,

LLC ("Peaceful"), and Serenity Options, LLC, and alleges as follows:

### DESCRIPTION OF THE ACTION

1.     This action is brought pursuant to an April 18, 2001 order issued by the

District Court for the Southern District of Florida ("Southern District") in Securities and

Exchange Commission v. SunState, FX Inc., Ulrich G. Garbe, Peggy L. Patterson and John

J. Hyland, Case No. 01-8328 CIV-RYSKAMP (the "Fraud Action"), which, inter alia,

appointed the Receiver (the "Receivership Order") to marshal SunState's assets for the

1

Tew Cardenas Rebak Kellogg Lehman DeMaria Tague Raymond & Levine, L.L.P.
Miami Center 20th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 · 305.53X.1112

Case No. 01-8566-CIV-RYSKAMP

benefit of its legitimate, defrauded investors. A copy of the Receivership Order is attached as **Exhibit "A."**[1]

2.      Pursuant to the Receivership Order, the Receiver seeks to obtain a money judgment for a fraudulent transfer, conversion and unjust enrichment, and seeks the imposition of a constructive trust and/or an equitable lien on the real property purchased with such funds.

### SUBJECT MATTER JURISDICTION

3.      Supplemental jurisdiction is proper in the Southern District, pursuant to 28 U.S.C. § 1367(a), because (i) the Receiver files this action to accomplish the ends sought in the Fraud Action (i.e., marshal assets for legitimate, defrauded investors) in which his appointment was made and such an action is ancillary; (ii) the Receiver files this ancillary action in the same district in which he was appointed; (iii) the Receiver is obligated by the Receivership Order entered in the Fraud Action to take custody, control and possession of SunState's assets by investigating and instituting actions (if necessary) against individuals or entities with possession of investor assets; (iv) the Receiver's claims against the defendants seek to recover such assets, pursuant to the Receivership Order entered in the Fraud Action; and (v) the claims asserted in this Amended Complaint are so related to the claims involved in the Fraud Action that they form part of the same case or controversy under Article III of the United States Constitution.

---

[1] The powers contained in the Receivership Order were also contained in a Temporary Restraining Order issued on April 18, 2001. Such powers were thereafter confirmed in Preliminary Injunctions issued against the defendants in the Fraud Action.

2

Case No. 01-8566-CIV-RYSKAMP

4.      Additionally, pursuant to 28 U.S.C. §754, on April 27, 2001, the Receiver filed a certified copy of the Receivership Order with the United States District Court for the District of Colorado.[2] As such, the Receiver is vested with subject matter jurisdiction, with control of any real property or personal property acquired with SunState's funds located in the District of Colorado, and with the right to take possession of such property.

5.      Finally, pursuant to the Receivership Order, the Receiver is obligated to "[t]ake immediate possession of all SunState's property, assets and estate, and all other property of SunState of every kind whatsoever and **wheresoever located** ... including, but not limited to ... all real property of SunState **wherever situated** ..." See Receivership Order at ¶1 (emphasis added). The Receivership Order empowers the Receiver to file actions and legal proceedings "as the Receiver deems necessary against [any individuals or entities with respect to] transfers of monies or other proceeds directly or indirectly traceable from investors in SunState ..." See Receivership Order at ¶2. Such rights of action, as well as "title to all property, real or personal ... of SunState ... **wherever located within or without this state**, [are] vested by operation of law in the Receiver." See Receivership Order at ¶17 (emphasis added).

_____

[2]The Receiver filed the Receivership Order and a copy of the Fraud Action Complaint out of an abundance of caution because one of SunState's former brokers was located in Colorado. The Receiver was only recently made aware of the transfer of funds that is the subject of this action.

3

Case No. 01-8566-CIV-RYSKAMP

## VENUE, PARTIES AND PERSONAL JURISDICTION

6.    Venue is proper in the Southern District because, as set forth more fully below, (i) the Defendants were unjustly enriched and committed the tort of conversion in the Southern District; (ii) the Defendants were the recipients of a fraudulent transfer from the Southern District; (iii) the Defendants – through their agent, SunState – conducted business in the Southern District; (iv) the Defendants – as alter egos of each other – executed a valid and independently enforceable forum selection clause in which they agreed to submit themselves to jurisdiction in the Southern District; (v) the Fraud Action, to which this suit is ancillary, is pending in the Southern District; (vi) trying this ancillary action and the Fraud Action before the same Court will avoid redundancy and preserve scarce judicial resources; and (vii) trying this action in the Southern District, the contractual forum of choice, would not be gravely difficult or inconvenient for the defendants such that they would be deprived of their day in court.

7.    SunState is a Florida corporation which had its principal place of business .in Boca Raton, Florida. Pursuant to the Receivership Order, SunState was placed into receivership and the Receiver was appointed to marshal its assets for the benefit of its legitimate, defrauded investors.

8.    Defendant Reserve is a Colorado limited liability company whose members and directors are individual defendant Harte, Debbie Harte (his wife) and Norman Eugene Schmidt ("Schmidt"). Reserve's address is – or once was – 1322 33rd Avenue, Greeley, Colorado, which is also individual defendant Harte's home. Reserve supposedly invested $6 million with SunState. In reality, however, and as set forth more fully below, Reserve

4

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor 201 South Biscayne Boulevard M...

merely served as the SunState investment front through which the funds and accounts discussed below were moved in and out of SunState at the apparent direction of Harte. Reserve also appointed SunState to act as its agent in Florida. Copies of that agreement, and all agreements between SunState and Reserve, are attached as Composite Exhibit "B."

9.      Defendant Harte is a resident of Pitkin County, Colorado. Harte resided – or has resided during the relevant time – at 1322 33ʳᵈ Avenue, Greeley, Colorado. Harte is the manager and director of Reserve, Peaceful, Tranquil and Serenity. Harte served as the liaison between Reserve and SunState and SunState and the LLCs. Harte, acting individually, through the several corporate fronts, and in conjunction with SunState's insiders, diverted the proceeds of SunState's investors to his alter egos: Peaceful, Tranquil and Serenity (hereinafter, the "LLCs"). The origin of these fraudulently obtained monies (i.e., SunState's investors) and their procurer's identity (i.e., Harte) were buried under layers of corporations; namely, Reserve as the alter-ego of Harte and the LLCs as the alter-egos of Reserve and Harte. Indeed, as set forth more fully below, Harte is indivisible from Reserve and the LLCs and will be referred to as "Harte/Reserve" in order to facilitate discussion of alter ego principles and their applicability to the SunState fraud.

10.     Defendant Peaceful is a Colorado limited liability company whose members and directors are Harte, Debbie Harte and Schmidt. Peaceful is and at all relevant times was controlled by Harte. Peaceful's address is also – or once was – 1322 33ʳᵈ Avenue, Greeley, Colorado 80634, the Harte residence. Peaceful, jointly and severally with Harte, Tranquil and Serenity, received $3.5 million from SunState, comprising monies belonging

5

to SunState's defrauded investors, some or all of which was used by Peaceful as Harte/Reserve's alter-ego to purchase property in Colorado known as the Redstone Castle Parcel in cash without returning any consideration or value to SunState.

11.     Defendant Tranquil is a Colorado limited liability company whose members and directors are Harte, Debbie Harte and Schmidt. Tranquil is and at all relevant times was controlled by Harte. Tranquil's address is – or once was – 1322 33rd Avenue, Greeley, Colorado 80634, the Harte residence. Tranquil, jointly and severally with Harte, Peaceful and Serenity, received \$3.5 million from SunState, comprising monies belonging to SunState's defrauded investors, some or all of which was used by Tranquil as Harte/Reserve's alter-ego to purchase property in Colorado known as the Redstone Castle Parcel in cash without returning any consideration or value to SunState.

12.     Defendant Serenity is a Colorado limited liability company whose members and directors are Harte, Debbie Harte and Schmidt. Serenity is and at all relevant times was controlled by Harte. Serenity's address is – or once was – 1322 33rd Avenue, Greeley, Colorado 80634, the Harte residence. Serenity, jointly and severally with Harte, Peaceful and Tranquil, received \$3.5 million from SunState, comprising monies belonging to SunState's defrauded investors, some or all of which was used by Serenity as Harte/Reserve's alter-ego to purchase property in Colorado known as the Redstone Castle Parcel in cash without returning any consideration or value to SunState.

13.     This Court has personal jurisdiction over the defendants pursuant to section 48.193(1)(a), Florida Statutes, because they, as alter egos of Harte/Reserve, transacted business in and out of Florida through their agent – SunState; the Receiver's claims arise

6

out of Harte/Reserve's business activities in Florida; and Harte/Reserve consented to jurisdiction here in their written agreements with SunState.

## ORDER APPOINTING RECEIVER

14.     The Order Appointing Receiver found that the declarations and other evidence filed by the Securities and Exchange Commission ("SEC") established, *prima facie*, "violations of the federal securities laws by SunState." (Order Appointing Receiver at p.1.) Such findings have since been confirmed in Consent Orders of Preliminary and Permanent Injunctions. As a result, this Court appointed the Receiver to, among other things, "[t]ake immediate possession of all SunState's property ... wherever situated ..." (Receivership Order at p.2.)

15.     The Order Appointing Receiver granted the Receiver various powers, including but not limited to the specific power to "institute such actions and legal proceedings ... as the Receiver deems necessary [to recover] transfers of monies or other proceeds directly or indirectly traceable from investors in SunState ... [including actions for] recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, et. seq. or otherwise ..." (Receivership Order Appointing at p. 2.) The claims alleged herein all seek to recover money and property "directly or indirectly traceable from investors in SunState" pursuant to the Receivership Order. The claims alleged herein are thus specifically contemplated by the terms of the Receivership Order.

## OVERVIEW OF SUNSTATE'S SCHEME

16.     The SEC's filings in the Fraud Action charge SunState with violating various federal securities laws in connection with the sale securities to the general public in the

7

form of investment contracts. Pursuant to the scheme, SunState represented to investors that their money would be used by SunState's "trading teams" to trade in foreign currency markets. SunState also represented to investors that they would be creating segregated accounts for each investor.

17. In reality, however, SunState was pooling all funds it received from investors and using such funds to pay earlier investors, to purchase undisclosed assets such as luxury homes and cars, and to handsomely compensate the SunState brokers that were bringing money to the fraudulent scheme. Specifically, of the approximately $54 million raised by SunState in 18 months, SunState transferred an estimated $10.6 million to its brokers, more than 20% of the entire funds raised by SunState. Also, only a small fraction of the $54 million raised by SunState – approximately $11 million – was actually traded in foreign currency. In short, SunState was operating as a classic Ponzi scheme.

## OVERVIEW OF RESERVE'S SCHEME

Reserve, like SunState, was also operating an investment firm and soliciting money from investors. Reserve, like SunState, may also have been operating as a Ponzi scheme. Since the filing of the Receiver's initial complaint against Peaceful, Tranquil and Serenity, two cases by former Reserve investors have been filed against (among others) Harte, Reserve and the LLCs. Copies of the complaints are attached as Composite Exhibit "C."

18. The complaints allege that Harte (along with his wife and Schmidt, [collectively, "the Colorado Defendants"]) perpetrated an intricate fraudulent scheme on investors by which they induced the investors to transfer significant funds to Reserve's account at Bank One of Colorado-Greeley.

8

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.

19.    Interestingly, the Colorado Defendants allegedly issued a Cooperative Private Placement Agreement ("PPA") not unlike SunState's Foreign Exchange Commission Agreement ("FEC Agreement"). In this document, Harte and Schmidt purported to act as "Trust Representatives" in the Reserve Foundation Trust – an offshore investment vehicle for the PPA. As in SunState's FEC Agreement, the PPA also integrated international credit rules in this offshore entity.

22.    Reserve's investors allege that they were misled by the Colorado Defendants into believing that their funds would be used as collateral for margin trading. This is also similar to SunState's representations that investor funds would be used for foreign exchange currency trading. Reserve, like SunState, was formed in the latter part of 1999. By the Summer of 2000, Reserve had raised approximately $19 million from investors.

## HARTE PURCHASES PROPERTY WITH SUNSTATE INVESTOR FUNDS

23.    On April 1, 2000, at an auction held at the St. Regis Hotel in Aspen, Colorado, Harte was the successful bidder on the purchase of the Redstone Castle for $6 million. Debbie Harte, Harte's wife, thereafter stated that she and her husband had been interested in owning the castle for over a year. Harte apparently advised Reserve's investors that the funds for this purchase came from the directors' share of Reserve's profits. As set forth more fully below, however, a significant portion of the funds for this purchase came from SunState's defrauded investors.

24.    On April 3, 2000, Harte reported to the Aspen Daily News that he "works for an off-shore investment company." The company to which he referred was Tranquil. Harte also represented that Tranquil Options owns wellness centers in Canada and Australia and

9

several restaurants in New York. At the time of these statements, Tranquil did not even exist.

25.     On April 14, 2000, SunState transmitted correspondence which purported to acknowledge receipt (i) of a $6 million investment from Reserve, and (ii) a notarized agreement to engage in business with SunState, including a signed Power of Attorney designating SunState as Reserve's agent for business operations of Florida.[3]

26.     On May 14, 2000, *Harte* instructed John Hyland at SunState ("Hyland") to wire $3.5 million to an account in Colorado for use in the Colorado real estate transaction by the *LLC*s.[4]

27.     On May 15, 2000, Harte sent two wires to a title company in Aspen: $2,164,737.03 directly from Reserve's account at Bank One and $3.5 million from SunState.

28.     On May 15, 2000, the newly incorporated LLCs, which had the apparent purpose of serving as holding companies for this purchase only, closed on the purchase of the Redstone Castle with SunState investor monies filtered through Harte's many alter ego, shell companies.

---

[3] The FEC Agreement between Harte/Reserve and SunState was notarized by Peggy Patterson, a defendant in the SEC's Fraud Action. Patterson has not provided testimony regarding her involvement with SunState; instead, she has asserted her Fifth Amendment right against self-incrimination.

[4] Hyland is also a defendant in the SEC's fraud action. Hyland has also not provided testimony regarding his involvement with SunState and has also asserted his Fifth Amendment right against self-incrimination.

## HARTE, RESERVE AND THE THREE LLCS ARE ALTER-EGOS OF EACH OTHER

29.     Harte (along with his wife and Schmidt) managed and directed Reserve, Tranquil, Peaceful and Serenity. All four entities operated out of Harte's residence in Greeley, Colorado.

30.     Harte controlled the funds and financial statements for Reserve. Harte also controlled the funds and financial statements of the LLCs.

31.     Harte was the signatory on Reserve's contract with SunState (which also included a forum selection clause in favor of Florida). Harte, working with Hyland, also orchestrated the transfer of funds from Reserve to SunState, from SunState to the Colorado title company, and then from the Colorado title company to the three LLCs.

32.     Harte bid at auction for the Redstone Castle more than a month before the closing on the property by the LLCs. Curiously, he won this property at the auction before the LLCs had even been formed and before Reserve "invested" with SunState. Thus, the right to buy the land was secured by Harte individually; the money for this purchase was moved under Harte's directions from Reserve to SunState to the title company; and the land was ultimately deeded to the newly-created LLCs.

33.     The Redstone Castle, which was purchased in part with SunState investors' funds, is presently being put to personal use by Debbie Harte, a manager and director of the LLCs, as a residence for her and her children.

34.     The LLCs had no separate assets or identity; perhaps only their names (which are themselves synonyms of each other.) Each LLC owned an adjacent sub-plot from the entire estate known as the Redstone Castle.

11

Case No. 01-8566-CIV-RYSKAMP

35.    All three LLCs were incorporated on the same date – May 3, 2000: (i) one
month and two days *AFTER* Harte acquired the property at an auction; (ii) one month
*AFTER* Harte told reporters he worked at a then non-existent Tranquil; (iii) nearly one
month after Reserve's "investment" with SunState; and (iv) twelve days before having to
close on the Redstone Castle.

36.    In short, Harte, Reserve, and the LLCs were one in the same with
inseparable assets, identity, and viability, and were completely devoid of any valid business
purpose except to act as financial conduits of Harte and to conceal the movement of
investors' monies.

37.    Harte/Reserve, and the LLCs as their alter-egos, purposefully engaged
SunState, a corporation formed, headquartered, and operating exclusively out of Florida,
to serve as their agent. Accordingly, Harte himself and as his alter-egos subjected all of
the defendants to Florida. In addition, Harte/Reserve and the LLCs also willingly
consented to a severable and independently enforceable forum selection clause in favor
of Florida.

## HARTE'S DIVERSION OF $3.5 MILLION OF SUNSTATE INVESTOR MONEY

38.    On May 14, 2000, Harte instructed Hyland of SunState to wire $3.5 million
comprising SunState's investors' funds to Aspen Title Corporation ("Aspen Title") in Denver
for the purchase of the Redstone Castle.

39.    Aspen Title, as title and/or escrow agent of Harte/Reserve, received the $3.5
million on May 16, 2000 for the benefit of the LLCs.

40.    Harte then utilized the monies held in this account to pay a substantial portion

12

of the purchase price for the Redstone Castle. It is crucial, however, to note how the origins of these fraudulently transferred funds were concealed by Harte: SunState investor funds were commingled with Reserve investor funds and then used to pay for property ultimately deeded to and closed on by Harte's newly-formed LLCs – his alter-egos. Attached hereto as **Composite Exhibit "D"** is a May 14, 2000 fax memo from Harte to Hyland at SunState requesting that SunState immediately wire $3.5 million for use in the Colorado real estate transaction; a May 15, 2000 fax memo from Harte to Aspen Title inquiring as to whether the $3.5 million from SunState was received for the closing; and a copy of the wire transfer report reflecting that the monies were, in fact, transferred by SunState as per Harte's request for the anticipated real property purchase.

41.     The $3.5 million transferred from SunState was utilized for the purchase of one or a combination of the following three real property parcels located at 58 Redstone Blvd., Redstone, Colorado 81623, in the names of the three LLCs as follows:

(i)     Purchase of the Redstone Castle Parcel by Tranquil for $4,000,000 (attached hereto as **Exhibit "E"** is a copy of the warranty deed);

(ii)     Purchase of the Redstone Castle Carriage House Parcel by Peaceful for $1,440,000.00 (attached hereto as **Exhibit "F"** is a copy of the warranty deed); and

(iii)     Purchase of the Redstone Castle Barn/Stable Parcel by Serenity for $560,000.00 (attached hereto as **Exhibit "G"** is a copy of the warranty deed);

(Collectively, the "Colorado real property").

42.     As reflected by **Exhibit "H,"** the prior deeds of trust recorded against the Colorado real property in the amount of $4,744,889.54 were paid off by Tranquil at the time of the purchase on May 16, 2000.

13

43.     It is also important to note that Harte maintained constant control over the transfer of these investor funds: Harte sent the monies to SunState; Harte ordered the return of funds from SunState; Harte instructed Hyland that the funds from SunState were to go into Aspen Title's account for the benefit of the LLCs; and Harte ultimately, in the names of the LLCs, closed on the property initially secured by him individually. Harte, the common denominator as to all these transfers, purposefully diverted SunState's investors' funds into the Aspen Title account: a common pot of fraudulently transferred monies collected through the concerted efforts of apparently *two*, cross-country Ponzi schemes.

44.     Armed with the foregoing information and as authorized by this Court, on June 14, 2001, the Receiver caused the filing in the Pitkin County, Colorado land records office of a certified copy of this Court's Order dated June 8, 2001 (Filing/Reception No. 455464) a copy of which is attached hereto as **Exhibit "I,"** in order to preserve the SunState Receivership's interest in the Colorado real property without its further transfer or encumbrance.

45.     The Court's June 8, 2001 Order finds that the underlying motion established, *prima facie*, that the SunState Receivership estate has an interest in the Colorado real property.

46.     Given the foregoing set of facts as substantiated by the attached exhibits, it is inequitable for Harte, Reserve, and/or the three LLCs to reap the benefit of millions of dollars derived from SunState's defrauded investors, for use in the purchase of the Colorado real property, without any consideration or value of any kind returned to SunState by the three LLCs, the recipient of the transfers.

14

Case No. 01-8566-CIV-RYSKAMP

## Count I
## Fraudulent Transfer

47.     The Receiver realleges and reincorporates paragraphs 1 through 46 above as if fully set forth herein.

48.     This is a claim to avoid and recover a fraudulent transfer pursuant to sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against the defendants.

49.     SunState transferred $3.5 million for use by the defendants, which the defendants in fact used, to purchase the Colorado real property.

50.     At the time of the transfer, SunState was operating as a classic *Ponzi* scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because SunState was operating as a *Ponzi* scheme, it was *de facto* insolvent.

51.     The defendants did not have good faith or pay reasonably equivalent value in exchange for SunState's transfer of $3.5 million, which the defendants used to pay a substantial portion of the purchase price for the Colorado real property. The $3.5 million transferred by SunState to the defendants comprised monies belonging to SunState's defrauded investors.

52.     As a direct and proximate result of SunState's $3.5 million transfer to the Defendants, the SunState receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of SunState are insufficient to pay SunState's liabilities.

53.     Accordingly, the transfer of $3.5 million to the Defendants is avoidable

15

Case No. 01-8566-CIV-RYSKAMP

pursuant to Chapter 726, Florida Statutes.

## Count II
## Conversion

54.     The Receiver realleges and reincorporates paragraphs 1 through 46 above as if fully set forth herein.

55.     This is a claim for conversion against the defendants.

56.     SunState, on behalf of its legitimate investors, collectively owned the $3.5 million that SunState wired to Aspen Title for use by the defendants to purchase the Colorado real property.

57.     The Defendants wrongfully exercised dominion and control over the $3.5 million, to the detriment of, and inconsistent with, SunState's ownership rights thereto, when the defendants used the funds to purchase the Colorado real property at the closing on or about May 16, 2000 and took title to said property.

58.     The defendants were not authorized by the SunState to assert any control over, manage or dispose of the $3.5 million and, notwithstanding, the defendants have wrongfully and permanently deprived SunState of its property.

## Count III
## Unjust Enrichment

59.     The Receiver realleges and reincorporates paragraphs 1 through 46 above as if fully set forth herein.

60.     This is an equitable claim of unjust enrichment against the defendants.

61.     SunState conferred a substantial benefit on the defendants; namely, SunState transferred $3.5 million, consisting of SunState investors' funds, to the

16

defendants for the defendants' use in purchasing the Colorado real property.

62.     The defendants knew or should have known that SunState wrongfully and unjustifiably transferred $3.5 million of its funds derived from defrauded investors for the defendants' use in purchasing the Colorado real property. Notwithstanding, the defendants voluntarily accepted and retained the $3.5 million transferred to them by SunState.

63.     In receiving and utilizing the $3.5 million, the defendants have unjustly retained a benefit to the detriment of the SunState Receivership estate.

64.     It is inherently unfair and inequitable that the defendants be able to retain the benefit of receiving $3.5 million of SunState funds derived from its defrauded investors for use in the purchase of the Colorado real property titled only in the LLCs' names without paying value to the defrauded SunState investors for use of their $3.5 million to acquire the Colorado real property. Accordingly, equity dictates that the defendants return to the SunState Receivership estate, the $3.5 million they received to acquire the Colorado real property.

65.     In addition, as a direct and proximate result of the defendants' retention and use of the $3.5 million, the SunState Receivership estate has been diminished.

## Count IV
## Constructive Trust

66.     The Receiver realleges and reincorporates paragraphs 1 through 46 above as if fully set forth herein.

67.     This is a claim for imposition of a constructive trust on the Colorado real property titled in the names of the defendants.

17

Case No. 01-8566-CIV-RYSKAMP

68.     The Defendants have acted unconscionably and wrongfully in obtaining legal title to the Colorado real property by virtue of their knowledge that they received and used $3.5 million derived from defrauded SunState investors to purchase the Colorado real property, and gave no consideration or value whatsoever in return to the SunState investors; rather, the defendants converted the funds derived from defrauded SunState investors and took title to the Colorado real property solely in the LLCs' names.

69.     The LLCs' obtained title to the Colorado real property by converting investor monies derived from defrauded SunState investors for their own use, gain and benefit, to the detriment of, and substantial loss to, the SunState Receivership.

70.     The defendants have no legitimate claim to the $3.5 million derived from defrauded SunState investors; rather, the defendants knew or should have known when they received said funds that they comprised funds derived from SunState investors and that such property had been misappropriated.

71.     As a direct and proximate result of the defendants' unconscionable conduct, the defendants have been unjustly enriched by retaining and using funds derived from defrauded SunState investors for their own benefit. Accordingly, equity dictates that the LLCs hold title to the Colorado real property as trustee, in constructive trust for the SunState Receivership.

### Count V
### Equitable Lien

72.     Plaintiff realleges and reincorporates paragraphs 1 through 46 above as if fully set forth herein.

18

TEW CARDENAS REBAK KELLOGG LEHMAN DeMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor 201 South Biscayne Boulevard Miami Florida

73. This is a claim for imposition of an equitable lien on the Colorado real property titled in the names of the LLC.

74. As per the conduct described above, the Defendants have wrongfully deprived SunState investors of their assets and failed to provide any consideration for said assets.

75. The defendants, in receiving and retaining the $3.5 million transfer comprising funds derived from defrauded SunState investors to and for their own benefit, have unjustly retained a benefit to the detriment of the SunState Receivership.

76. The defendants' retention of $3.5 million violates fundamental principles of justice, equity and good conscience.

77. The defendants are not bona fide purchasers of the Colorado real property.

78. As a direct and proximate result of the defendants' conduct, the defendants have been unjustly enriched by retaining the $3.5 million and the Colorado real property. Accordingly, the Receiver should be granted an equitable lien on the Colorado real property on behalf of the SunState Receivership.

**WHEREFORE**, David M. Levine, not individually, but solely in his capacity as Receiver for SunState FX, Inc., demands judgment as follows:

A. ·Setting aside the transfer of $3.5 million, directly or indirectly, including through the Colorado real property to the Defendants, and, if necessary, imposing a constructive trust and/or an equitable lien on any funds or assets traceable to such transfer;

B. Entering a money judgment against the Defendants, jointly and severally, in

19

Case No. 01-8566-CIV-RYSKAMP

the amount of the transfer ($3.5 million) to them, together with interest thereon from the date of the transfer;

  C. Entering a money judgment against the Defendants, jointly and severally, in the amount of SunState investor assets ($3.5 million) converted by them, together with interest from the date of the conversion;

  D. Entering a money judgment against the Defendants, jointly and severally, in the amount of their unjust enrichment in retaining $3.5 million of SunState investor assets, together with interest from the date of that they were unjustly enriched by said retention;

  E. Imposing a constructive trust on the Colorado real property and/or entering a judgment authorizing the Receiver to initiate legal proceedings in the State of Colorado to foreclose on the Colorado real property based on the Receivership estate's interest in and entitlement to a constructive trust on the Colorado real property;

  F. Imposing an equitable lien on the Colorado real property and/or a judgment authorizing the Receiver to initiate legal proceedings in the State of Colorado to foreclose on the Colorado real property based on the Receivership estate's interest in and entitlement to an equitable lien on the Colorado real property;

  G. Entering a money judgment against the Defendants, jointly and severally, for the costs of this action; and

  H. Providing such other and further relief as the Court deems just and appropriate.

20

Case No. 01-8566-CIV-RYSKAMP

Dated: November ___13___, 2001.

Respectfully submitted,

TEW CARDENAS REBAK KELLOGG LEHMAN
DEMARIA TAGUE RAYMOND & LEVINE, LLP
Attorneys for the Receiver
Miami Center, Suite 2600
201 So. Biscayne Boulevard
Miami, Florida 33131-4336
Telephone: (305) 536-1112
Facsimile: (305) 536-1116

By: _____
Jeffrey C. Schneider, Esq.
Florida Bar No. 933244
Michelle T. Visiedo-Hidalgo, Esq.
Bar Number Pending

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via U.S. Mail on this ___13th___ day of November, 2001, upon **Gregory L. Denes, Esq.,** Campbell, Denes & Brown, 6100 S.W. 76th Street, Miami, FL 33143.

By: _____
Jeffrey C. Schneider, Esq.

::ODMA\MHODMA\Miami:276767;1
version 1

21

# FOREIGN EXCHANGE AGREEMENT

This Agreement is made as of _____, 2000 between SunState FX Inc., One Royal Palm Place, 1877 South Federal Highway, Suite 308, Boca Raton, FL 33432 (SFI)
and_____(Customer).

## RECITALS

A. Whereas, from time to time Customer and SFI may enter into various forward and spot foreign exchange contracts.

B. Whereas, the Agreement does not evidence a commitment of either Customer or SFI to enter into foreign exchange contracts generally or to enter into any specific foreign exchange contracts.

C. NOW, THEREFORE, SFI AND Customer agree as follows:

1. Offsets If, at any one time, two or more outstanding foreign exchange contracts require the delivery on the same date at the same place of the same currencies, including U.S. dollars, by each of SFI and Customer to the other, then the obligations shall be immediately offset and the net amount of said offset shall be paid without further action by either party. All payments due hereunder shall be made on the date when due in immediately available funds to SFI or to Customer as the case may be, in accordance with its instructions.

2. Conditions to SFI Performance All foreign exchange contracts and this agreement shall be integrated as a single contract and it shall be a condition for the payment of any amount or the delivery of any foreign currency by SFI with respect to any specific foreign exchange contract that Customer not be in breach or, or default under, any obligation to hereunder.

3. Limits SFI shall have the right to set limits on the number of foreign exchange contracts SFI will transact or carry for Customer, as set forth in Appendix A, attached hereto. SFI reserves the right, exercisable at any time in its sole discretion, to refuse acceptance of any Customer order to establish new contract positions.

4. Margin As security for the Customer's obligations under any foreign exchange contract and this Agreement, the Customer shall at all time maintain collateral with SFI as required form time to time by SFI in its sole and absolute discretion.

5. Limit on Liability SFI shall not be liable for any loss suffered by Customer as a result of Customer's foreign exchange transactions, except to the extent that any such loss arises out of SFI gross negligence in the performance of its duties hereunder.

1


EXHIBIT

B

6.     <u>Covenants and Representations of Customer</u>  If Customer is a corporation or partnership, then, prior to entering into the first foreign exchange contract Customer will deliver to SFI a corporate resolution or a certificate of partnership in form and substance satisfactory to SFI evidencing Customer's authority to enter foreign exchange contracts and to enter into this agreement. SFI may also require such additional evidence of Customer's authority to enter into this agreement as SFI may in its sole opinion deem necessary.  Customer represents, warrants, and agrees that it has authority to enter into foreign exchange contracts and this Agreement with SFI, and that the person who has executed this Agreement in the name and on behalf of the Customer has been duly authorized by the Board of Directors of the Customer if the Customer is a corporation or pursuant to Customer's partnership agreement if the Customer is a partnership, to execute this Agreement and to designate from time to time the individuals who are authorized to transact any foreign exchange business with SFI in the name on behalf of the Customer.  SFI shall be entitled to rely conclusively and without inquiry on the designation of such individuals as being fully authorized to transact any foreign exchange business with SFI in the name and on behalf of the Customer.

Customer represents and warrants that is a sophisticated investor and is aware of the risks of foreign exchange trading and is financially able to bear any risk and meet any obligation associated with such trading.

7.     <u>Customer's Default</u>  "Event of Default" means the occurrence of any one or more of the following events:

    a.     Customer fails to observe or perform any of its obligations hereunder or under any foreign exchange contracts;

    b.     Customer breaches any representations, warranty, or covenant in this Agreement or under any of the instruments or Agreements with SFI;

    c.     Customer's death, insolvency, failure in business, dissolution, winding up, the failure generally of Customer to pay its debts as they mature, general assignment for the benefit of Customer's creditors, filing any petition in bankruptcy or for relief under the provisions of the bankruptcy code, as the same may be amended from time to time, of, by or against Customer of any co maker, accommodation maker, surely, or guarantor of the Customer, or entry of such an order for relief.

8.     <u>Remedies</u> without prejudice to any other rights or remedies which SFI may have, if any event of Default shall occur, SFI shall be entitled at any time:

    a.     To suspend performance of its obligations to Customer, whether hereunder, under any foreign exchange contract or otherwise;

    b.     To declare all foreign exchange contracts, interest, and any other amounts which are payable by Customer to SFI to be immediately due and payable;

<u>2</u>

c.   Without notice to customer, to close out any or all foreign exchange contracts or positions of Customer with SFI; and

d.   SFI shall not be under any obligation to exercise any such rights or remedies or to exercise them at a time or in a manner beneficial to Customer. Customer shall be liable for any amounts remaining owed to SFI after exercise of any such rights and remedies.

e.   If Customer fails to pay any amount when due, then interest will be charged on such amount until payment in full as made, at SFI's "prime rate" in effect from time to time plus 2 ½% per annum. The term "prime rate" shall mean the rate of interest established by SFI from time as its "prime rate", and such term shall not be construed to mean SFI best or most favorable rate.

9.   <u>Confirmation</u>  Upon entering into a foreign exchange contract with the Customer, SFI shall verbally confirm the terms and shall send the customer written confirmation specifying the amount of foreign currency bought or sold by the customer against U.S. dollars or another foreign currency the exchange rate and the date on which the foreign currency is to be delivered.

10.   <u>Governing Law and Jurisdiction</u>  This agreement shall be governed by the law of the state of Florida without giving effect to the conflict of law principles thereof, and the Customer agree to submit to the jurisdiction of the courts of Palm Beach County and State of Florida and of the U.S. for the Southern District of Florida. If SFI is required to retain an attorney to collect any amount due hereunder, the Customer will pay SFI all cost of collection, including reasonable attorney's fees.

IN WITNESS WHEREOF the parties have caused this Agreement to be executed on the date set forth above.

SFI

Peggy L. Patterson
Commission # CC 892191
Expires Dec. 2, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

By: _____
By: _____

By: _____
By: _____

_Reserve Foundation LLC_
Name of Customer

_____
Name of Customer

3

## POWER OF ATTORNEY
## POWER OF ATTORNEY LIMITED TO PURCHASES AND SALES OF
## FOREIGN EXCHANGE

The undersigned hereby authorizes SUNSTATE FX INC. as his/her agent and attorney in fact to buy, sell and trade foreign currencies in accordance with SFI terms and conditions as stated in the foreign exchange customer agreement forms of the undersigned's account and risk and in the undersigned's name of SFI books. The undersigned hereby agrees to indemnify and hold SFI harmless from and pay SFI promptly on demand of any and all losses arising there from or debit balance due thereon.

In all such purchases, sales or trades SFI is authorized to follow the instructions of the aforesaid agent in every respect concerning the undersigned's account with SFI and he/she is authorized to act for the undersigned or in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales and trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades.

The undersigned hereby ratifies and confirms any and all transactions with SFI heretofore or hereafter made by the aforesaid agent for the undersigned's account.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights that may or may have under any other agreement or agreements between the undersigned and SFI.

This authorization and indemnity is a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to SFI and delivered to its office at 1877 S. Federal Hwy, Suite 308, Boca Raton, Fl. 33432. Such revocation shall not affect a liability in any way resulting from transactions initiated prior to such revocation. This authorization and indemnity shall enure to the benefit of SFI and of any successors or assigns. The undersigned acknowledges that throughout this document SUNSTATE FX INC. is referred to as SFI.

The undersigned acknowledges that the attorney is acting on behalf of the undersigned.

_____          4/13/00
Customer Signature                Date

_____          4/13/00
Customer Signature                Date

<u>4</u>

## APPENDIX A

**Account Number:** $01- 0400 - 2021- 100$

**Authorized Persons:**
Leon Harte
Peter Moss

**Phone Number:**
970- 356- 0340   office
970- 371- 0538   call
917- 330- 8929   Peter *
**Contract/Trading Limit:**

$10\%$

**Comments:**

We intend to be aggresive, without being
insane.

5

# Customer Agreement Signature Form

**I have read and understand the contents of this Agreement and I do read English. Customer(s) hereby acknowledge reading and understanding the provisions of the Customer Agreement and agree to abide by those provisions.**

Customer Signature

Date 4/13/00

Customer Signature

Date 4/13/00

If this is a joint account it shall be with/without (check one) rights of survivorship.

## DEPOSIT INSTRUCTIONS

1) Make check payable to SunState FX Inc. Please write your account number on the memo part of the check.

### OR

2) To wire Funds to SunState FX Inc. please use the following instructions:

Send Wire to:    SunState FX Inc.
First Union National Bank
975 South Federal Highway
Boca Raton, FL 33432
ABA No. 063-000-021

SunState FX Inc. *Customer Segregated Funds* Account No. 9983650918

<u>6</u>

# SunState FX Inc.
## Rebate And Fee Acknowledgment

SunState FX Inc. confirms that all prices quoted to the client in relation to any unspecified contract amount is inclusive of SFI's rebate. Although, SFI may charge various fees for services, including, but not limited to: bank/dealer fees, statement fees, wire transfer fees and transfer fees. The cost of these fees may vary from time to time or may be added, without notice to Customer. The only fee, which will not be changed, unless agreed upon by the Customer, is the rebate fee because it is inclusive of the contract price.

SFI receives two pips in and two pips out on any offset position.

The U.S. Dollar amount of one pip varies because
1) of currency traded,
2) of dollar amount traded, and
3) amount of extended credit to client.

Your Broker will inform you about the credit SFI will extend to you as well as the dollar value of one pip.

Customer's receipt of statements from SFI showing all other fees charged is the Customer's notification of those charges. Any questions or disputes regarding those charges must be brought to the attention of SFI either by telephone or in writing, within five days of the statement date. Otherwise, Customer agrees to those charges as correct.

Personal checks require clearance before you can trade on those funds. T-Bills, certified checks, cashiers checks and money orders are considered cleared funds, which allow you to begin trading your account immediately.

All instruments are payable to SunState FX Inc.

Please indicate your acceptance of the terms of this notice by signing in the space(s) indicated below. Please notify SunState FX Inc. or your broker immediately if you have any questions.

_____  4/13/00
SIGNATURE                          DATE

_____  4/13/00
SIGNATURE                          DATE

Reserve  Foundation  LLC
ACCOUNT NAME

01-0400-2021-100
ACCOUNT NO.

7

## SunState Fx Inc.
# RISK DISCLOSURE DOCUMENT

SunState FX Inc. would like to inform all of our clients of the risks that are inherent in trading the Foreign Currency Markets. This is an important issue that must be addressed so that you have a clear understanding of the investment vehicle. Any questions regarding risk can be directed toward your SunState Forex broker.

1. The Global foreign exchange markets can be volatile.

2. The Global foreign exchange markets can fluctuate rapidly, creating instability in your portfolio.

3. Each Global foreign exchange transaction carries with it a commission charge.

4. All funds in your account should be discretionary capital set aside strictly for speculative purposes.

5. All funds used for this type of spending should only be disposable income and loss of part or all of this money would not affect your lifestyle.

6. The purchaser of an option is limited to the premium paid and commissions/fees.

I understand the risks involved in trading the Foreign Currency Markets and I am willing and able to participate in these markets.

_Leon Harte_
Name

_Peter Moss_
Name

1322    33rd Ave    Greeley                 Co.        80634
Address                     City                        State      Zip Code

Signature                                    Date   4/13/00

Signature                                    Date

8

## SunState Fx Inc.
## Risk Disclosure Customer Signature

**I have read and understand this document and I do read English. I hereby acknowledge that I have received and understand this risk disclosure statement.**

_____

Signature of Customer 1

4/13/00

Date

_____

Signature of Customer 2

4/13/00

Date

**I have read and understand this document and I do read English. I hereby acknowledge that I am to abide by this Arbitration Agreement.**

_____

Signature of Customer 1

4/13/00

Date

_____

Signature of Customer 2

4/13/00

Date

2

# SunState Fx Inc.

## Fee Rider

The purchases of all options carry a $200.00 round turn commission.

There are no additional fees for selling etc.



_____
**Print name here**

_____
**Signature**

_____
**Date**

_____
**Print name here**

_____
**Signature**

_____
**Date**

10

Name _Reserve_ _Foundation_, _LLC_

Address _1322_  _32nd_  _Ave_  City _Greeley_  State _CO_  Zip _80634_

**Warning**

Unless you complete EITHER the W-9 or the W-8 Sections. i.e. you fail to furnish us with the correct taxpayer identification number or an exemption certificate as a "Foreign Person." we must generally withhold 20% of withdrawals and payments from your account. if this account is exempt from REPORTING on Form 1099-B Section.

| | | |
|---|---|---|
| **W-9 Section**<br><br>Payer's<br>Request<br><br>for<br>Identification<br>Number | **Part I** — For United States Citizens. Legal Entities or Residents. Taxpayer Identification Number. For most individual taxpayers. the taxpayer identification number is the social security number. NOTICE: For individual. joint. custodian and sole proprietorship the social security number is to be used.<br><br>Social Security No.<br><br>Employer ID No. _84 - 1532054_ | **Part II** — Initial the box if you are NOT subject to backup withholding under the provisions of section 3406 (a) (1) (C) of the Internal Revenue Code.<br><br>Initial Here<br><br>_∅_ |

**OR** (in the middle of the Part I / Part II row)

**W-8 Section**                    **OR**

Foreign Person Exemption:  Initial here_____ if this is the account of an EXEMPT FOREIGN PERSON meeting each of the following requirements:
1. You are neither a citizen nor a resident of the United States;
2. You have not been nor plan to be in the U.S. for a period aggregating 183 or more days during the calendar year; and
3. You do not expect to engage in trade or business in the United States with respect to which any gain derived from transactions effected by the broker during that calendar year is effectively connected.

If your mailing address is within the United States, please provide your non-United States address below:

Name_____

Street_____

City_____Country_____

---

**1099-B   CERTIFICATE OF EXEMPTION FROM REPORTING OF SECURITIES AND COMMODITIES TRANSACTIONS**

Please complete this section if this account is exempt from the Internal Revenue Service regulations which require a FCM report of the account's Commodity and Security transactions on Form 1099-B.

Check category under which exemption is claimed;  **Foreign Persons – Complete W-8 Above.**

| | |
|---|---|
| Corporation, Domestic<br>Corporation, Foreign<br>Tax Exempt Entity. Section 501(a)<br>Foreign Person, SEE W-9 SECTION ABOVE<br>Individual Retirement Plan | Trusts taxed as Corporation<br>Bank Common Trust<br>Entity registered under the Investment<br>Company Act of 1940<br>Real Estate Investment Trust<br>Other_____ |

---

**CERTIFICATION**   Under the penalties of perjury, I certify that the information provided on this form is true, correct, and complete Sections W-9 or W-8 and 1099 – B (if applicable).

Signature _Lion Vault_                        Date_ 4/13/00_

**CUSTOMER ACCOUNT APPLICATION**
Reserve Foundation LLC

**ACCOUNT NO.** 0-0400-2021-100

| CUSTOMER 1 | CUSTOMER 2 (COMPLETE FOR JOINT, PARTNER ACCOUNTS) |
|---|---|
| **NAME** S.S.# Reserve Foundation, LLC | **NAME** S.S.# |
| **ADDRESS** 1322 33rd Ave. | **ADDRESS** |
| **CITY** Greeley **STATE** CO **ZIP** 80634 | **CITY** **STATE** **ZIP** |
| **EMPLOYER** N/A | **EMPLOYER** |
| **ADDRESS** N/A | **ADDRESS** |
| **CITY** N/A **STATE** **ZIP** | **CITY** **STATE** **ZIP** |
| **HOME PHONE** 970-356-0340 Leon **BUS. PHONE** 917-370-8929 Feb | **HOME PHONE** **BUS. PHONE** |
| **CELLULAR PHONE/BEEPER** 970-371-0538 **FAX** 970-356-2876 | **CELLULAR PHONE/BEEPER** **FAX** |
| **DOB** **CITIZENSHIP** **#OF DEPENDENTS** **MARITAL STATUS** N/A | **DOB** **CITIZENSHIP** **#OF DEPENDENTS** **MARITAL STATUS** |

| ANNUAL INCOME | ANNUAL INCOME |
|---|---|
| ☐ under $50,000   ☐ $50,000 TO $100,000 ☐ $101,000 TO 250,000   ☒ OVER $250,000 | ☐ $25,000 TO $50,000   ☐ $50,000 TO $75,000 ☐ $75,000 TO 100,000   ☐ OVER $100,000 |
| **NET WORTH (EXCLUSIVE OF RESIDENCE)** | **NET WORTH (EXCLUSIVE OF RESIDENCE)** |
| ☐ $50,000 TO $100,000   ☐ $100,000 TO $250,000 ☐ $250,000 TO $500,000   ☒ OVER $500,000 | ☐ UNDER $100,000   ☐ $100,000 TO $500,000 ☐ $500,000 TO $5,000,000   ☐ OVER $5,000,000 |

**INVESTMENT EXPERIENCE**

| | LAST TYPE | TRANSACTIONS PER YEAR | AVERAGE TRANSACTION PER YEAR | YEARS OF EXPERIENCE | DATE OF LAST TRANSACTION |
|---|---|---|---|---|---|
| **STOCKS** | 30 | 1,000,000 | 15 | 3/15/00 |
| **BONDS** | 1000's | 100,000,000 | 31 | 4/12/00 |
| **FUTURES** | | | | |
| **OPTIONS** | | | | |
| **FOREX** | 4 | 250,000 | 5 | 4/19/00 |

**BANKING INFORMATION**

| **BANK** Bank One | **PHONE NO.** 970-392-3223 |
|---|---|
| **ADDRESS** 822 7th St. | Greeley Co 80631 |
| **BRANCH** | **BANK REPRESENTATIVE** Bryan Guest |
| **ACCOUNT TYPE** ☒ CHECKING ☐ SAVINGS ☐ OTHER | |
| **ACCOUNT NO.** 119236 2547 | **ACCOUNT NAME/TITLE** Reserve Foundation LLC | **ABA/ROUTING NO.** 102001017 |

| TYPE OF TRADING | TYPE OF ACCOUNT | INITIAL DEPOSIT TO ACCOUNT |
|---|---|---|
| ☒ SPECULATIVE ☐ HEDGE (SUBMIT SEPARATE HEDGE DESIGNATION FORM) | ☐ INDIVIDUAL   ☐ JOINT   ☐ PARTNERSHIP ☒ CORPORATE   ☐ TRUST   ☐ I.R.A. | $ 6,000,000 ☒ |

SIGNATURE CUSTOMER 1 _____   DATE 4/13/00

SIGNATURE CUSTOMER 2 _____   DATE 4/13/00

rev/4-5-00/IVKH

12

OPP-13-2000  14:22

| | |
|---|---|
| **DISTRICT COURT, PITKIN COUNTY, COLORADO**<br>Court Address: **506 East Main Street**<br>Aspen, Colorado 81611<br>(970) 925-7635 | |
| **Plaintiff:** CYNTHIA S. LANGE, on behalf of herself and all similarly situated parties<br><br>**v.**<br><br>**Defendants:** LEON F. HARTE, in his individual and representative capacities; DEBBIE A. HARTE, in her individual and representative capacities; NORMAN E. SCHMIDT, in his individual and representative capacities; THE RESERVE FOUNDATION TRUST; RESERVE FOUNDATION, LLC, a Colorado limited liability company; TRANQUIL OPTIONS, LLC, a Colorado limited liability company; PEACEFUL OPTIONS, LLC, a Colorado limited liability company; and SERENTY OPTIONS, LLC, a Colorado limited liability company. | Δ   **COURT USE ONLY**   Δ |
| **Attorney:** Peter W. Thomas<br>**Atty. Reg. No.:** 27657<br>**Firm Name:** Petersen, Thomas & Slade, PLLC<br>**Address:** 434 East Cooper Avenue<br>Aspen, Colorado 81611<br>**Phone Number:** (970) 544-0898<br>**Fax Number:** (970) 544-0916<br>**E-Mail:** _Peterthirty-nineColorado-Lawyers.net_ | Case Number: 2001 CV _113_<br><br><br>Division: _1_   Courtroom: |
| **CLASS ACTION COMPLAINT** | |

Plaintiff, CYNTHIA S. LANGE, by and through her counsel, PETERSEN, THOMAS & SLADE, P.L.L.C., brings her complaint as a class action, pursuant to C.R.C.P. 23(a), (b)(1), and (b)(3) on behalf of a class consisting of herself and all similarly defrauded investors, averring and alleging as follows:

## I. THE PARTIES

1.      Plaintiff Cynthia S. Lange (hereinafter "Ms. Lange") is an individual currently residing in Parker, Colorado. Ms. Lange was at all times relevant to this complaint the Resort Manager of the Redstone Castle in Pitkin County, Colorado and employed by defendant Tranquil Options, LLC.

2.      Defendant Leon F. Harte (hereinafter "Harte") is an individual residing in Pitkin County, Colorado. Harte is and at all times relevant to this complaint was a member/manager of defendants Tranquil Options, LLC, Peaceful Options, LLC, Serenity Options, LLC, and Reserve



EXHIBIT
C

Foundation, LLC. Harte also at all times relevant to this complaint exercised substantial control over offshore defendant The Reserve Foundation Trust.

3.    Defendant Debbie A. Harte (hereinafter "Mrs. Harte") is an individual residing in Pitkin County, Colorado. Mrs. Harte is and at all times relevant to this complaint was a member/manager of defendants Tranquil Options, LLC, Peaceful Options, LLC, Serenity Options, LLC, and Reserve Foundation, LLC.

4.    Defendant Norman L. Schmidt (hereinafter "Schmidt") is an individual residing in Pitkin County, Colorado. Schmidt is and at all times relevant to this complaint was a member/manager of defendants Tranquil Options, LLC, Peaceful Options, LLC, Serenity Options, LLC, and Reserve Foundation, LLC. Schmidt also at all times relevant to this complaint exercised substantial control over offshore defendant The Reserve Foundation Trust.

5.    Defendant The Reserve Foundation Trust (hereinafter "The Trust") is, upon information and belief, a partnership duly organized under the laws St. Vincent's and the Grenadines, with its principal place of business located at 97 Granby Street, Kingstown. The Trust was organized for the purpose of purchasing, selling and holding securities for the benefit of its investors, and at all times relevant to this complaint was controlled by defendants Harte and Schmidt. The Trust does not possess a certificate of authority to transact business within the State of Colorado.

6.    Defendant Reserve Foundation, LLC (hereinafter "Reserve Foundation") is a limited liability company duly organized under the laws of the State of Colorado, with its principal place of business located at 550 E. 12th Avenue, Suite 1805, Denver, Colorado 80203. The Reserve Foundation was formed for the purpose of serving as the initial investment vehicle to perpetrate the fraudulent investment scheme detailed herein.

7.    Defendant Tranquil Options, LLC is a limited liability company duly organized under the laws of the State of Colorado, with its principal place of business located at 1322 33rd Street, Greeley, Colorado 80634. Tranquil Options is and at all times relevant to this complaint was a title owner of the Redstone Castle in Pitkin County from which it conducted the fraudulent investment scheme detailed herein.

8.    Defendant Peaceful Options, LLC is a limited liability company duly organized under the laws of the State of Colorado, with its principal place of business located at 2150 W. 29th Avenue, Ste. 130, Denver, Colorado 80211. Peaceful Options is and at all times relevant to this complaint was a title owner of the Redstone Castle in Pitkin County from which it conducted the fraudulent investment scheme detailed herein.

9.    Defendant Serenity Options, LLC is a limited liability company duly organized under the laws of the State of Colorado, with its principal place of business located at 2150 W. 29th Avenue, Ste. 130, Denver, Colorado 80211. Serenity Options is and at all times relevant to this complaint was a title owner of the Redstone Castle in Pitkin County from which it conducted the fraudulent investment scheme detailed herein.

## II. JURISDICTION AND VENUE

10.     This Court properly may exercise personal jurisdiction over non-resident defendant The Reserve Foundation Trust predicated upon Colorado's long-arm statute, C.R.S. § 13-1-124 *et seq.*, by virtue of The Trust's having purposefully availed itself of the privilege of conducting business within the State of Colorado through soliciting multiple investors within the state that ultimately resulted in economic damages to Colorado residents.

11.     Venue is proper in this Court pursuant to Rule 98(c), C.R.C.P.

## III. FACTS

### A. GENERAL ALLEGATIONS

12.     Sometime in 1999 or early 2000, defendants Harte and Schmidt conspired to engage in a securities fraud and criminal racketeering scheme by which they would lure individuals to "invest" money with them under the auspice that the funds would be deposited with various United States and international banks for leveraged margin trading of U.S. Treasury Bonds.

13.     In furtherance of this scheme and conspiracy, defendants issued a "Cooperative Private Placement Agreement" (hereinafter the "PPA") setting forth the terms of the purported offering. In an apparent effort to lend an air of legitimacy to the document, defendants laced the PPA with obscure references to international credit rules and an exotic offshore entity. The Reserve Foundation Trust claimed to be the offshore investment vehicle for the PPA, with Harte and Schmidt acting as "Trust Representatives."

14.     Defendants began actively soliciting prospective investors in January or February of 2000, instructing all new investors to wire monies to Account No. 1192362547 with Bank One in Greeley, Colorado. The account is and was held under the name of defendant Reserve Foundation, LLC.

15.     Defendants falsely promised investors both orally and in writing through the PPA that investor funds would "be used to buy, sell, lease or trade, on a loss free pre-sale basis, in medium term notes and other banking and governmental financial instruments to the mutual benefit of Party A and the 'Trust' as designated by the Trader and the Trading Bank." This was a lie. Investor monies were never used for any such purpose, but were instead fraudulently transferred to other corporate entities established and controlled by defendants in furtherance of their scheme to convert and misappropriate investor funds for defendants' own use and enjoyment.

16.     Defendants falsely promised investors both orally and in writing through the PPA a return yield to the investor of not less than 50% monthly. This was a lie. Individuals' investments have yielded no return whatsoever.

17.     Defendants falsely represented to investors both orally and in writing through the

-3-

PPA that the initial principal was fully secured through insurance policies issued by Lloyds of London. This was a lie. The investments were never insured by or through Lloyds of London.

18. Defendants falsely represented to investors both orally and in writing through the PPA that investors could withdraw their initial principal at any time upon 30-day written notice to the Trust. This was a lie. Defendants have failed and refused to return the initial principal to any investor, despite the investor having providing the required notice.

19. Within months, defendants had conned countless investors out of millions of dollars, all of which was wired directly into the above-identified bank account. Defendants utilized intrastate and interstate wire communications to facilitate this scheme.

20. On Sunday, April 1, 2000, at an auction held at the St. Regis hotel in Aspen, defendants Harte purchased the historic Redstone Castle located at 58 Redstone Blvd. in Redstone, Colorado for six million dollars cash. Debbie Harte disclosed at that time that she and her husband had been interested in owning the Castle for over a year.

21. Defendants used investor monies fraudulently transferred out of Reserve Foundation, LLC to purchase the Castle.

22. Harte reported to the Aspen Daily News, in a feature article on April 3, 2000, that he "works for an offshore investment company called Tranquil Options. Tranquil Options owns wellness centers in Canada and Australia. The company also owns several restaurants in New York." But in fact, Tranquil Options did not even exist at that time.

23. It wasn't until two days later, on April 5, 2000, that Harte and Schmidt organized defendant Tranquil Options, LLC. On May 3, 2000, Harte and Schmidt then organized defendants Peaceful Options, LLC and Serenity Options, LLC. Harte and Schmidt formed these companies with the apparent purpose of serving as holding companies for the Redstone Castle and other personalty and real estate acquired with investor monies laundered through defendants' various companies and investment vehicles.

24. The Redstone Castle sale closed on May 15, 2000. Harte and Schmidt fraudulently transferred investor monies from Reserve Foundation to new accounts opened for Tranquil Options, Peaceful Options, and Serenity Options for purposes of this closing.

25. Defendants then recorded warranty deeds with the Pitkin County Clerk and Recorder's Office in favor of defendants Tranquil Options for $4,000,000.00, Peaceful Options for $1,440,000.00, and Serenity Options for $560,000.00.

26. Plaintiff, meanwhile, had served as the Resort Manager for the Redstone Castle since 1986. Upon defendants' acquisition of the Castle, she became employed by Tranquil Options, LLC. Through her position, she became acquaintances with Harte and Schmidt.

27. Over the next two months, between June and July, 2000, defendants built a relationship of trust and confidence with Ms. Lange, encouraging her, as they did with other

investors, to purchase into The Trust.

28.     Defendants continued to make false representations to Plaintiff and other prospective investors that an investment in The Trust was 100% secured through an insurance policy issued through Lloyds of London and that The Trust guaranteed not less than a fifty percent monthly return on the investment.

29.     Near the end of July, Harte even represented to Ms. Lange that she "would never have to work again" if she invested in The Trust.

30.     Defendants impliedly represented that the securities were being offered as a private offering exempt under Regulation D from registration under the Securities Act of 1933 or the Colorado Securities Act of 1990. Defendants wholly omitted to state this material fact in connection with the offering, however.

31.     Defendants also knowingly and intentionally failed to register with the Colorado Securities Exchange Commission to serve as financial advisors to The Trust or managers of The Trust. They were required to register with the Colorado Securities Commission.

32.     Ms. Lange is an unsophisticated investor who did not have the knowledge or experience in financial matters to be capable of evaluating the merits and risks of the prospective investment in The Trust.

33.     On August 1, 2000, in reliance upon defendants' false oral assurances to her and in reliance upon the false representations in the PPA, Ms. Lange executed a wire transfer of $50,000.00 to the same Colorado bank account still held under the auspice of Reserve Foundation.

34.     Around October, 2000, Plaintiff began to get suspicious when she still had received no return on her investment. She began to question to defendants, who continued to instill in her false trust and confidence that The Trust was a legitimate and lucrative investment vehicle.

35.     But upon information and belief, defendants had again illegally converted and misappropriated Plaintiff's investment, as with all other investors' monies, to defendants' own use and enjoyment, including the purchase of personalty and fixtures at the Castle.

36.     In November, Plaintiff gave formal written demand for the immediate return of her investment. On November 28, 2000, defendants, through The Trust, sent to Plaintiff by email directions to execute an attached document purporting to be a "Release" admitting that "clients have been misled" and that investors "deserve prompt return of their Private Placement amounts." Defendants falsely promised in writing in the "Release" that upon execution of the form, Plaintiff's funds immediately would be returned. Plaintiff signed and returned the form consistent with their instructions. Nonetheless, defendants continue to refuse to return Plaintiff's investment monies.

## B. CLASS ACTION ALLEGATIONS

37.   The prerequisites to class certification under C.R.C.P. 23(a) are met in that:

   (a)   Defendants conned numerous individual and business investors from the United
         States, Canada, England, and possibly other countries. Consequently, we believe
         the class is so numerous and geographically disperse that joinder of all members
         is impracticable;

   (b)   There are questions of law and fact common to all class members including, but
         limited to, whether defendants engaged in a pattern of racketeering activities
         proscribed by the Colorado Organized Crime Control Act, whether defendants
         made fraudulent misrepresentations in the PPA, whether defendants actions
         constitute securities fraud under the Colorado Blue Sky Act, whether defendants
         were engaged in a civil conspiracy, and whether defendants laundered investor
         monies through Colorado companies to effect the purchase of the Redstone
         Castle and other real estate and personalty.

   (c)   The claims of the representative party are typical of those in the class; and

   (d)   The representative party has the requisite personal interest in the outcome of this
         action and will fairly and adequately protect the interests of the class.

   38.   A class action is properly maintained pursuant to C.R.C.P. 26(b)(1) in that the
defense and prosecution of separate actions by individual members of the class would create a
risk of inconsistent or varying adjudications with respect to defendants' liability for securities
fraud and racketeering, a risk that is further heightened if such actions are brought in different
states or even countries where uncertain choice of law issues could result in inconsistent
adjudications and remedies adversely affecting other defrauded investors.

   39.   A class action also is properly maintained pursuant to C.R.C.P. 26(b)(3). There
are questions of law and fact common to all class members that predominate over any questions
affecting only individual class members, making a class action superior to the fair and efficient
adjudication of the controversy.

## IV. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
### (Colorado Organized Crime Control Act, C.R.S. § 18-17-104(1))

   40.   Plaintiff incorporates herein by reference the allegations of Paragraphs one
through and including thirty-nine, as if fully set forth herein.

   41.   Defendants are a group of persons associated in fact who conspired together
towards a common plan or enterprise to defraud investors pursuant to the scheme as detailed

-6-

above.

42.    Defendants engaged in multiple acts of fraud and securities offenses involving the same enterprise directed against numerous investors through a continuing and open-ended pattern of racketeering activity.

43.    Defendants directly and indirectly received proceeds in the form of investor monies from their pattern of racketeering activity.

44.    Defendants fraudulently diverted these investment monies to their own use and benefit to acquire title, interest and equity in real property, personalty, fixtures, and improvements in real property situate in Pitkin County and elsewhere.

45.    Defendants' conduct was the direct and proximate cause of economic damages to Plaintiff in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
### (Colorado Organized Crime Control Act, C.R.S. § 18-17-104(3))

46.    Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine, as if fully set forth herein.

47.    Defendants are a group of individuals associated in fact who conspired together towards a common plan or enterprise to defraud investors pursuant to the scheme as detailed above.

48.    Defendants engaged in multiple acts of fraud and securities offenses involving the same enterprise directed against numerous investors, constituting a pattern of racketeering activity.

49.    Defendants directly and indirectly received proceeds from this pattern of racketeering activity to acquire title, interest and equity in real property, personalty, fixtures, and improvements in real property situate in Pitkin County and elsewhere.

50.    Defendants' conduct was the direct and proximate cause of economic damages to Plaintiff in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Securities Fraud, C.R.S. § 11-51-604 *et seq.*)

51.    Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine, as if fully set forth herein.

52.    Ms. Lange is an unsophisticated investor and inexperienced individual purchaser of securities.

53.     Defendants knowingly and intentionally made misleading statements or omissions of material fact, and employed devices, schemes and artifice in connection with the purchase or sale of securities with the intent to deceive, manipulate or defraud Ms. Lange and other investors.

54.     Ms. Lange and others reasonably relied upon Defendants' misleading statements or omissions in entering the investment transactions.

55.     Defendants' conduct was the direct and proximate cause of economic damages to Ms. Lange and other investors in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Common Law Fraud)

56.     Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine as if fully set forth herein.

57.     Defendants made false and reckless representations of material fact to Ms. Lange as detailed above.

58.     Defendants intended that Ms. Lange rely on their representations.

59.     Plaintiff reasonably and justifiably relied to her detriment upon defendants' representations

60.     Defendants representations were false and they never intended to comply with any of their promises and obligations as set forth in the PPA.

61.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has been damaged in an amount to be proven at trial.

62.     Defendants' conduct was attended by willful and wanton disregard for the rights and interests of Ms. Lange and other investors, entitling them to recover punitive damages pursuant to statute.

## FIFTH CLAIM FOR RELIEF
### (Intentional Misrepresentation)

63.     Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine, as if fully set forth herein.

64.     Defendants knowingly or recklessly made false representations of material fact to Ms. Lange with the intent that Ms. Lange rely upon their representations.

65.     Ms. Lange reasonably relied to her detriment upon defendants' representations.

66.     Defendants' intentional misrepresentations are the direct and proximate cause of

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

79.     Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine, as if fully set forth herein.       .

80.     Defendants owed Ms. Lange and other investors a fiduciary duty related to their representations related to The Trust and a fiduciary duty in safeguarding individuals' investments.

81.     Defendants breached that fiduciary duty by lying to Plaintiff about the legitimacy of The Trust, lying to Plaintiff about the investments' lucrative potential, and by stealing Ms. Lange's money.

82.     These breaches of fiduciary duty by Defendants are the direct and proximate cause of damages to Ms. Lange in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Breach of Contract)

83.     Plaintiff incorporates herein by reference the allegations of Paragraphs one through and including thirty-nine, as if fully set forth herein.

84.     Plaintiff and Defendants entered a contractual relationship under which Defendants owed certain duties and obligations to Ms. Lange. The contract was supported by valuable consideration.

85.     Defendants' actions as set forth herein constitute breach of contract.

86.     These breaches of contract by Defendants are the direct and proximate cause of damages to Ms. Lange in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
### (Promissory Estoppel)

87.     Plaintiff incorporates by reference all of the above paragraphs as if fully set forth herein.

88.     Defendants made certain promises to Plaintiff, as set forth herein.

89.     Defendants should reasonably have expected and in fact did anticipate that their promises would induce Plaintiff to invest money with them.

90.     Plaintiff reasonably relied to her detriment upon defendants' promises by investing considerable money in their purported investment plan.

Dated: June 1, 2001.

Respectfully submitted.

PETERSEN, THOMAS & SLADE, P.L.L.C.

By Peter W. Thomas, Jr., No 27657
434 East Cooper Avenue
Aspen, Colorado 81611
(970) 544-0898

*Attorneys for Plaintiff*