Attachment

19

1   DISTRICT COURT, PITKIN COUNTY, STATE OF COLORADO

2   Case No. 01-DR-1, Division A

3   _____

4   **DEPOSITION OF LEON HARTE**   COPY

5   January 29, 2002

6   _____

7   In re the Marriage of:

8   DEBBIE A. HARTE,

9         Petitioner,

10   and

11   LEON F. HARTE,

12         Respondent.

13   _____

14

15                **A P P E A R A N C E S**

16

17   FOR THE PETITIONER:         TED GARDENSWARTZ, ESQ.
                                 Oates, Knezevich
18                               & Gardenswartz, PC
                                 533 East Hopkins Avenue
19                               Third Floor
                                 Aspen, Colorado 81611
20

21   FOR THE RESPONDENT:         GARY N. HERBERT, ESQ.
                                 2150 West 29th Avenue
22                               Suite 130
                                 Denver, Colorado 80211
23

24   ALSO PRESENT:              CYNTHIA TESTER, ESQ.
                                 Beattie & Chadwick
25

2

1        Deposition of LEON HARTE, the Respondent herein,
2  called by Petitioner in the above-entitled matter on Tuesday, the
3  29th day of January, 2002, commencing at the hour of 9:25 a.m.,
4  at 533 East Hopkins Avenue, Aspen, Colorado, before ELIZABETH M.
5  WHITTON, Registered Professional Reporter and Notary Public
6  within and for the State of Colorado; said deposition being taken
7  pursuant to Notice and the Colorado Rules of Civil Procedure.
8        Petitioner is present, appearing by telephone.
9
10                    INDEX
11                                                Page
12  Examination by Mr. Gardenswartz                4
13
14                    EXHIBITS
15  Exhibit No.                        Initial Reference
16
17  1 - Respondent's Answers to Interrogatories          40
18  2 - Respondent's Financial Affidavit                 57
19  3 - Tranquil Options, LLC Operating Agreement        75
20  4 - 8/7/00 $250,000 Business Loan Agreement          82
21  5 - Tranquil Options, LLC Balance Sheet              83
22  6 - May 2000 Warranty Deed                           85
23  7 - 5/16/00 Deed of Trust                            88
24  8 - 7/26/00 Deed of Trust                            94
25

3

1              INDEX OF EXHIBITS (continued)
2
3  Exhibit No.                        Initial Reference
4
5  9 - 8/4/00 Warranty Deed                            104
6  10 - Reserve Foundation, LLC Minutes of Org Meeting 105
7  11 - $25,000 Loan Application                       106
8  12 - 12/7/01 letter to Harte, Schmidt from Goldberg 112
9  13 - 12/7/01 letter from Goldberg re: offshore bank 113
10  14 - 11/9/00 Wire Transfer Notice                  114
11  15 - American Eagle Industries Articles of Org.     119
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1                  PROCEEDINGS
2                    LEON HARTE,
3  being first duly sworn, was examined and testified as follows:
4                    EXAMINATION
5  BY MR. GARDENSWARTZ:
6      Q   Would you state your name for the record, please.
7      A   Leon Harte.
8      Q   And Mr. Harte, what is your current address?
9      A   550 East 12th Avenue, Apartment 1805 Denver,
10  Colorado 80203.
11     Q   And how long have you lived at that address?
12     A   Since October of 2000.
13     Q   Do you rent or own it?
14     A   Neither. It's my partner's place; I stay with him.
15     Q   Who is your partner?
16     A   Norm Schmidt.
17     Q   Do you pay Mr. Schmidt any rent?
18     A   When I can.
19     Q   How much do you pay him?
20     A   Whatever whenever I can.
21     Q   Do you have a lease agreement with him?
22     A   No.
23     Q   Prior to living on 12th Avenue, where did you live?
24     A   68 Redstone Boulevard Redstone, Colorado.
25     Q   Mr. Harte, have you ever had your deposition taken

5

1  before?
2      A   No.
3      Q   Have you ever testified before?
4      A   No, not to my knowledge. I've had traffic tickets
5  and traffic violations, so I testified in them, but not in a
6  deposition type setting, no.
7      Q   I'm sure you've discussed the ground rules with
8  your attorney, but fundamentally, I'm going to ask questions. If
9  at any point in time you don't understand my question, be sure
10  and let me know, and I'll try to repeat it or rephrase it or make
11  it more intelligible for you.
12     A   Okay.
13     Q   It's also important that you let me finish my
14  question even though you may know what I'm going to ask, and I
15  will try to let you finish your answer even though I know what
16  you may say, because the court reporter can only take down one of
17  us talking at a time.
18         It's also important that you verbalize your
19  responses: "yes," "no," because she can't interpret "uh-huhs" or
20  "huh-uhs" or nods of your head, things like that.
21         If at any point in time you don't understand my
22  question, be sure and let me know.
23         Is there any reason that you cannot sit here and
24  truthfully and honestly answer questions?
25     A   No.

0401837

6

1    Q    Are you on any type of medication?
2    A    No.
3    Q    Do you have any questions about the deposition
4  procedure?
5    A    No.
6    Q    You do understand that you are under oath?
7    A    Yes.
8    Q    Are you currently employed?
9    A    No.
10   Q    When were you last employed?
11   A    Last time I had a paycheck on a regular basis was
12  when I lived in Greeley, Colorado; 1998.
13   Q    And who was that employer?
14   A    Deals on Wheels.
15   Q    And what type of compensation were you earning at
16  Deals on Wheels?
17   A    I was a car salesman on commission; anything from
18  2,000 a month up to 4,000 a month, in that range.
19   Q    Have you received any compensation from any source
20  whatsoever since you left Deals on Wheels in 1998?
21   A    I've had some loans from the Reserve Foundation,
22  L.L.C. corporation I'm involved with.
23   Q    Tell me about those loans.
24   A    Let's see. I believe I got about $113,000 in loans
25  from them. I'm a member of the L.L.C.

7

1    Q    When did you obtain your first loan from Reserve
2  Foundation, L.L.C.?
3    A    January of 2000.
4    Q    How much did you receive at that time?
5    A    I took floating loans over a year and a half
6  period, maybe a thousand one day, two thousand, four thousand,
7  five. It varied.
8    Q    Is there any documentation of these loans?
9    A    Just the withdrawals from the bank; checks made out
10  to me, yeah.
11   Q    Who would make out the checks?
12   A    I would.
13   Q    Who would sign the checks?
14   A    I would.
15   Q    How would you make the checks payable?
16   A    To Leon Harte.
17   Q    How do you know they're loans?
18   A    Because I know.
19   Q    Is there a promissory note?
20   A    Yeah.
21   Q    That's what I was asking; my question is is there
22  any documentation there would be loans?
23   A    Yes, there is.
24   Q    What sort of promissory note do you have?
25   A    I got a promissory note from the corporation to

8

1  myself in the year 2000.
2    Q    And have you produced that in this case?
3    A    No, I have not.
4    Q    Why not?
5    A    I don't know.
6    Q    What was the date of the note?
7    A    I don't know off the top of my head.
8    Q    Approximately?
9    A    Would have been towards the end of the year 2000.
10  Would have been December of 2000 sometime.
11   Q    If I understood your previous testimony, you
12  started getting money in January of 2000.
13   A    Uh-huh.
14   Q    Correct?
15   A    Uh-huh.
16   Q    You need to answer yes or no.
17   A    Yes, sir.
18   Q    And that promissory note that you just referred to
19  wasn't drafted until the end of the year 2000?
20   A    That's correct.
21   Q    So why was there not a promissory note when you
22  started taking out the funds?
23   A    Weak bookkeeping. I don't know, I didn't make a
24  note every time I took money out of the corporation.
25   Q    How many promissory notes do you have with Reserve

9

1  Foundation?
2    A    Just one at the end of the year.
3    Q    How much was that note for?
4    A    One hundred thirteen thousand dollars.
5    Q    How did you arrive at that figure?
6    A    Checks made out to me personally from the
7  corporation.
8    Q    In the year 2000, do I understand, then, that you
9  received $113,000 from Reserve Foundation, L.L.C.?
10   A    Correct.
11   Q    Have you received any money from Reserve
12  Foundation, L.L.C. in the year 2001?
13   A    No.
14   Q    How about year 2000 -- sorry, 1999?
15   A    No.
16   Q    How did you live between 1998 when you left Deals
17  on Wheels and you started receiving money from Reserve Foundation
18  the year 2000? What was your source of income?
19   A    Didn't really have one.
20   Q    What did you live on?
21   A    My wife had a good job, and I had a friend borrow
22  me some money to help me along.
23   Q    Who was that friend?
24   A    Norm Schmidt.
25   Q    Did he lend you money or give it to you?

0401838

10

| 1 | A | He actually just gave it to me. |
|---|---|---|
| 2 | Q | How much did he give you? |
| 3 | A | It was minimal. |
| 4 | Q | I don't know what that means. |
| 5 | A | I really don't have an idea, but 5- or $10,000. I |
| 6 | don't know. | |
| 7 | Q | Who were the owners of Reserve Foundation, L.L.C.? |
| 8 | A | Two members. It's an L.L.C. Leon Harte and Norm |
| 9 | Schmidt, 50/50. | |
| 10 | Q | When was Reserve Foundation, L.L.C. formed? |
| 11 | A | January 2000. |
| 12 | Q | What was the purpose of that L.L.C.? What is the |
| 13 | purpose of that L.L.C.? | |
| 14 | A | Handle investment capital for investors. |
| 15 | Q | What is your role? |
| 16 | A | I'm one of the members. |
| 17 | Q | What do you do for Reserve Foundation, L.L.C.? |
| 18 | A | Nothing anymore. |
| 19 | Q | When was the last time you performed any services |
| 20 | for Reserve Foundation, L.L.C.? | |
| 21 | A | Good question. Actually, I just don't perform any |
| 22 | services. We're in litigation and things like that, so |
| 23 | technically . . . | |
| 24 | Q | What sort of services are you currently performing? |
| 25 | A | Nothing but litigation. |

11

| 1 | | MR. HERBERT: Can we go off the record a minute? |
|---|---|---|
| 2 | Can he and I confer a minute? | |
| 3 | | MR. GARDENSWARTZ: Sure. |
| 4 | | (A break was taken from 9:47 a.m. until 9:55 a.m.) |
| 5 | A | Litigation is the only thing. We're trying to |
| 6 | clean up the Reserve Foundation, L.L.C. and liquidate it. |
| 7 | Q | (By Mr. Gardenswartz) Starting when Reserve |
| 8 | Foundation, L.L.C. was originally formed to the present, tell me |
| 9 | what services you have performed for that entity. |
| 10 | A | I did pretty much everything for Reserve |
| 11 | Foundation, L.L.C. | |
| 12 | Q | Tell me what that means. |
| 13 | A | The checking accounts, bookkeeping, handling the |
| 14 | funds. | |
| 15 | Q | What is the business of Reserve Foundation, L.L.C.? |
| 16 | A | Reserve foundation, L.L.C. was an investment arm of |
| 17 | a trust out of Saint Vincent and the Grenadines called Reserve |
| 18 | Foundation Trust. | |
| 19 | Q | Let's go backwards. Reserve Foundation Trust is a |
| 20 | foreign corporation, correct? | |
| 21 | A | Correct. |
| 22 | Q | In what country? |
| 23 | A | Saint Vincent and the Grenadines. |
| 24 | Q | And when was that corporation formed? |
| 25 | A | Give or take a couple months, probably June of |

12

| 1 | 1999. It was in 1999, I believe. | |
|---|---|---|
| 2 | Q | Who formed that corporation? |
| 3 | A | I was one of the originators that helped set it up. |
| 4 | Q | Who else? |
| 5 | A | Norm Schmidt. |
| 6 | Q | Anyone else? |
| 7 | A | The only two in the U.S. and trustees and lawyers |
| 8 | out of Saint Vincent and the Grenadines. |
| 9 | Q | You, Norm Schmidt, and trustees and lawyers from |
| 10 | the Grenadines formed the corporation? |
| 11 | A | Saint Vincent. It's not a corporation, it's a |
| 12 | trust. | |
| 13 | Q | Formed that trust? |
| 14 | A | Correct. |
| 15 | Q | Who were the trustees? |
| 16 | A | There was only ever one trustee; I can't think of |
| 17 | his name right now. |
| 18 | | MR. HERBERT: The institutional trustee? |
| 19 | | THE DEPONENT: Yeah. |
| 20 | | MR. GARDENSWARTZ: Who is it? |
| 21 | | MR. HERBERT: We have the name, but -- |
| 22 | A | I don't know it off the top of my head, Ted. I'm |
| 23 | sorry. | |
| 24 | Q | (By Mr. Gardenswartz) You don't know the name of |
| 25 | the trustee? | |

13

| 1 | A | He's not there anymore. |
|---|---|---|
| 2 | Q | Who's the current trustee? |
| 3 | A | There isn't one. |
| 4 | Q | Who are the current beneficiaries? |
| 5 | A | There aren't any. |
| 6 | Q | Were there ever any beneficiaries? |
| 7 | A | Originally when we started it in 1999 there were |
| 8 | two beneficiaries: Leon Harte, Norm Schmidt. Both were included |
| 9 | in the original trust documents; both of them were excluded in |
| 10 | December of 1999 because laws changed about offshore trust in the |
| 11 | U.S. Oh, I said that wrong. Beneficiaries from the U.S. in |
| 12 | outside trusts -- in offshore trusts, the laws changed in 2000, |
| 13 | so it was changed in December of 1999. |
| 14 | Q | And as a result of that you formed reserve |
| 15 | foundation L.L.C. Is that part of the reason that was formed so |
| 16 | you could have a U.S. investment arm in this trust? |
| 17 | A | No. |
| 18 | Q | Why was it formed? |
| 19 | A | Strictly banking. |
| 20 | Q | And were there ever any investors in either Reserve |
| 21 | Foundation, L.L.C. or the Reserve Foundation Trust? |
| 22 | A | Yeah. |
| 23 | Q | Who were they? |
| 24 | A | The ones in -- the investors were all brought in |
| 25 | through the trust. |

14

1　　Q　　Who are they?
2　　A　　I can't divulge that. I won't.
3　　Q　　How many investors are there?
4　　A　　Belongs to the trust, sir. I can't divulge that.
5　I don't know.
6　　Q　　Do you know any of them?
7　　A　　Uh-huh.
8　　Q　　Tell me the ones you know.
9　　A　　No.
10　　Q　　What is the basis for your refusal to answer that?
11　　A　　It's an offshore corporation set up for privacy,
12 and I'm not going to divulge it.
13　　Q　　What are the assets of Reserve Foundation, L.L.C.?
14　　A　　Nothing.
15　　Q　　What are the assets of the Reserve Foundation
16 Trust?
17　　A　　Nothing. Nothing. There's investments through
18 Reserve Foundation, L.L.C..
19　　Q　　What are those investments?
20　　A　　There's loans to a restaurant chain in New York
21 City; loans to Tranquil Options, L.L.C.; Serenity Options,
22 L.L.C.; Peaceful Options L.L.C. There was a private loan made in
23 London to an individual; there were some other investments in the
24 U.S. that didn't pan too well that are gone already. There was a
25 $6 million investment made in the Sun States in Florida, that

15

1　they stole the million and a half the first month we were there.
2　　Q　　Are there documentation for each of these loans?
3　　A　　Yes.
4　　Q　　And have they been produced in discovery?
5　　A　　No.
6　　Q　　Why not?
7　　A　　What Reserve Foundation, L.L.C. did, some of the
8　loans directly -- which are on public record -- some of the loans
9　were done from associates to the trust overseas, which I don't
10 have the records of.
11　　Q　　Have you produced the ones that you have records
12 of?
13　　A　　Yes.
14　　Q　　Which one?
15　　A　　They're public record.
16　　Q　　Have you produced those in discovery? Not are they
17 public, have you produced them to us?
18　　A　　No, I guess not.
19　　Q　　And why not?
20　　A　　I have no idea. I don't know.
21　　Q　　It's not funny, Mr. Harte. I'm trying to get to
22 the bottom of what your assets are and where they are. I don't
23 think it's funny.
24　　A　　I don't know why we didn't produce them. I don't
25 know.

16

1　　Q　　How many of them are there that you have
2　documentation for?
3　　A　　Three loans for the three L.L.C.s in Pitkin County.
4　　Q　　Tranquil, Serenity and Peaceful?
5　　A　　Yes, sir.
6　　Q　　How are investment decisions made?
7　　A　　Every one was decided differently.
8　　Q　　Who makes the investment decisions?
9　　A　　Basically three people.
10　　Q　　And who are they?
11　　A　　Leon Harte, Norm Schmidt, and a gentleman out of
12 London by the name of Peter Moss as an advisor.
13　　Q　　Is Peter Moss involved in either the Reserve
14 Foundation Trust or the Reserve Foundation, L.L.C.?
15　　A　　He's not involved in the Reserve Foundation, L.L.C.
16 I'm not one hundred percent who is involved in the Reserve
17 Foundation Trust at this point.
18　　Q　　And what do you know about Peter Moss? What does
19 he do?
20　　A　　He's a friend and associate.
21　　Q　　What does he do for a living?
22　　A　　Works with banking instruments.
23　　Q　　What's his business?
24　　A　　Electrical engineer.
25　　Q　　And he assists you in making investment decisions?

17

1　　A　　Yes, sir.
2　　Q　　And how does he do that? Do the three of you meet?
3　Do you write letters? What do you do?
4　　A　　We talk on the phone a lot. I don't know, I
5　haven't seen him for a year.
6　　Q　　And how is he compensated?
7　　A　　Profits off the investments.
8　　Q　　How does that work?
9　　A　　We've never made a profit, so it hasn't worked yet.
10　　Q　　Do you have a written agreement with him?
11　　A　　No.
12　　Q　　Does anyone?
13　　A　　No.
14　　Q　　Do you have a written agreement?
15　　A　　No.
16　　Q　　Does Norm Schmidt have a written agreement?
17　　A　　No.
18　　Q　　How are you compensated?
19　　A　　I'm not unless we make money, and we haven't to
20 this point.
21　　Q　　On any of your investments?
22　　A　　None.
23　　Q　　You haven't made any money on any of the
24 investments?
25　　A　　No, sir.

18

1   Q   Have you personally invested any money?
2   A   No, sir.
3   Q   And how do you find investors?
4   A   I've never found an investor, they all come to me.
5   Q   And how do they know about you; do you advertise?
6   A   No advertising.
7   Q   How do they know about you; how do they find out?
8   A   Word of mouth.  I don't know.
9   Q   And how does that work?  Give me an example of how
10  it would work.
11  A   People hear about me and people call me from all
12  over the world.
13  Q   To do what?
14  A   Invest money for them.
15  Q·  And why do they do that?
16  A   Rumors, I guess.
17  Q   Well, you told me you never made any money on any
18  investment.
19  A   That's correct.
20  Q   So why would they go to you?  Why do they do that?
21  A   They're not coming to me anymore, are they?
22  Q   How did they come to you in the first place?
23  A   Rumors and innuendos.
24  Q   From whom?
25  A   Different people around the world.

19

1   Q   What sort of rumors?
2   A   Thought I had the magic touch there for a while.
3   Q   Why would that be?  What would give them that
4   impression?  What have you done that's been a magic touch?
5   A   Nothing.
6   Q   So why would they think that?  What rumor would let
7   them think that?
8   A   I've been studying a program of trading since 1989
9   that has yet to be successful.  We thought we had found the magic
10  wand a couple times.  We haven't yet.
11  Q   What is that program of investing?
12  A   It's a long story, but I'll shorten it for you.  It
13  was with a little political help buying deeply discounted notes
14  from a large corporation or banks and turning them in quick
15  process.
16  Q   Collection of promissory notes?
17  A   No, no, buying Triple A discount notes.
18  Q   And then doing what with them?
19  A   Selling them immediately.
20  Q   And how do you make money on that?
21  A   Difference in between the discount and sales price.
22  Q   And how long have you been doing that?
23  A   We've never done it successfully.  I've been trying
24  to do it since 1989.
25  Q   Have you ever bought any notes, discounted notes?

20

1   A   No, sir.
2   Q   Have you ever sold any?
3   A   No.
4   Q   So I don't understand what that has to do with
5   anything.  You've never done that; you have that idea; you've
6   never successfully or even unsuccessfully done it?
7   A   That's correct.
8   Q   Okay.  So let's go back to why somebody would come
9   to you.  What rumor or innuendo would they come to you for?
10  A   Because I thought we could do it, and we've never
11  accomplished it.
12  Q   Are these investors friends?
13  A   No.
14  Q   Acquaintances?
15  A   No.  I don't know any of them personally.
16  Q   In total, how much money has been invested in all
17  these investments you just enumerated for me?
18  A   The ones through the Reserve Foundation, L.L.C.
19  Q   You just enumerated there's a loan to a restaurant
20  chain in New York, loans to Tranquil, Serenity, Peaceful, an
21  individual in London, and loans to Sun State in Florida?
22  A   No loans to Sun State.  That was an investment.
23  Q   And loans to private people?  I'm trying to get an
24  idea how much has been invested.
25  A   Approximately $12 million.

21

1   Q   Who keeps track of the investments?
2   A   I do some of them.
3   Q   Which ones do you keep track of?
4   A   The three notes to the corporations here in
5   Colorado; another investment we made in Colorado that's already
6   went bankrupt.
7   Q   Which one was that?
8   A   A corporation called Entertech.
9   Q   Any others?
10  A   Not that I personally track, no.
11  Q   Any that Norm Schmidt tracks?
12  A   No.
13  Q   Who tracks the other ones?
14  A   The ones in London and New York City were done by
15  Peter Moss with our blessing.
16  Q   What does that mean?  What does "with your
17  blessing" mean?
18  A   We thought it was a good idea too.  It didn't work
19  out that way.
20  Q   What do you have at stake in any of these
21  investments?
22  A   Personally out of pocket?
23  Q   Yes.
24  A   Nothing.
25  Q   And how would you get compensated?

0401841



22

1    A    If the investments made money.
2    Q    And how? Do you get a percentage?
3    A    Yeah, but it's never been put in writing.
4    Q    What percentage do you get?
5    A    Never agreed upon.
6    Q    So you invested $12 million total in various
7    investments; you don't know where these investors came from and
8    you don't know what compensation you were to receive from any of
9    these investments; is that a fair summary?
10   A    No.
11   Q    Tell me what's unfair about that.
12   A    The investors invested under a contract called the
13   cooperative private placement agreement to go into a trading
14   program such as I described. There's offshore banking
15   capabilities that whatever investment we made in the U.S. could
16   be paired on a credit line overseas.
17   Q    How would that work?
18   A    I don't think it would at this point.
19   Q    How was it supposed to work?
20   A    Well, for example, the notes or the loans to the
21   three corporations: Serenity, Peaceful, Tranquil, those notes
22   could be used as an asset to leverage into a trading program.
23   Overseas note to the restaurant, same thing; note to Entertech,
24   which has since gone bankrupt, same thing. They were all viable
25   loans. It's paper.

23

1    Q    It's just a leverage scheme, you take one note and
2    try to leverage into something else and keep going?
3    A    I wouldn't call it a leverage scheme, but the notes
4    are leverageable, yes, semibankable, I guess you'd call them.
5    Q    Tell me about the cooperative private placement
6    agreements; do you have any of those?
7    A    Yeah.
8    Q    Have you produced any of those?
9    A    Cindy has them. She had them listed in all her
10   stuff.
11   Q    Any have you produced any of those in discovery?
12        THE DEPONENT: Did we produce any?
13        MR. HERBERT: I think so.
14   A    I thought we did.
15   Q    (By Mr. Gardenswartz) How many are there?
16   A    There's only one.
17   Q    Who are the parties to that one?
18   A    Well, there's only one cooperative private
19   placement agreement.
20   Q    Who are the parties to that agreement?
21   A    Nobody on the one we submitted. That belongs to
22   the trust; it's not mine.
23        MR. HERBERT: That's not what he asked.
24   Q    (By Mr. Gardenswartz) Who are the parties to the
25   agreement?

24

1    A    They're clients of the trust. I am not at liberty
2    to say.
3    Q    So one party is the trust, correct?
4    A    Correct.
5    Q    And that would be the Reserve Foundation Trust?
6    A    That's correct.
7    Q    And the other party would be various individuals?
8    A    Corporations or individuals or governments.
9    Q    And those individuals signed an agreement in which
10   they gave money to a trust?
11   A    Correct.
12   Q    And the trust then invested that money for these
13   individuals, correct?
14   A    That was the original theory, yes.
15   Q    And then theoretically what was supposed to happen?
16   A    They were supposed to go into a trading program
17   such as I described. That has not happened yet.
18   Q    So their money is sitting somewhere for these
19   individuals?
20   A    There's some invested in the notes that we have in
21   the United States, and there's some funds overseas, yeah.
22   Q    How much do you have in notes in the United States
23   that's invested?
24   A    Right now, viable notes?
25   Q    Viable, unviable; total.

25

1    A    Just the four I told you about.
2    Q    We have one to Tranquil, right?
3    A    One to Tranquil.
4    Q    How much is that one?
5    A    The whole place was bought for 6.3 million. It was
6    split up into three corporations; I don't know exactly what the
7    breakout is.
8    Q    How much is the Tranquil note?
9    A    I don't know.
10   Q    How about the Serenity note?
11   A    I don't know.
12   Q    How about the Peaceful note?
13   A    I don't know specifically; all three of them
14   together originally was 6.3 million. I don't have the exact
15   figure in front of me.
16   Q    Those are the only three notes you keep track of,
17   right? Isn't that what you told me earlier, that's your job,
18   those are the three you keep track of?
19   A    And I took track of the Sun State investment in
20   Florida, but they went broke also.
21   Q    So you keep track of four notes also; three of them
22   are viable: Serenity, Tranquil and Peaceful?
23   A    That's correct.
24   Q    And you don't know how much those notes are?
25   A    No, sir.

26

1  Q    Do you know if there have been any payments on
2  those notes?
3  A    None.
4  Q    How much was invested in Sun State?
5  A    Six million.
6  Q    Pursuant to a note?
7  A    No.
8  Q    How was that investment done?
9  A    It's a foreign exchange trading facility under
10 normal investment guidelines. They're SIP insured; just like a
11 stock brokerage account is all it was, except it was a foreign
12 exchange account.
13 Q    What's the status of that account?
14 A    The company went bankrupt shortly after taking us
15 for a million and a half dollars. Still in litigation. It's in
16 the trustees' hands at this point.
17       MR. HERBERT: Receiver's hands.
18 A    Receivership, okay.
19 Q    (By Mr. Gardenswartz) And what about the other
20 one, Entertech?
21 A    Entertech is gone.
22 Q    How much was invested in Entertech?
23 A    Eight hundred fifty thousand dollars.
24 Q    Where did that money go?
25 A    Went to a public corporation called Entertech, and

27

1  it's gone.
2  Q    Entertech no longer exists?
3  A    It's trading under OTC bulletin board and it's a
4  10th of a cent, but the corporation is nonfunctioning.
5  Q    To your knowledge has any money ever been paid to
6  Reserve Foundation Trust or Reserve Foundation, L.L.C. from any
7  of these investments?
8  A    No, none.
9  Q    Who keeps the books and records for the Reserve
10 Foundation Trust?
11 A    I don't know.
12 Q    Who keeps the books and records; you don't know or
13 you don't want to tell me?
14 A    I don't know.
15 Q    Who keeps them for the Reserve Foundation, L.L.C.?
16 A    I do.
17 Q    Where do you keep those books and records?
18 A    550 East 12th Avenue Denver, Colorado.
19 Q    Have you produced the books and records for Reserve
20 Foundation, L.L.C.?
21 A    Hasn't existed since June of 2000.
22 Q    Have you produced any of the records from June of
23 2000?
24 A    I don't think so.
25 Q    Why not?

28

1  A    I don't know.
2  Q    And why are there no books and records after June
3  of 2000?
4  A    Never any money.
5  Q    And what is the status of the promissory note?
6  A    Excuse me, I think is August of 2000.
7  Q    What is the status of the promissory notes?
8  A    None of them are active; none of them are paying.
9  Q    And have any of the investors taken any action as a
10 result of that?
11 A    Absolutely.
12 Q    Tell me about that.
13 A    Two lawsuits here in Pitkin County; one for $3.8
14 million, one for $50,000.
15 Q    Who were the parties to the one for 3.8?
16 A    I don't know any of them.
17 Q    Is that Peter Thomas working on that one?
18 A    Yeah. I don't know any of these people; they drove
19 on my property one time in my life, that's the only time I talked
20 to any of them.
21 Q    They claim to be the investors in --
22 A    Reserve Foundation Trust.
23 Q    And they claim to be owed $3.8 million?
24 A    That's correct.
25 Q    And what about the $50,000 lawsuit?

29

1  A    That was an individual that worked for me, and I
2  took the money on that one.
3  Q    Who is that?
4  A    Cyd Lang.
5  Q    And he claims to be owed $50,000 -- sorry, she
6  claims to be owed $50,000?
7  A    That's correct.
8  Q    By whom?
9  A    Reserve Foundation Trust. And she named every
10 corporation personally, Norm Schmidt personally.
11 Q    Who is she represented by?
12 A    I was just going to correct -- I misspoke awhile
13 ago when you said Peter Thomas I was referring to that one Peter
14 Thomas represents Cyd Lang, okay. Mara Kleinschmidt from Eagle
15 represents the Universal Synergy, et. al., is the other suit.
16 Q    And who are you represented by in those two
17 lawsuits, the Reserve Foundation and the Cyd Lang lawsuit?
18 A    Gary Herbert.
19 Q    And does Mr. Herbert represent anyone other than
20 you individually?
21 A    Reserve Foundation, L.L.C., Norm Schmidt, Tranquil
22 Options, Peaceful Options, Serenity Options.
23 Q    When you talked about your $113,000 promissory note
24 earlier on, what are the terms of that note? When is it due?
25 A    Five percent open and one year renewable.



30

1   Q   So has it been renewed?
2   A   Yeah.
3   Q   When was that?
4   A   December 2001.
5   Q   And who made the decision to renew it?
6   A   Leon Harte and Norm Schmidt.
7   Q   Is that promissory note secured or unsecured?
8   A   Unsecured.
9   Q   And where did Reserve Foundation, L.L.C. get the
10  money to loan you?
11  A   From investors through the Reserve Foundation
12  Trust.
13  Q   And did those investors know they were investing to
14  loan money to you?
15  A   No.
16  Q   What did they think they were investing?
17  A   They all came in under the trust agreements, the
18  CPPA that I talked about before, to go into the bank trading
19  program.
20  Q   But their funds aren't being used for that purpose.
21  A   Never got off the ground.
22  Q   My question was are their funds being used for the
23  purpose in which they invested?
24  A   No, sir.
25  Q   Why do you think you have the ability to loan money

31

1   to yourself?
2   A   I wasn't loaning money to myself.
3   Q   Well, the Reserve Foundation, L.L.C., You're a
4   50/50 owner of that, you wrote the checks to yourself, you told
5   me that earlier you made them out; you wrote them to yourself;
6   you signed the promissory note to yourself.  Under what authority
7   did you do that?
8   A   Mutual agreement between the members of the
9   Reserve Foundation L.L.C.
10  Q   You and Norm?
11  A   That's correct.
12  Q   But you knew that that was not why the money was
13  invested, to lend to you so you could live on it, correct?
14  A   That's correct.
15  Q   Why did you think you did that?  Don't you have an
16  obligation to your investors?
17  A   Yes.
18  Q   And are you breaching that obligation by loaning
19  money to yourself for personal use?
20  A   Never occurred to me.  I don't know.
21  Q   Well, think about it.  Why don't you take a few
22  minutes and think about it.
23  A   Well, I'm going to do better at paying it back than
24  some of the other investments we made.  That's the only answer
25  I've got.

32

1   Q   Was it the intent of the investor that they be
2   loaning money to you or Norm?
3   A   No.
4   Q   You knew that?
5   A   Yes, sir.
6   Q   And you've given yourself an unsecured note for
7   $113,000?
8   A   That's correct.
9   Q   Are there any other investments that you've made or
10  any other loans that you've made with Reserve Foundation, L.L.C.
11  money?
12  A   No, outside the other money ones mentioned.
13  Q   How about Norm?  Does the Reserve Foundation,
14  L.L.C. owe money to him?
15  A   No, he borrowed the exact same amount, 113,000.
16  Q   So he has a $113,000 loan from Reserve Foundation,
17  L.L.C. as well?
18  A   Yes.
19  Q   With a promissory note?
20  A   Yes, sir.
21  Q   Same terms as yours?
22  A   Yes, sir.
23  Q   Who signed off on that one?  Who signed off on that
24  promissory note?
25  A   Who signed off on it?  The only person that signed

33

1   it is the debtor.
2   Q   And who approved it on behalf of Reserve
3   Foundation, L.L.C.?
4   A   Me and Norm Schmidt.
5   Q   And did he get it the same way as you, checks
6   periodically over a course of a year?
7   A   Some checks, some wire transfers, yeah.
8   Q   Is that note secured or unsecured?
9   A   Unsecured.
10  Q   And was that investment, that loan to Norm, was
11  that the type of investment that was contemplated by the parties
12  to the CPPA?
13  A   No, probably not.
14  Q   Are the trust members aware of those loans?
15  A   Yes.
16  Q   How do you know that?
17  A   The trustee -- which I can't remember his name, and
18  I should be able to -- was aware of them when we did them and was
19  aware that it was an ongoing thing in 2000.
20  Q   Any other investments that the Reserve Foundation,
21  L.L.C. has made other than the loan to you, the loan to Norm,
22  Tranquil, Serenity, Peaceful?
23  A   Yes, there is one more.
24  Q   Okay.
25  A   Twenty-five thousand dollar loan made to Harte

34

1  Entertainment Group, which there is not a note on.
2      Q     What is Harte Entertainment Group?
3      A     That is the owner of the liquor license at the
4  Redstone Castle, 100 percent owned L.L.C. by Debbie Harte.
5      Q     And when was that $25,000 loaned?
6      A     Give or take a little bit, probably June of 2000,
7  May or June of 2000.
8      Q     Who is the lender?
9      A     Reserve Foundation, L.L.C.
10     Q     And who is the borrower?
11     A     Harte Entertainment Group.
12     Q     L.L.C.?
13     A     Correct.
14     Q     Who formed Harte Entertainment Group, L.L.C.?
15     A     Debbie Harte.
16     Q     And is there any documentation of that loan?
17     A     No.
18     Q     What are the terms of the loan?
19     A     Never was discussed.
20     Q     Who made the loan on behalf of the Reserve
21 Foundation, L.L.C., you and Norm?
22     A     I did, yeah -- both of us, yeah.
23     Q     And you loaned money to an entity without a
24 promissory note and without any terms?
25     A     That's correct.

35

1      Q     Is that secured or unsecured?
2      A     Unsecured, obviously.
3      Q     And did you advise the trust of that loan?
4      A     I believe so.
5      Q     Do you know so or do you think so?
6      A     I think I did.
7      Q     Who did you advise?
8      A     Again, I can't remember his name, I'm sorry.
9      Q     Does the Reserve Foundation, L.L.C. maintain a bank
10 account?
11     A     No. Not at this point, no.
12     Q     When was the last time it had a bank account?
13     A     I believe August 2000.
14     Q     What are the current assets of the Reserve
15 Foundation, L.L.C.?
16     A     The three notes to the corporations here in
17 Colorado, the L.L.C.s: Tranquil, Peaceful, Serenity; the note to
18 the restaurants in New York, which are being held over in London;
19 the note of the individual in London, which is being held over
20 there, which I don't know the terms or conditions to either one;
21 the balance, if it ever exists, from the receivership on the Sun
22 State investment.
23     Q     And what are the liabilities of the Reserve
24 Foundation, L.L.C.?
25     A     Approximately $13 million.

36

1      Q     How do you calculate that figure?
2      A     It's the money that was handed over from the
3  Reserve Foundation Trust.
4      Q     Who has records of that?
5      A     The deposits, I would have record of.
6      Q     And have you produced any of that documentation?
7      A     No.
8      Q     Why not?
9      A     I don't know.
10     Q     How many deposits have there been?
11     A     Just guessing, probably 100. I don't know.
12     Q     So there have been 100 deposits totaling about $13
13 million?
14     A     Correct.
15     Q     And where were they deposited into?
16     A     The majority of them went into a Bank One account
17 in Greeley, Colorado.
18     Q     Where did the rest of them go?
19     A     There were a few that came in through New Frontier
20 Bank in Greeley, Colorado, directly into the trust account.
21 There were some that were handled overseas that eventually ended
22 up at Bank One.
23     Q     And who has all those Bank One records?
24     A     I do, most of them.
25     Q     And have you produced any of those?

37

1      A     No. The investors are privileged information on
2  the offshore trust.
3      Q     I'm not asking who the investors are, I just want
4  the bank records showing the $13 million deposited; who would
5  have those records?
6      A     I would, partially.
7      Q     Who would have the rest of them?
8      A     They would be overseas. Some of them went to the
9  trustee overseas, who is no longer with us, went to trust.
10     Q     So you have about $13 million invested, according
11 to you, and total value of the assets is approximately what?
12     A     Approximately at this point probably $9 million.
13     Q     How do you calculate that?
14     A     Original loans to the property in Colorado were
15 $6.3 million plus six to seven that have interest, depending on
16 whether they were real estate loans or if they were equipment
17 loans.
18          There was additional real estate bought in
19 Colorado, so there was notes due later. So there's approximately
20 $7 million in capital that was invested in the three corporations
21 here plus interest over soon to be two years time.
22          That's 7 and a half, 8 percent. So approximately
23 -- there's probably eight to eight and a half million dollars
24 there. There's still a million dollars outstanding in the
25 restaurant deal in New York. There's still a million dollars

0401845

38

1  outstanding to the private person in London plus interest. And
2  there's whatever it -- what or if ever we receive anything from
3  the receiver in Florida.
4      Q      Who is the attorney for Reserve Foundation, L.L.C.?
5      A      Gary Herbert, I guess.
6             THE DEPONENT: Is that correct?
7             MR. HERBERT: Uh-huh.
8      Q      (By Mr. Gardenswartz) Who formed it?
9      A      Marty O'Fallon and Norm Schmidt. And Norm Schmidt
10  would be my -- I don't have it in front of me, but that would be
11  my guess. Marty O'Fallon would be the attorney of record or -- I
12  don't know what you call him on an L.L.C., incorporator.
13             MR. HERBERT: Agent for the --
14             THE DEPONENT: For the L.L.C.
15      A      And Norm Schmidt would be the original member.
16      Q      (By Mr. Gardenswartz) Is there any kind of an
17  agreement between you and the Reserve Foundation, L.L.C.?
18      A      No, sir.
19      Q      Compensation agreement, any kind of agreement at
20  all?
21      A      There's no compensation agreement. The only
22  agreement that I have -- and I would have to look -- is the
23  authority to open a bank account in their name.
24      Q      And what about Norm; any agreements with Norm?
25      A      Just the same banking agreement.

39

1             MR. GARDENSWARTZ: Why don't we take a five minute
2  break.
3             (A break was taken from 10:15 a.m. until
4  10:30 a.m.)
5      Q      (By Mr. Gardenswartz) During that last break, you
6  indicated off the record that you may have recalled the name of
7  the trustee. Who is that?
8      A      The trustee for the Reserve Foundation Trust
9  originally was Clifford Pitt.
10      Q      How do you spell that?
11      A      C-l-i-f-f-o-r-d P-i-t-t. And his group.
12      Q      And you said he was the original trustee?
13      A      Yeah. He resigned March or April of 2000,
14  something like that.
15      Q      And do I understand there has not been a trustee
16  since that time?
17      A      Not to my knowledge.
18      Q      Have there been any loans to Peter Moss?
19      A      From?
20      Q      Reserve Foundation, L.L.C. or the Reserve
21  Foundation Trust?
22      A      No. I wouldn't know about the trust, but they're
23  not from the L.L.C.
24      Q      The loans to the restaurant in New York, were those
25  to Peter Moss?

40

1      A      No, they were handled by Peter Moss.
2      Q      And the loans to the individual in London, were
3  those to Peter Moss?
4      A      They were handled by Peter Moss.
5      Q      Do you recall the name of that individual in London
6  now?
7      A      No, sir, I don't.
8      Q      How would one get ahold of Peter Moss?
9      A      I can have Gary get his phone number; I don't have
10  it with me, but I can get it to him.
11      Q      Will you do that?
12      A      What relevance does that have, if I may ask?
13      Q      This is the real downside to the deposition. Only
14  I get to ask the questions.
15             (Deposition Exhibit 1 was marked for
16  identification.)
17      Q      (By Mr. Gardenswartz) Mr. Harte, I've handed you
18  what I've marked as Deposition Exhibit No. 1, which is a document
19  entitled Answers to Interrogatories, Admissions and Production of
20  Documents. Do you recognize that?
21      A      Yes, I do.
22      Q      And was that your responses to the interrogatories
23  and requests for admission and request for production of
24  documents?
25      A      I believe so, yeah.

41

1      Q      Is Exhibit 1 your answers to interrogatories,
2  admissions and production of documents?
3      A      Yes.
4      Q      And does your signature appear on the first page of
5  Exhibit 1?
6      A      No.
7      Q      Did you sign anywhere on Exhibit 1?
8      A      I don't believe so.
9      Q      Do you -- did you understand that your answers to
10  interrogatories, admissions, and production of documents need to
11  be sworn and verified by you?
12      A      Yes.
13      Q      And did you swear and verify these answers to
14  interrogatories, admissions, and production of documents?
15      A      Yes, to the best of my ability.
16      Q      How would I know that? Where are they signed?
17      A      I don't know.
18      Q      Was Exhibit 1 a true and accurate Answers to
19  Interrogatories, Admissions, and Production of Documents as of
20  October 19, 2001?
21      A      Yes, sir, to the best of my ability.
22      Q      Are the answers to interrogatories, admissions, and
23  production of documents in Exhibit no. 1 still true and accurate?
24      A      With minor changes, I believe so, yes.
25      Q      Tell me what changes need to be made that would

0401846



42

1  make them totally accurate.

2      A      I owe more money now than I did then.

3      Q      Any other changes?

4      A      I didn't see any glaring changes, no.

5      Q      I want all changes, glaring, nonglaring.

6      A      I owe Gary Herbert more than $15,000 right now.

7             THE DEPONENT: Gary, what do I owe you now,

8  30,000?

9             MR. HERBERT: It's more than that, but I'd have to

10  bring it up to date. It's probably around 40-.

11      Q      (By Mr. Gardenswartz) Other than the debt to Mr.

12  Herbert, which would increase by some amount, are there any other

13  changes that you wish to make to the answers to interrogatories,

14  admissions, and production of documents?

15      A      The van has been sold, and that note will be paid

16  off tomorrow. We owe the bank approximately $4,000; I sold the

17  van for $3,000 and had to wait until I got the extra thousand to

18  pay the van off, the marital asset. Debbie Harte was advised and

19  she agreed to it.

20      Q      Any other changes other than the van being sold and

21  you owe more money to Mr. Herbert than $15,000?

22      A      I mean, I don't know what my phone bill is today,

23  which would be the Qwest bill. I owe John Miner more money than

24  the 6,700 that's on there now, but I don't have the exact amount

25  in front of me. Some of the other past due bills like the

43

1  Providian Visa, Capital One Visa and New Frontier Bank credit

2  card are all in excess of what's stated here.

3             I don't exactly know the amounts; I know the New

4  Frontier is over $4,000 at this point. I don't have the exact

5  amounts on the other two.

6             The IRS bill, I'm sure with interest and penalties

7  has gone up. I'm sure I owe Marty O'Fallon more money than I

8  have on here at this point. I'm not aware of any other changes

9  at this point.

10      Q      All right. Just so we have a clear record, Exhibit

11  1, is it your testimony that that exhibit, the answers to

12  interrogatories, admissions, and production of documents in

13  Exhibit 1 was true and accurate as of October 19, 2001?

14      A      That's correct.

15      Q      And sitting here today, the only changes would be

16  in response to question no. 5 that some of the debts are bigger

17  than those reflected on Exhibit 1 and the van has been sold?

18      A      Correct.

19      Q      Are there any other changes that you need to make

20  to make Exhibit no. 1 true and accurate as of today's date?

21      A      Not that I see.

22             (Discussion was held off the record.)

23      Q      (By Mr. Gardenswartz) After conferring with your

24  attorney is there anything else you wish to state?

25      A      Yeah, I'm working part time for a couple different

44

1  companies to survive. I drive a truck a little bit, I worked on

2  a Redi-mix plant for a couple weeks, just picking up odd jobs.

3      Q      The first question I asked you is whether you're

4  currently employed, and you said no. Then I asked you if you

5  were getting compensation from any source and you said no.

6      A      I'm not currently.

7      Q      Between 1998, when you left Deals on Wheels, and

8  the present, have you received compensation from anyone or any

9  entity?

10      A      Yes, I have.

11      Q      Okay. Tell me about that.

12      A      Recently I've done some truck driving and some

13  labor work and some set-up work, I guess you'd call it, for a

14  company called Big Hole, L.L.C.. I did a consulting job in

15  October for an individual on an insurance claim that I haven't

16  been compensated for yet. I'm currently not employed.

17      Q      All right. I want to be real clear. From the time

18  you left Deals on Wheels -- which I understood was in 1998,

19  correct?

20      A      I believe so, yes.

21      Q      -- until the present, which is the end of January,

22  2002, have you received compensation from any source?

23      A      Just part-time work, Big Hole, L.L.C. and the

24  consulting job I just told you about.

25      Q      The consulting job was on an insurance claim?

45

1      A      That's right.

2      Q      Who did you consult for?

3      A      Marcie Albin, A-l-b-i-n.

4      Q      What was the nature of your consultation?

5      A      The roof blew off her building, and part of her

6  business was devastated. And I mediated between her and the

7  insurance company on the physical damage.

8      Q      Was that resolved?

9      A      Not yet.

10      Q      Who is paying you to do your mediation services?

11      A      Marcie Albin.

12      Q      And how much does she owe you?

13      A      At this point, approximately $2,500. I think she's

14  paid me 1,400 up until now.

15      Q      How are you charging her, by the hour?

16      A      No.

17      Q      By the job?

18      A      We started out I took the job for $2,000, and then

19  she kept adding more and more stuff. I did some dismantling and

20  labor work for her and some moving and stuff, a little bit of

21  everything, so it keeps changing.

22      Q      How much does she owe you right now?

23      A      Approximately 2,500.

24      Q      And how much do you anticipate she will owe you

25  when you're done?



46

1   A       We submitted the last paperwork last week, so I
2   think we're done.
3   Q       Twenty-five hundred dollars?
4   A       Yeah.
5   Q       And then you said you did some work for Big Hole,
6   L.L.C.; what is that?
7   A       They own a truck, they own some equipment
8   construction type equipment, and I've helped them work on some of
9   the equipment, moved some equipment around for them and driven a
10  truck a few times.
11  Q       Does Big Hole, L.L.C. owe you money?
12  A       No.
13  Q       Have you been compensated by Big Hole, L.L.C.?
14  A       Yes.
15  Q       How much have you received from Big Hole, L.L.C.?
16  A       Over the last three months off and on, probably
17  2,500. Most of it was in cash.
18  Q       You were paid in cash?
19  A       Yeah.
20  Q       Why is that?
21  A       They don't report it.
22  Q       Who is Big Hole, L.L.C.?
23  A       John Miner. And he's got two partners, I don't
24  know who they are.
25  Q       Minor, M-i-n-o-r?

47

1   A       -e-r.
2   Q       Okay. Where is he located?
3   A       Denver, Colorado. Actually, I believe his house is
4   in Aurora; I don't have the address with me, but I can get it.
5   Q       Where is Big Hole L.L.C. located?
6   A       I think technically it's in Castle Rock, Colorado,
7   but he operates it out of his house.
8   Q       Who is John Miner?
9   A       Friend of mine.
10  Q       Going back, then, since 1998 when you left Deals on
11  Wheels, to January 2002, during that entire stretch of time,
12  you've received some compensation from Big Hole, L.L.C. for truck
13  driving related work and you received some money for consults on
14  an insurance claim, and you're owed approximately $2,500 for that
15  work, correct?
16  A       Correct.
17  Q       Any other compensation paid to you by any other
18  source from 1998 to the present?
19  A       I can't think of any, Ted.
20  Q       Have you worked for anyone else between 1998 and
21  2002?
22  A       No.
23  Q       Does anyone owe you money?
24  A       No -- excuse me, I'm owed about $220 on a note. I
25  borrowed some money to an employee of mine a couple years ago --

48

1   his parents, actually -- and that note is down to $220
2   approximately, because I know it's right at 220. I just figured
3   it out the other day. They're paying me off next week. That's
4   in here somewhere.
5   Q       Have you had any other employment other than you
6   described between 1998 and 2002?
7   A       In 1999 I was paid, I'm going to say, approximately
8   $4,000 for a little consulting work I did for a company in
9   Loveland. I'm trying to think of the name. I know the owner,
10  but I can't think of the company name.
11  Q       Who is the owner?
12  A       Bill Thomas. I did a little private placement work
13  for them in 1999, and I received -- I think it was like $4,000,
14  4- or 5-, somewhere in that neighborhood.
15  Q       Anyone else, Leon?
16  A       Not that I can think of, Ted. I never took a
17  paycheck from any of the corporations up here.
18  Q       Do they owe you money?
19  A       Yes, they do.
20  Q       How much do they owe you?
21  A       Well, on the car deal, approximately $18,000. We
22  took a personal car that we bought and converted it to a
23  corporate asset on trade in on a corporate vehicle. So the
24  trade-in value on the vehicle was $17,950.
25  Q       Who owes you that?

49

1   A       Tranquil Options. That would be a marital asset.
2   Q       Anything else? Anyone else or any other entity owe
3   you money?
4   A       Me personally? I can't think of any.
5   Q       Have you had any other employment?
6   A       No.
7   Q       Briefly tell me --
8   A       Excuse me, yes, I did. I did get some paychecks
9   from the Reserve Foundation Trust directly in 1999 for like a
10  month or two.
11  Q       In 1999 you received a paycheck from Reserve
12  Foundation Trust?
13  A       Yes, sir.
14  Q       For what?
15  A       Work I'd done for them bringing investors in.
16  Q       How much did you receive?
17  A       It's a total guess, Ted. I'm going to guess in the
18  $25,000 range.
19  Q       And what investors did you bring in in 1999 that
20  garnered you that $25,000?
21  A       Clients that I brought to the trust.
22  Q       Who are they?
23  A       That's information of the trust. I bring clients
24  in under privileged information, under contract. It's a
25  confidentiality contract. I can't say.

0401848



50

1   Q   Do you have a confidentiality contract with the
2   Reserve Foundation Trust?
3   A   No, I do not.
4   Q   What contract are you talking about?
5   A   The trust does with the clients.
6   Q   My question is do you have a confidentiality
7   arrangement contract?
8   A   No.
9   Q   So you're not bound by a confidentiality agreement,
10  correct?
11  A   I'm bound by being a gentleman, sir.
12  Q   My question is are you bound by a confidentiality
13  agreement?
14  A   No.
15  Q   Who did you bring in in 1999 as an investor?
16  A   I'd have to go look; I don't remember the name.
17  Q   You do remember the name, you just don't want to
18  tell me; is that right?
19  A   No, Ted, I don't remember.
20  Q   You've received -- let's back up.
21      Since 1998 you've received about four or five
22  checks, the biggest one you just talked about, which was the last
23  one, was $25,000, biggest by the long shot for bringing in an
24  investor. You're telling me you don't know who that was? That's
25  the only real money you've earned for the last three years.

51

1   A   I don't remember the names, Ted.
2   Q   There's more than one?
3   A   Could be. Yeah, I'm sure there was.
4   Q   You don't remember any names?
5   A   Not from 1999, no, I don't.
6   Q   What did they invest in?
7   A   They signed a contract with the trust.
8   Q   And you received a commission or a paycheck from
9   the trust for that?
10  A   Finder's fee, basically, yes.
11  Q   What percentage?
12  A   There was no percentage.
13  Q   How was the $25,000 determined?
14  A   Arbitrary.
15  Q   Who determined it?
16  A   Good question. I don't know. I had some input
17  into it. I needed 25 grand to live on.
18  Q   Did you pay tax on it?
19  A   Yeah, it was filed on my 1999 tax return, which Deb
20  has all the records of. I don't have them. It's in here. It's
21  on the social security bill, said here in 1999 I made $18,861
22  which would have been part of that, and obviously had some
23  personal business loss and had loss carry-forward previous to
24  that from other businesses.
25  Q   What was the last tax return you filed?

52

1   A   Nineteen ninety-nine.
2   Q   Why haven't you filed 2000?
3   A   Didn't have any income.
4   Q   So you didn't file a tax return?
5   A   No.
6   Q   What's your educational background?
7   A   My education? I have one year of college.
8   Q   Any licenses in real estate, securities, anything
9   like that?
10  A   Not at this point.
11  Q   Have you ever --
12  A   Yes, I had a Series 7 securities license in 1985.
13  I believe I got it from May of 1985 into 1990, early 1990
14  probably. Either the end of '89 or the end of '90, I'm not sure.
15  Q   What happened to that license?
16  A   It expired when I quit doing business as a stock
17  broker. I had a couple others too, like Series 63, which allowed
18  me to do out of state. I think those were the only two I had.
19  Q   How long have you been a business person?
20  A   All my life.
21  Q   How many years?
22  A   Forty-seven years.
23  Q   How old are you?
24  A   Forty-seven -- well, I'll be 47 in March.
25  Q   So you've got 30 years of working, 25 to 30 years

53

1   of working?
2   A   Yes, sir.
3   Q   Tell me again why you didn't file a tax return for
4   the year 2000.
5   A   I didn't make any money.
6   Q   And you don't think you have to file a tax return?
7   A   I ain't going to get any money back. And I owe the
8   IRS money, so when I do 2001, if I need to do 2001, I'll just
9   file them both then. I don't owe anything, so there's no
10  penalty. And also I don't have the real estate -- oh, oh, oh
11  real estate. I missed real estate in 2000. Sorry about that.
12  We sold our house in 2000, so I had some income in 2000 from the
13  property -- real estate property in Greeley, Colorado.
14  Q   My question is why didn't you file a tax return in
15  the year 2000? You know you had income.
16  A   Yeah, I don't have the records on the real estate
17  transaction. I need to get them from my ex-wife, now that you
18  said that.
19  Q   Who is your accountant?
20  A   I don't have one.
21  Q   Have you ever had one?
22  A   Yeah. It's been a long time back, personally.
23  Q   Who filed your '99 return?
24  A   I did.
25  Q   Who prepared it?

54

```
1    A     Me and Debbie, I think. I'm sure we did. I don't
2  have it here in front of me, but I'm sure we did.
3    Q     Let's go back here. Exhibit no. 1, your responses
4  to the interrogatories, request for admissions, and production of
5  documents.
6    A     Are you asking me something?
7    Q     I will.
8    A     Okay, sorry.
9    Q     On question no. 3, you say "I have to get a job."
10 Tell me what you've done to get a job.
11   A     I haven't done anything at this point.
12   Q     When was the last time you tried to get a job?
13   A     Probably 1987 -- or '97 or '98 when I worked at
14 Deals on Wheels.
15   Q     Since that time have you done anything to, quote,
16 get a job, end quote?
17   A     No, sir.
18   Q     Why not?
19   A     Living on --
20        (Discussion was held off the record.)
21        MS. TESTER: There's a question pending; please
22 don't confer with attorneys while the question is pending.
23   A     I guess I'm still living in a dream world.
24   Q     (By Mr. Gardenswartz) What does that mean?
25   A     I keep thinking some day the thing I've been
```

55

```
1  chasing since 1989 will come to pass.
2    Q     What thing is that you've been chasing?
3    A     The elusive trading program that I described
4  earlier with the discounted notes.
5    Q     And tell me what you're doing to further that
6  dream.
7    A     Still working with supposed vendors in London and
8  all over trying to get it together.
9    Q     How are you doing that?
10   A     Phone.
11   Q     Are you traveling to those places?
12   A     No.
13   Q     Meeting with people?
14   A     No.
15   Q     I don't understand what you're doing, then. What
16 are you doing to further your dream?
17   A     E-mail, computer, phone, trying to find a program
18 that does what our clients are investing for and trying to find
19 one that works.
20   Q     Who are you talking to to do that?
21   A     Several people. But the most prominent would be
22 Peter Moss.
23   Q     Who else?
24   A     There's other people in London and stuff. There's
25 -- I can't remember the guy's name in the Bahamas. I'm terrible
```

56

```
1  on names. I'm sorry. I can't remember his name. I can get it
2  for you. I don't have it. I'm terrible on names, Ted, I'm
3  sorry.
4        Biggest thing I'm trying to do at this point is
5  trying to get out from under these lawsuits and move on with
6  life.
7    Q     And what do you plan on doing when you move on with
8  life?
9    A     Look at the corporations that I'm involved with; do
10 what we have to do to liquidate or whatever we have to do so I
11 can get my divorce done and go on with life.
12   Q     What are the corporations you're involved with?
13   A     There's four at this point.
14   Q     Tell me what they are.
15   A     Reserve Foundation, L.L.C., Tranquil Options,
16 Peaceful Options, and Serenity Options that are active. They're
17 the only four that are active.
18   Q     And what do you need to do with those four, in your
19 view of the world?
20   A     I would like to liquidate the assets in all four of
21 them and just make it go away.
22   Q     Make what go away?
23   A     Outstanding debts to the corporation, outstanding
24 everything. And if there's any money left over from all the
25 liquidation, and it's a marital asset -- but it's doubtful there
```

57

```
1  will be anything left. I don't have another occupation. I don't
2  know what else to do.
3    Q     Question no. 4 sets forth -- you're supposed to set
4  forth your employment during your marriage. Do you see that?
5    A     Yes, I did.
6    Q     One of the questions was to set forth the gross
7  annual income from such employment. Tell me what your gross
8  annual incomes were.
9    A     I include all my social security records, which
10 would give you a net figure from all these, but I don't remember
11 off the top of my head.
12   Q     What was the most you ever earned in terms of gross
13 income?
14   A     Probably 1985, $80,000, approximately. That was on
15 a 1099.
16   Q     And that was when you were working for --
17   A     Probably would have been '86, excuse me.
18   Q     Eighty thousand dollars?
19   A     In that neighborhood, yes. Working for Stewart
20 James. I would dare say that's the only time I made over $40,000
21 in my life.
22        (Deposition Exhibit 2 was marked for
23 identification.)
24   Q     (By Mr. Gardenswartz) Let me hand you what I've
25 marked, Mr. Harte, as Exhibit No. 2, and ask you if you can
```

0401850



58

1  identify that.
2     A    Yes, I can.
3     Q    What is it?
4     A    It's my financial disclosure.
5     Q    It's your financial affidavit?
6     A    Correct.
7     Q    And it was signed by you on October 17, 2001?
8     A    That's correct.
9     Q    Before a notary public?
10    A    That's correct.
11    Q    And do you recognize the name of that notary
12 public?
13    A    Yes, I do.
14    Q    Who is it?
15    A    Marty O'Fallon.
16    Q    And he is one of the attorneys that has done work
17 for you in the past?
18    A    Yes, sir.
19    Q    Was your financial affidavit true and accurate as
20 of October 17, 2001?
21    A    Well, I see one mistake right off the bat. We have
22 a phone number where my social security number is supposed to be.
23 I can rectify that.
24    Q    What is your social security number?
25    A    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.

59

1     Q    Any other changes?
2     A    The monthly debts we already went over on the other
3  Exhibit 1, would be one change. No. 10 would be the same as we
4  went over in No. 1 -- or Exhibit 1, and the van has been sold.
5     Q    Other than the fact that your debts have increased
6  and that you sold the van, are there any changes that would be
7  necessary to make to Deposition Exhibit No. 2, your financial
8  affidavit, in order to make it true and accurate as of today's
9  date?
10    A    Not to my knowledge, Ted. I don't see anything.
11    Q    I want you to take your time; I want you to give me
12 your under oath, honest answer if there's any changes.
13    A    Well, my part-time employment that we discussed
14 earlier. When I filled this out, I wasn't employed by either one
15 of those people, so there's part-time employment. There's no
16 other income. I still have the $220 due on that note coming to
17 me, which I should get in the next week or two.
18         Well, it's in Exhibit 1, but the $16,000 that I
19 feel the corporation owes me.
20    Q    Any other changes to your financial affidavit, any
21 notes, any other changes to your financial affidavit or your
22 responses to discovery requests?
23    A    No, sir.
24    Q    Let's go through the three L.L.C.s that we talked
25 about earlier. One of them is Tranquil Options, L.L.C.?

60

1     A    Correct.
2     Q    What is that?
3     A    Tranquil Options is the holding and operating
4  company for the Redstone Castle, the main parcel.
5     Q    Who formed Tranquil Options, L.L.C.?
6     A    Well, the attorney that handled it was Marty
7  O'Fallon, so I guess he would be the incorporator, or however you
8  do that. And the originator would probably be me and Norm
9  Schmidt. I don't have it in front of me.
10    Q    Who are the current owners of Tranquil Options,
11 L.L.C.?
12    A    There's two members at this point: 50 percent Leon
13 Harte, 50 percent Debbie Harte.
14    Q    Were there ever other members?
15    A    Norm Schmidt.
16    Q    What did he own, what percentage?
17    A    A third, third, and a third at one time, just as
18 the other two corporations are.
19    Q    When it was originally formed, who were the two
20 owners or three owners?
21    A    Leon Harte, Debbie Harte, and Norm Schmidt.
22    Q    What was Leon Harte's capital contribution?
23    A    Zero.
24    Q    What was Debbie Harte's capital contribution?
25    A    Zero.

61

1     Q    What was Norm Schmidt's capital contribution?
2     A    Zero.
3     Q    When did Norm Schmidt cease being a member?
4     A    August of 2000.
5     Q    And why is that?
6     A    We borrowed additional funds to buy additional real
7  estate, and he didn't want to be on the note, so we took him off
8  the L.L.C.
9     Q    And did you acquire his ownership interest in that
10 L.L.C.?
11    A    No, he just signed it over. He had no investment
12 anyhow at that point.
13    Q    Who keeps the books and records for Tranquil
14 Options, L.L.C.?
15    A    Debbie Harte.
16    Q    Who kept them when it was originally formed?
17    A    Debbie Harte. She's always kept the books. But
18 Marty O'Fallon handled the paperwork on the original
19 incorporation.
20    Q    How long have you known Norm Schmidt?
21    A    Approximately 13, 14 years.
22    Q    And how is it you came to meet him?
23    A    Proposed business venture we both looked at that
24 neither one of us did.
25    Q    Which was that?

0401851



62

| 1 | A | It was something proposed by Michael Bergman. I |
|---|---|---|
2 can't remember what it was.
3    Q    Was he your attorney at the time?
4    A    No.
5    Q    Has he ever done legal work for you?
6    A    No.
7    Q    And how would you describe your relationship with
8 Norm Schmidt?
9    A    We're associates; we work together day-to-day; I
10 live with him rent-free at this point. We're friends.
11    Q    How would you describe Norm Schmidt's relationship
12 with Debbie Harte?
13    A    Only association would be through me.
14    Q    What is Norm Schmidt's current occupation?
15    A    Works as an outside salesman for a plastics
16 manufacturing company, plastic conjunction molding company in
17 Denver, Colorado.
18    Q    What's that company?
19    A    America West Packaging.
20    Q    How long has he worked for America West Packaging?
21    A    He's been involved with them off and on ever since
22 I've known him; previous to me knowing him he's been involved
23 with them.
24    Q    Do you have any involvement with that entity?
25    A    No, I do not. We had an option at one time to

64

1 approximately one and a half million dollars, 1.5 million,
2 somewhere in there. I don't know that they ever finalized an
3 offer. They were negotiating, but I don't know if they -- I
4 don't think ever did anything written, to be honest.
5    Q    When was that discussion about acquiring America
6 West Packaging -- when did that occur -- or the negotiations?
7    A    He stated that he -- I guess he always intended to
8 buy it as long as I've known him.
9    Q    Where were you going to get the money to acquire
10 America West Packaging?
11    A    Hopefully we were going to have proceeds from the
12 trading program. That hasn't happened yet.
13    Q    Where is Cliff Petty currently?
14    A    Still running America West Packaging.
15    Q    Has Cliff Petty ever been involved in the Reserve
16 Foundation Trust?
17    A    No.
18    Q    Reserve Foundation, L.L.C.?
19    A    No.
20    Q    What are the current assets of Tranquil Options,
21 L.L.C.?
22    A    The real estate known as Redstone Castle all along
23 with all the equipment, dishes, there's -- I always say UCC
24 filings; is that correct? There's the all the equipment that's
25 up there. There's backhoes, there's outside equipment, there's

63

1 purchase it but never came up with the money, so I haven't.
2 Nothing. As a matter of fact, one of the corporations that's
3 sitting there dead right now is American Eagle Industries. That
4 was formed specifically to buy that business, but it never
5 happened.
6    Q    What is American Eagle Industries?
7    A    It was just -- American Eagle Industries, L.L.C.
8 was formed by me and Norm Schmidt to buy America West Packaging,
9 but it never happened. It's never been activated.
10    Q    Has American Eagle Industries ever done anything?
11    A    No, it's never been activated. It's never had a
12 checking account, it's never done anything.
13    Q    It was formed for the purpose of acquiring America
14 West Packaging?
15    A    Yeah, and other business ventures.
16    Q    Who owns America West Packaging?
17    A    Cliff Petty is one of the owners, and I think his
18 mother and brother are involved in it. I don't know.
19    Q    Did you make an offer to acquire that through
20 American Eagle Industries?
21    A    Actually, Norm Schmidt did that, I didn't.
22    Q    Do you know what the offer was?
23    A    No, I don't.
24    Q    Do you know how much was offered?
25    A    With the real estate and everything, it was

65

1 inventory. As far as -- I shouldn't say -- probably not
2 inventory, but supplies, new silverware, hardware, dishware,
3 dishwashers, kitchen equipment, outdoor equipment, lighting
4 equipment.
5    Q    And what is the approximate value of the assets of
6 Tranquil Options, L.L.C.?
7    A    With the outside equipment or without it?
8    Q    Total.
9    A    In this economy, I don't know.
10    Q    Did you ever know?
11    A    No. I'm not an appraiser, I guess. No.
12    Q    What do you think it's worth as an owner?
13    A    At this point in time?
14    Q    Yes.
15    A    Less than we paid for it.
16    Q    What do you think it's worth? We can do this
17 quickly or slowly.
18    A    Yeah, I'm sorry. Ted, I have no idea at this
19 point. My suggestion would be to put it up for auction and find
20 out.
21    Q    How much would you put it up at auction?
22    A    I'd sell all three pieces together and hopefully
23 get 60-, $70 million out of it. But I don't know, the economy,
24 everything. I don't know.
25            MR. GARDENSWARTZ: Do you need to take a coin



66

1  break here?
2                    (A break was taken from 11:30 a.m. until
3  12:36 p.m.)
4        Q        (By Mr. Gardenswartz) I think where we were, Leon,
5  is we were discussing the value of the assets of Tranquil
6  Options, L.L.C. Do you remember that?
7        A        Uh-huh.
8        Q        You just need to answer yes or no.
9        A        Yes, I'm sorry.
10       Q        Do you have any thoughts as to the value of those
11  assets?
12       A        All combined, you know, I'm guessing in the eight
13  and a half to $10 million range, depending on markets and
14  everything else.
15       Q        Tell me what you think that eight and a half to $10
16  million includes.
17       A        . I would assume the Castle property and the assets
18  up there are in the 7- to $8 million range, if we're lucky.
19  There's a million dollar outstanding loan in London and a
20  million-dollar loan to that restaurant.
21       Q        I'm talking about the assets of Tranquil Options,
22  L.L.C.
23       A        Oh, I'm sorry. The real estate, the Castle
24  property, the one parcel, plus all the equipment is in Tranquil
25  Options' name, plus the house downtown.

67

1        Q        And approximate value of the assets held currently
2  by Tranquil Options, L.L.C. is?
3        A        Five to $6 million.
4        Q        And how do you arrive at that figure?
5        A        I'm -- the house downtown and the equipment is
6  probably in the 5- to $600,000 range, and I'm guessing the Castle
7  is in the 4- to $5 million range.
8        Q        And what are the liabilities of Tranquil Options,
9  L.L.C.?
10       A        Deb has all the books, but I haven't seen the books
11  in years. But I assume the liabilities are in the $6 million
12  range.
13       Q        Tell me what you think the liabilities are.
14       A        Well, obviously there's outstanding notes to
15  Reserve Foundation, L.L.C. I think the original note was in the
16  $4.5 million range, plus there's a couple hundred thousand
17  additional funded for equipment. So that would make it 4.7.
18  Then there's, I think, approximately $300,000 that we put into
19  the house downtown, so that would make 5 million. Then there's
20  an outstanding loan for 650,000.
21                    Is that right, Cindy?
22       Q        You just get to testify.
23       A        Oh, I'm sorry. There's an outstanding debt to some
24  mortgage company, I don't know the name. Well, I've got it
25  written down, but I don't know the name of it. I think that's in

68

1  the $650,000 range. I would guess normal operating expenses and
2  other things, she probably owes another 25-, $30,000. Again, I
3  don't know.
4        Q        Tell me how it is that Tranquil Options, L.L.C.
5  came to acquire the property where the Redstone Castle is.
6        A        Bought it at an auction here in Aspen.
7        Q        And how was it that the decision was made to
8  participate in that auction; who made that decision?
9        A        Me and Debbie.
10       Q        And why did you want to acquire that property?
11       A        Looked like a good piece of property and a business
12  venture.
13       Q        Tell me what investigation you did prior to
14  acquiring the property.
15       A        Very little.
16       Q        Tell me what investigation you did.
17       A        Oh, okay. Read the sales brochures, made some
18  calls around town, just tried to figure out what the Redstone
19  area was like, and came up and looked around.
20       Q        Did you discuss the Redstone Castle with any
21  professionals, accountants, attorneys, real estate professionals,
22  anyone?
23       A        No, sir.
24       Q        Did you get advice from anyone?
25       A        No, sir.

69

1        Q        Did Norm Schmidt participate on any level?
2        A        He was aware of it, the decision; obviously he was
3  part of the decision to borrow the money from the corporation to
4  buy it.
5        Q        What year did you acquire or did Tranquil Options
6  acquire the Castle parcel?
7        A        April of 2000 -- April, May, we bought it in April,
8  and I think Tranquil Options was incorporated either the end of
9  April or early May.
10       Q        And at that time in April or May 2000, who was the
11  seller?
12       A        I believe it was the Cumberland Group or some group
13  out of Texas.
14       Q        And how did you pay -- or how did Tranquil Options
15  pay the Cumberland Group for the property?
16       A        Through Aspen Title. The money was wired up here
17  from the Reserve Foundation account in Greeley and part of it
18  from the investment account in Sun State in Florida.
19       Q        Tell me how much came from each of the two
20  accounts.
21                    (Pause in proceedings)
22       Q        (By Mr. Gardenswartz) Question was where did the
23  money come from to acquire the Redstone property.
24       A        It was all borrowed from Reserve Foundation, L.L.C.
25       Q        Tell me how much was borrowed from which account



70

1  and where the money came from.
2     A     Well, the original purchase of the Castle was $6.3
3  million.
4     Q     And where did that $6.3 million come from?
5     A     Three point five million of it came from Sun State
6  in Florida, the Reserve Foundation, L.L.C. account, and the
7  balance at 2.8 million came from the Reserve Foundation, L.L.C.
8  account in the Bank One account in Greeley, Colorado.
9     Q     The 2.8 million that came from Bank One in Greeley,
10  how did that money get to Bank One in Greeley?
11     A     Investors through the Reserve Foundation Trust. It
12  was wired in.
13     Q     From where?
14     A     All over the world.
15     Q     And they, the investors, wired money to Bank One in
16  Greeley, or did they wire it to someplace else?
17     A     Bank One in Greeley, the majority of it, yeah.
18     Q     Tell me what portion came in directly from
19  investors to Bank One.
20     A     One hundred percent.
21     Q     So investors in the Reserve Foundation Trust wired
22  $2.8 million to Bank One in Greeley?
23     A     More than that.
24     Q     How much did they wire?
25     A     Ultimately -- well, 13 million, in that

71

1  neighborhood, because there was 6 million withdrawn out of that
2  account to Sun State in Florida.
3     Q     How many investors wired money in for the
4  acquisition of the Redstone property by Tranquil Options, L.L.C.?
5     A     None.
6     Q     How many investors have an interest in the Tranquil
7  Options, L.L.C. property?
8     A     None outside of the note back to Reserve
9  Foundation, L.L.C.
10     Q     Two point eight million dollars comes from Bank One
11  in Greeley and 3.5 million comes from Sun State in Florida,
12  correct, to make the 6.3? That's what you just said?
13     A     Correct, yeah.
14     Q     How much money was in the Bank One account when
15  you took out 2.8 million?
16     A     Probably 6 or $7 million. I don't know off the top
17  of my head.
18     Q     Who would have the records of that?
19     A     I have the bank records.
20     Q     And that would show me how much money was in that
21  account?
22     A     Uh-huh.
23     Q     Yes?
24     A     Yes, it would.
25     Q     And you have not produced those records, correct?

72

1     A     No, I have not at this point, but we can.
2     Q     When can you do that?
3     A     Within the next week, 10 days. I got to have some
4  of them sent back.
5     Q     And who made the decision to --
6     A     Let me stop right here. I do have one problem.
7  The incoming wires are privileged information from privileged
8  investors that belong to the Reserve Foundation Trust.
9     Q     Under what privilege?
10     A     The contract they have with the Reserve Foundation
11  Trust.
12     Q     But they've already -- you don't have a contract
13  and you've already seen that information, correct?
14     A     Well, I've seen most of it at one time or another,
15  yes.
16     Q     So it's already been divulged to nonprivileged
17  parties to the contract, correct? You're not a party to the
18  CPPA; we went through this earlier, right?
19     A     I'm not a party; I was one of the signers on it.
20     Q     But you have no confidentiality agreement, you
21  personally?
22     A     Actually, I think I do, because actually I sign
23  most of the contracts.
24     Q     What contracts did you sign? I thought you weren't
25  a party of the CPPA this morning.

73

1     A     No, I've always been a party of the CPPA.
2     Q     Who are the parties to the CPPA?
3     A     Ted, I don't understand what you're asking me.
4     Q     Well, you understand what an agreement is, right?
5     A     Yes, sir.
6     Q     And there are parties to an agreement?
7     A     Reserve Foundation Trust and the clients are the
8  two parties.
9     Q     And you are not Reserve Foundation Trust, correct?
10     A     No, but I was working for them at that time
11  representing them.
12     Q     You were not a party to the CPPA; you, Leon Harte,
13  are not a party to the CPPA?
14         MR. HERBERT: Can we go off the record?
15         MR. GARDENSWARTZ: Sure.
16         (Discussion was held off the record.)
17     Q     (By Mr. Gardenswartz) So I understand, you're
18  going to provide redacted bank records within a week or ten days?
19     A     That's fine, yeah.
20     Q     Yes.
21     A     Yes.
22     Q     And $3.5 million came from Sun State in Florida?
23     A     That's correct.
24     Q     How did that work?
25     A     There were $6 million placed in a regular brokerage



74

1 account with Sun State in Florida. They were a brokerage trading
2 program in foreign exchange.
3    Q    And you contacted somebody at Sun State and said
4 wire $3.5 million so the Redstone Castle can be acquired?
5    A    That's correct.
6    Q    Who did you contact?
7    A    John Highland.
8    Q    Who is he?
9    A    He was one of the officers of Sun State.
10   Q    Did any money to acquire the Redstone Castle come
11 from any source other than the Reserve Foundation Trust?
12   A    It all came from the Reserve Foundation, L.L.C.,
13 not from the trust.
14   Q    And the money that came from Reserve Foundation,
15 L.L.C. had its origin with the Reserve Foundation Trust?
16   A    Correct.
17   Q    Where did Reserve Foundation, L.L.C. bank?
18   A    Bank One, Greeley, Colorado.
19   Q    Anywhere else?
20   A    No, that's the only account they've ever had.
21   Q    And does the Reserve Foundation, L.L.C. still
22 maintain any bank accounts?
23   A    No.
24   Q    When did it last have bank accounts?
25   A    Approximately August of 2000.

75

1            (Deposition Exhibit 3 was marked for
2 identification.)
3    Q    (By Mr. Gardenswartz) Mr. Harte, let me show you
4 what I've marked as Exhibit 3 and ask you if you can identify
5 that.
6    A    Looks like the original corporation papers or
7 L.L.C. papers for Tranquil Options.
8    Q    Go to page 19.
9    A    I don't have a page 19 -- oh, there.
10   Q    Does your signature appear on page 19?
11   A    Yes, it does.
12   Q    Do you recognize the other signatures?
13   A    Norman Schmidt, Debbie Harte.
14   Q    And who was the witness?
15   A    Harold Jakel.
16   Q    Who was he?
17   A    He was an employee at the time at the Castle.
18   Q    And are the first 19 pages of Exhibit 3 the
19 operating agreement of Tranquil Options, L.L.C.?
20   A    I believe so.
21   Q    The operating agreement on page 1 indicates that it
22 was made as of April 20 -- or excuse me, April 20, 2000. Do you
23 see that?
24   A    April of 2000; 20th day of April 2000.
25   Q    Who prepared the operating agreement of Tranquil

76

1 Options, L.L.C.?
2    A    Martin O'Fallon.
3    Q    And who was he working for?
4    A    Who was he working for?
5    Q    He's an attorney?
6    A    Correct.
7    Q    And is he on his own?
8    A    Yeah, he's an independent.
9    Q    Who did he prepare this on behalf of? Who was his
10 client?
11   A    Tranquil Options.
12   Q    You, Debbie --
13   A    Me, Debbie, Norman; Tranquil Options.
14   Q    Exhibit A to the operating agreement sets forth the
15 list of members, the capital contributions, and the percentages.
16 Do you see that?
17   A    Yes, I do.
18   Q    And who does it list?
19   A    This was amended.
20   Q    Who does this list?
21   A    Leon Harte and Debbie Harte.
22   Q    And it indicates that at least at the time the
23 operating agreement was originally drafted, the members were you
24 and Debbie, 50/50, correct?
25   A    Incorrect.

77

1    Q    What does it tell you?
2    A    This was amended in August of 2000 when we took out
3 a bank loan, and there should be a letter attached where Norman
4 signed it in 2000.
5    Q    Listen to the question. In April 2000 when
6 Tranquil Options, L.L.C. was formed, the original members were
7 Leon Harte, Debbie Harte, 50/50?
8    A    Incorrect.
9    Q    The change that you're talking about occurred in
10 August of 2000, correct?
11   A    The original incorporation, there was three people
12 as members: Norm Schmidt, Leon Harte, and Debbie Harte.
13   Q    Does Exhibit A indicate the members are you and
14 Debbie?
15   A    Yes, but it wasn't done in April of 2000.
16   Q    Go back to the front of this agreement on page 1.
17 "This operating agreement is entered into this 20th day of April
18 by and among Leon, Debbie, and Norm," and it talks about Norm
19 being a manager but the members being you and Debbie.
20   A    The paper is incorrect.
21   Q    Nonetheless, when Tranquil Options bought the
22 Redstone Castle in May of 2000, this Exhibit 3 operating
23 agreement, the April 20, 2000 operating agreement was the only
24 operating agreement in existence, correct?
25   A    That is correct, but this is amended later.

0401855

78

1  Q  When the property was acquired, when Tranquil
2  Options closed and acquired the Redstone property that it
3  acquired, the operating agreement dated April 20, 2000 was the
4  operating agreement in effect, correct?
5  A  Correct, but this was not part of it. This was not
6  part of it. Never was until August of that year. What I'm
7  saying is the paperwork is wrong here. It doesn't have a date on
8  it, but I can produce the letter where Norm resigned and states
9  in there what the date was and when he withdrew his one-third,
10 and that's when this letter was produced.
11  Q  Why don't you look further on in Exhibit 3 where it
12 says Minutes of Meeting of Members of Tranquil Options, L.L.C.
13 Do you see that?
14  A  Yes. That's dated July 28 of 2000.
15  Q.  That's the one where it says Norm resigns as a
16 member, correct?
17  A  Correct.
18  Q  Is there any paperwork prior to that time
19 indicating that Norm had an ownership interest?
20  A  Yes, there is. It would have to be in Marty's
21 file, because the three members were listed in all three
22 corporations.
23  Q  But the only paperwork we're looking at here today
24 indicates that the Tranquil Options, L.L.C. was owned 50/50 by
25 Debbie and Leon; is that what it says?

79

1  A  That was not what it was supposed to say
2  originally, sir.
3  Q  Is that what it says?
4  A  This was attached later. It is not the same date
5  on both of these papers.
6  Q  It indicates that the initial capital contribution
7  of Leon Harte was $2 million; do you see that?
8  A  Yes, I do.
9  Q  Where did that $2 million come from?
10  A  We doctored this up to get a loan from the bank for
11 the rest of the real estate, and Tranquil Options bought the
12 original house.
13  MR. GARDENSWARTZ: Do you want to go off the
14 record and advise him of some of his rights that he may have?
15  A  The bank was advised --
16  Q  (By Mr. Gardenswartz) Wait, you may want to go out
17 and let your attorney advise you of some of your Constitutional
18 Rights before you continue.
19  (Discussion was held off the record.)
20  MR. GARDENSWARTZ: We just took a brief recess,
21 and I understand that Mr. Harte wants to say something to clarify
22 some previous responses.
23  THE DEPONENT: Yes. When we went to Alpine
24 Bank to get additional funding to buy the residence in the town
25 of Redstone -- or actually not a town, but in Redstone itself, we

80

1  procured a loan from Alpine Bank for $250,000; that when Norm
2  Schmidt stepped down from the L.L.C., that's when these documents
3  on the ownership were presented, okay? The bank or Joe -- I
4  can't even think of his last name, Joe something.
5  MS. TESTER: Schofield?
6  THE DEPONENT: Schofield. Joe Schofield asked us
7  where the money came from. I told him it was through a private
8  loan and that the funds are -- the liens from that private loan
9  would not be filed until Alpine Bank filed theirs and got in
10 first position.
11  Q  (By Mr. Gardenswartz) Is there anything else you
12 want to say to clarify your last response before we took a break?
13  A  I don't know what you're asking me, Ted, I'm sorry.
14  Q  I wasn't out there at your private conversation
15 with your attorney, so I don't know what else you want to clarify
16 or say regarding your first previous response.
17  A  Oh, yes.
18  Q  And I would note that you're looking at notes from
19 your attorney to do that.
20  A  Okay. This document was done in July when we got
21 that loan, okay? The bank was aware of where the funds came
22 from, from a private -- and I said -- before I used the term this
23 document was doctored, that's bad terminology at best. The bank
24 was very much aware of what was going on.
25  Q  Anything else you want to say before we move on?

81

1  A  Can we take a break for a second?
2  Q  Sure.
3  (A break was taken from 1:06 p.m. until 1:11 p.m.)
4  Q  (By Mr. Gardenswartz) Mr. Harte, back on the
5  record. After another break with your attorney, do you have
6  anything you wish to add to your previous statements?
7  A  This document was made in July, the one with the 2
8  million and 50 percent ownership. Me and Deb turned it in to the
9  bank at that time. The bank was aware, we were told, that there
10 were outstanding debts on the property --
11  (Discussion was held off the record.)
12  A  This document was an arbitrary figure me and Deb
13 put together. It was done at the same time Norm got removed, and
14 the attorney typed it up under our instructions. And the bank
15 was fully aware that there were outstanding debts on the
16 property. Under the implicit possibility of threat on what
17 you're leading to in this, I've been advised to not say any more
18 than that about that from my attorney.
19  Q  (By Mr. Gardenswartz) Let's go back. Who dealt
20 with Mr. O'Fallon, you or Debbie?
21  A  I did usually, yes.
22  Q  And Mr. O'Fallon prepared, under your instructions,
23 Exhibit 3, correct?
24  A  That's correct.
25  Q  And who primarily dealt with Joe Schofield from

82

1  Alpine Bank, you or Debbie?
2         A       Both of us. I think both of us were there on every
3  meeting. I believe both of us were there for every meeting, Ted.
4                 (Deposition Exhibit 4 was marked for
5  identification.)
6         Q       (By Mr. Gardenswartz) Let me show you what I've
7  marked as Exhibit No. 4, and ask if you can identify that.
8         A       Loan for $250,000 from Alpine Bank in Carbondale,
9  Colorado to Tranquil Options, L.L.C.
10        Q       And is that the loan you're talking about?
11        A       Correct.
12        Q       And that's a $250,000 loan?
13        A       Correct.
14        Q       And did you have an understanding that this loan
15  represented by Exhibit 4 was going to be a first?
16        A       That's what Joe told me, yes. And that's what I
17  agreed to with him; that was the understanding I had.
18        Q       Is there any writing to that effect?
19        A       Not to my knowledge.
20        Q       In order to obtain the loan set forth in Exhibit 4,
21  did you present a loan application or financial statement to
22  Alpine Bank?
23        A       I don't know. Deb usually did all paperwork. I
24  assume we did.
25        Q       You don't think Alpine Bank was going to give you

83

1  $250,000 without a financial statement, do you?
2         A       They were looking strictly at the real estate. I
3  don't remember if they did or not. I don't remember if we did
4  personal financial statements or a corporate financial statement
5  or what we did. I really don't remember. But the 250,000 was
6  strictly based on the real estate.
7         Q       On page 1 of Exhibit 4, about two-thirds of the way
8  down it talks about financial information, and it indicates that
9  you supplied to the lender true and completely disclosed
10  financial condition -- financial statements, correct?
11        A       Yeah, that's correct.
12                (Deposition Exhibit 5 was marked for
13  identification.)
14        Q       (By Mr. Gardenswartz) Let me show you what's
15  marked as Exhibit 5 and ask if you can identify that.
16        A       It's a balance sheet, Tranquil Options, L.L.C.,
17  July 31, 2000.
18        Q       Is that what you provided to Alpine Bank in
19  connection with the loan which is set forth in Exhibit 4?
20        A       Yeah, I think so. Yes.
21        Q       And does it bear -- does Exhibit 5 bear your
22  signature?
23        A       Yes, it does, but I also want to go on record as
24  saying it was prepared by Debbie Harte.
25        Q       We'll get to that. Does Exhibit 5 contain your

84

1  signature?
2         A       Yes, it does.
3         Q       And this was tendered to Alpine Bank in connection
4  with the loan which is Exhibit 4, correct?
5         A       Correct.
6         Q       And you signed it, correct?
7         A       Correct.
8         Q       No one else signed it, correct?
9         A       Correct. As it appears, it's a copy. And I don't
10  have the original, but it sounds probably right.
11        Q       What does it indicate the owner's equity is in the
12  property? "It" being Exhibit 5.
13        A       It's hard to read, but approximately 4.8 million.
14        Q       And what does Exhibit 5 indicate the total
15  liabilities to be?
16        A       Looks -- I can't read it, but it looks like
17  198,000.
18        Q       Let me show you what I'll mark as --
19        A       Can I ask for a five-minute recess here?
20        Q       Not yet.
21                MR. GARDENSWARTZ: Let's mark this as Exhibit 6.
22                MR. HERBERT: Why are we refusing?
23                MS. TESTER: Are we rationing them? I think he's
24                MR. HERBERT: Are we rationing them? I think he's
25  entitled to have one if he wants one.

85

1                MR. GARDENSWARTZ: He can have a break.
2                MR. HERBERT: That's what he's asking.
3                You want it right now?
4                THE DEPONENT: Just for a couple seconds, won't
5  take very long.
6                (A break was taken from 1:20 p.m. until 1:22 p.m.)
7                MR. GARDENSWARTZ: The record can reflect we've had
8  our third break in the last 15 or 20 minutes.
9         Q       (By Mr. Gardenswartz) And as a result of that, do
10  you wish to say something?
11        A       The document with my signature on the financial
12  condition of Tranquil Options was generated by Debbie Harte.
13        Q       And you signed it?
14        A       Yes, I did.
15        Q       And you presented it to Alpine Bank?
16        A       Yes, I did.
17        Q       Let me hand you Exhibit 6. Ask you if you can
18  identify that.
19        A       It appears to be the warranty deed on the Castle
20  property, legal description. That is a copy of the warranty
21  deed.
22        Q       And Exhibit 6 indicates that on or about May 15,
23  2000, Cumberland Redstone Partners, L.L.C. conveyed to Tranquil
24  Options, L.L.C. a parcel of property which became the Redstone
25  Castle property for $4 million, correct?

0401857



86

1    A    Correct.
2    Q    And that deed was recorded approximately on the
3 same day, May 15, approximately, 2000, correct?
4    A    Correct.
5        (Deposition Exhibit 7 was marked for
6 identification.)
7    Q    (By Mr. Gardenswartz) Now let me show you what
8 we've marked -- or I marked as Exhibit 7 and ask you if you can
9 identify that document.
10   A    That is the note from Reserve Foundation, L.L.C. to
11 Tranquil Options, L.L.C.
12   Q    Exhibit 7 appears on the first four pages to be a
13 deed of trust; do you see that?
14   A    Yes.
15   Q    And the remaining two pages are a legal description
16 for the Castle parcel, correct?
17   A    Correct.
18   Q    Who prepared Exhibit 7?
19   A    I did.
20   Q    And your handwriting appears on Exhibit 7 on the
21 first page and subsequent pages?
22   A    That's correct.
23   Q    Is there anywhere on here that Ms. Harte's
24 signature or handwriting appears?
25   A    No.

87

1    Q    Exhibit 7, the deed of trust, refers to an
2 obligation to pay $4,200,000 in the middle of the first page?
3    A    That's correct.
4    Q    And it refers to a note dated May 16, 2000?
5    A    Correct.
6    Q    Do you have that note?
7    A    Yes, I do.
8    Q    Where is it?
9    A    Another attorney has it right now.
10   Q    Who is that?
11   A    Dick Dally has the original.
12   Q    Who is that?
13   A    He's an attorney that I was originally going to
14 retain to do my divorce and I never retained him.
15   Q    That's Richard Dally?
16   A    Yeah, he's local here.
17   Q    He has the original note?
18   A    I'm sure he does, yes.
19   Q    We'll take a break -- do you mind if we take a
20 break and call him? Not now, but we'll take a break later and
21 have him fax it over.
22   A    I'm sure he's got all the original files.
23   Q    Who negotiated the terms?
24   A    Excuse me a minute, Ted. I don't know that he'll
25 fax it to you, though, because I still never paid him his

88

1 retainer. He wanted money before I could get my paperwork back.
2 I don't know if he'll fax it or not.
3    Q    Who negotiated the terms of the $4,200,000
4 promissory note?
5    A    I did.
6    Q    With whom?
7    A    Norm Schmidt and Reserve Foundation, L.L.C., which
8 I'm a member of also.
9    Q    According to the deed of trust, there were supposed
10 to be payments made to a certain address at 550 East 12th Avenue.
11 Do you see that?
12   A    That's correct.
13   Q    That's your address?
14   A    That was Norm Schmidt's at the time; it's mine now,
15 yes.
16   Q    It's where you're living with Norm?
17   A    Yes.
18   Q    And have any payments been made?
19   A    No.
20   Q    Why not?
21   A    Never sufficient capital in the corporation to make
22 any payments. It's losing money without making payments.
23   Q    And who negotiated that the payments were going to
24 be $33,000 per month?
25   A    I guess I did.

89

1    Q    And how did you think that the Tranquil Options,
2 L.L.C. was going to be able to pay $33,000 a month?
3    A    I don't know.
4    Q    I'll ask it again. How did you possibly think that
5 Tranquil Options, L.L.C. was going to be able to pay $33,000 a
6 month?
7    A    I don't know.
8    Q    You structured the deal; did you structure it
9 thinking it could never be paid or did you think it could be
10 paid?
11   A    Well, we knew we were going to lose money for a
12 couple of years, so I guess maybe we structured the deal wrong
13 and should have made it without payments.
14   Q    "We" didn't structure the deal wrong, you
15 structured the deal wrong, correct?
16   A    Possibly, yes.
17   Q    And you structured a deal obligating Tranquil
18 Options, L.L.C. to pay $33,000 a month. How did you think they
19 were going to possibly earn $33,000 a month to pay on this note
20 or deed of trust? Did you think about it?
21   A    Obviously not.
22   Q    And in making that quote/unquote loan on behalf of
23 Reserve Foundation, L.L.C., were you acting in the best interest
24 of Reserve Foundation, L.L.C.?
25   A    We had the real estate as collateral.



90

1    Q    Were you acting in the best interest of Reserve
2 Foundation, L.L.C.?
3    A    In retrospect, probably not.
4    Q    Were you acting in the best interest of Tranquil
5 Options, L.L.C.?
6    A    That's the only way they could buy the property.
7    Q    Were you acting in the best interest of Tranquil
8 Options, L.L.C.?
9    A    No, in retrospect, probably not.
10    Q    Were you acting in the best interest of the
11 investors in the Reserve Foundation Trust?
12    A    That's out of my category.
13    Q    Were you acting in their best interest? Isn't that
14 where the money came from?
15    A    (Deponent nods his head)
16    Q    Were you acting in the best interest of those
17 people, those investors?
18    A    With the structure we had in place at that time, it
19 was covered.
20    Q    Were you --
21    A    There was no risk.
22    Q    And why do you say that?
23    A    Because the assets of the property could be used as
24 leverage in transactions overseas.
25    Q    And that was the whole intention of this, wasn't

91

1 it? It was never for the benefit of the Reserve Foundation,
2 L.L.C. or Tranquil Options, L.L.C.; it was to take this piece of
3 paper and use it to leverage to get another deal, correct?
4    A    It was an asset like any other asset.
5    Q    And you used a piece of paper; you had a note, you
6 created a note that you knew couldn't be repaid for the purpose
7 of creating a note so you could use that to show an asset so you
8 could go on and make other business deals; isn't that right?
9    A    It could be used that way, but we never did use it.
10    Q    But that was the intention, wasn't it? That was
11 the intention of creating all that paperwork?
12    A    No. There had to be a note from corporation to
13 corporation, or there would have been income to the corporation.
14    Q    Who signed on the promissory note?
15    A    I did.
16    Q    Individually or as --
17    A    Tranquil Options.
18    Q    As a member of Tranquil Options, L.L.C.?
19    A    As a member of Tranquil Options, L.L.C.
20    Q    And did Debbie sign on the promissory note?
21    A    No, she did not. I have full banking authority and
22 full authority to act for Tranquil, L.L.C. -- Tranquil Options,
23 L.L.C.
24    Q    Let's go back to Exhibit 3 under the Operating
25 Agreement, paragraph 5.1. Do you see that?

92

1    A    What page is it on, Ted?
2    Q    It says 12 in the upper right-hand corner.
3          Paragraph 5.1 indicates that all decisions
4 affecting or arising out of the company shall be made only by the
5 affirmative vote of the members owning more than 50 percent,
6 correct?
7    A    Correct.
8    Q    And the owners were you and Debbie 50/50?
9    A    Incorrect. Not when these notes were done. There
10 were three owners originally: Norm Schmidt, Leon Harte, Debbie
11 Harte -- third, third, third -- as the two other corporations are
12 still.
13    Q    And you have no documentation of that third, third,
14 third, correct?
15    A    I'm sure I do. I've got to have it somewhere.
16    Q    And where would that affirmative vote -- where were
17 the minutes of that affirmative vote? Where were the meeting
18 documentations of that affirmative vote?
19    A    I'm going to have to look for them.
20    Q    And where would you look?
21    A    Either Richard Daily would have them, Marty
22 O'Fallon would have them, or I would have them somewhere.
23    Q    And you haven't produced any of those, correct?
24    A    I don't think I have them.
25    Q    Well, they're either in your custody and control or

93

1 they're --
2    A    Debbie Harte has the file on it, I don't. All
3 three corporations, L.L.C.s, were originally set up one-third,
4 one-third, one-third, all three of them.
5    Q    Any operating agreements for Peaceful or Serenity
6 Options, L.L.C.?
7    A    It would be a boilerplate exactly like this one.
8    Q    Exactly like Exhibit 3?
9    A    With different name changes and stuff, and the
10 stockholders would be listed on a separate page.
11    Q    Are there written signed operating agreements for
12 Serenity Options, L.L.C.?
13    A    I believe there is.
14    Q    Who would have those?
15    A    I think Marty O'Fallon or Dick Daily.
16    Q    And what about for Peaceful Options, L.L.C.?
17    A    Marty O'Fallon or Dick Daily or Debbie Harte.
18 Debbie has all of the corporate files, I have none of them.
19    Q    Are you telling me, then, that the affirmative vote
20 to incur this $4 million obligation was an affirmative vote that
21 you and Norm made?
22    A    I guess so, yes.
23    Q    Let me have you look at --
24    A    I don't really remember doing it, to be real
25 honest.

94

1    Q    Well, it was an affirmative vote of you and Norm,
2 we know that.
3    A    Correct.
4         (Deposition Exhibit 8 was marked for
5 identification.)
6    Q    (By Mr. Gardenswartz)  Let me have you look at
7 Exhibit 8. Can you identify that document?
8    A    Yep. That is the deed of trust on the residence we
9 bought in July of 2000 in Redstone.
10   Q    And that was acquired by Tranquil Options, L.L.C.?
11   A    Correct. That's what the bank loan at Alpine Bank
12 was for. That's where the 250,000 went.
13   Q    Just so we're clear, you're talking about the bank
14 loan referred to in Exhibit 4?
15   A    That's correct. That's what the money was used to
16 purchase, was this real estate.
17   Q    When did that close?
18   A    August sometime. I'm not sure when.
19   Q    And Exhibit 8 is a deed of trust dated July 26,
20 2000; is that correct?
21   A    That's correct.
22   Q    And it refers to a promissory note in the middle;
23 do you see that?
24   A    Yep. Yeah, I see that.
25   Q    And that refers to payments of $1,811 per month

95

1 that are due?
2    A    Yep.
3    Q    And what is the status of that obligation?
4    A    Never been a payment made.
5    Q    Why not?
6    A    There was never money in the corporation to make
7 payments.
8    Q    Who negotiated the promissory note?
9    A    I did.
10   Q    Did you and Norm negotiate that together?
11   A    Yes, sir.
12   Q    And then you prepared Exhibit 8?
13   A    That's correct.
14   Q    Who has the original promissory note dated July 26,
15 2000?
16   A    Richard Dally would still have it, I believe.
17   Q    And does your handwriting appear on Exhibit 8?
18   A    Yes, it does.
19   Q    And your signature?
20   A    Yes, it does.
21   Q    Is there anywhere on Exhibit 8 that the signature
22 or handwriting of Ms. Harte appears?
23   A    No.
24   Q    Both Exhibits 7 and 8 appear to be notarized; do
25 you see that on page 4?

96

1    A    Yep.
2    Q    Who notarized these documents?
3    A    John Kusic.
4    Q    Who is he?
5    A    He's an attorney in Denver.
6    Q    Did he prepare these?
7    A    No.
8    Q    Where did you sign these? "These" being Exhibits 7
9 and 8.
10   A    At his office.
11   Q    Where is his office located?
12   A    2150 West 29th Avenue, Suite 130.
13   Q    Same complex with Mr. Herbert?
14   A    Correct.
15   Q    Same complex with Mr. O'Fallon?
16   A    Correct.
17   Q    Anyone else in that complex?
18   A    No.
19   Q    What day did you sign Exhibits 7 and 8?
20   A    I'm not sure.
21   Q    Who was present when you signed Exhibits 7 and 8?
22   A    John had to be there if he notarized them.
23   Q    Anyone else present?
24   A    I don't remember if Norm was there or not. I'd
25 have to ask him; I don't remember.

97

1    Q    Ms. Harte wasn't present when Exhibit 7 and 8 were
2 signed; is that correct?
3    A    No, that's correct. That, I'm sure of.
4    Q    Does Reserve Foundation, L.L.C. have any other
5 encumbrances to your knowledge on the Tranquil Options, L.L.C.
6 property?
7    A    Yes.
8    Q    What other ones?
9    A    There's the UCC filing and another note.
10   Q    What's the other note?
11   A    It's a couple hundred thousand dollars that was
12 used for purchase and acquisition of equipment, dishes,
13 dishwashers, kitchen equipment, loaders, trucks, vehicles.
14   Q    And that was a $200,000 loan?
15   A    I think so.
16   Q    Made by Reserve --
17   A    -- Foundation, L.L.C., yeah.
18   Q    You and Norm?
19   A    Correct.
20   Q    And what are the terms of that obligation?
21   A    It was set up on monthly payments too, but I don't
22 have it here in front of me.
23   Q    Were there any payments made?
24   A    No, sir.
25   Q    And were you acting in the best interest of Reserve



98

1  Foundation, L.L.C. or Tranquil Options, L.L.C. in connection with
2  either the obligations referred to in Exhibit 8 or this $200,000
3  obligation you're referring to now?
4       A      The Reserve Foundation, L.L.C. had the assets for
5  backing.
6       Q      Were you acting in their best interest or Tranquil
7  Options, L.L.C.'s best interest?
8       A      Tranquil Options wouldn't have had -- it wouldn't
9  have existed if they wouldn't have borrowed the money. There was
10 no other place to borrow the money at that time.
11      Q      So whose best interest were you acting in?
12      A      I'm not sure.
13      Q      In connection with this $200,000 obligation, was
14 there a deed of trust similar to Exhibits 7 and 8?
15      A .    Yes, there was.
16      Q      And who prepared it?
17      A      I did.
18      Q      Who signed it?
19      A      I did.
20      Q      And was it recorded?
21      A      Yes, it was.
22      Q      Do you know when?
23      A      January 2001.
24      Q      Same time Exhibit 7 and 8 were recorded?
25      A      Yes, same day -- well, no, I'm not sure about that,

99

1  because I think the UCCs had to be filed in Denver and these had
2  to be filed in Pitkin County, so I'm not sure that they were the
3  same date, but it was in early January of 2001.
4       Q      The $200,000 obligation, is that a UCC filing or a
5  filing that was done in the records of the Pitkin County clerk
6  and Recorder?
7       A      It was a UCC filing, but I can't remember if we
8  filed it with the county or if it got filed with the state.  I
9  think . . .
10      Q      Who filed it?
11      A      I did, but I don't remember.  I'm sorry.
12      Q      How did you know where to file it?
13      A      I think I called Pitkin County, and I think I filed
14 it up here and then they transferred it to the State. But I'm
15 not sure. I did it, but I don't remember.
16      Q      Were you getting any legal advice in connection
17 with Exhibits 7 and 8?
18      A      No.
19      Q      Has Reserve Foundation, L.L.C. taken any steps to
20 enforce any obligations against Tranquil Options, L.L.C.?
21      A      Not at this point.
22      Q      Why not?
23      A      Don't have a good answer for that. I don't know.
24      Q      Whatever answer you've got is all I want.
25      A      Well, first thing, it's another attorney fee we

100

1  don't have the money to pay right now.
2       Q      Have you discussed that position with anyone on
3  behalf of the Reserve Foundation Trust?
4       A      No.
5       Q      The person owed or the entity owed money under
6  Exhibit 7 and 8 -- allegedly owed money -- is Reserve Foundation,
7  L.L.C., correct?
8       A      That's correct.
9       Q      And Reserve Foundation, L.L.C. is a Colorado
10 L.L.C.?
11      A      Correct.
12      Q      Owned 50/50 with you and Norm Schmidt?
13      A      That's correct.
14      Q      So you and Norm Schmidt each have a 50 percent
15 interest in these obligations of Tranquil Options, L.L.C.,
16 correct?
17      A      We have 50/50 in Reserve Foundation, L.L.C. but not
18 in Tranquil Options, L.L.C.
19      Q      I understand that, but if for instance
20 hypothetically Reserve Foundation, L.L.C. were to foreclose and
21 get paid some amount of money, the entity that would get paid
22 that amount of money would be Reserve Foundation, L.L.C., which
23 would be 50 percent you and 50 percent Norm?
24      A      Yeah. At that point the money would go back to the
25 investors through the Reserve Foundation Trust.

101

1       Q      What agreement?
2       A      Where the Reserve Foundation, L.L.C. borrowed the
3  money to start with.
4       Q      What agreement is there between Reserve Foundation,
5  L.L.C. and Reserve Foundation Trust?
6       A      The obligation of the debt.
7       Q      Where is that documented?
8       A      London.
9       Q      No documentation here on that obligation?
10      A      No, sir. No.
11      Q      Promissory note, nothing?
12      A      No, sir.
13      Q      Who has it?
14      A      Cliff Pitt originally had it.
15      Q      Where is it now?
16      A      Not in London -- I said London -- it would be in
17 Saint Vincent and the Grenadines.
18      Q      Is there any paperwork that you signed with the
19 Reserve Foundation, L.L.C. obligating it to repay any monies to
20 Reserve Foundation Trust?
21      A      That documentation will all be over there.
22      Q      Is there any documentation in your possession,
23 custody, or control or in the United States that would indicate
24 you have any obligation whatsoever to the Reserve Foundation
25 Trust?

0401861



102

1    A    I don't think so, no.  Not that I'm aware of.

2    Q    You never signed anything on behalf of Reserve

3 Foundation, L.L.C. that obligated that L.L.C. to repay anything,

4 did you?

5    A    I don't remember. Along the line we had to do it,

6 yes, but I don't remember doing it, no.

7    Q    You're telling me that you got millions of dollars

8 and you don't remember — you have no paperwork evidencing any

9 obligation to repay that?

10    A    That's correct.

11    Q    You're a guy who his best year earned 40,000 or

12 80,000 once and 40,000 up to this point in your life and you've

13 got million-dollar obligations and you have no documentation; is

14 that what you're telling me?

15    A    I don't have a copy of it, no.

16    Q    Do you have any documentation, not if you have a

17 copy of it.

18    A    No.  I do in the —

19    Q    Does it exist?

20    A    I know there was something done like two years ago,

21 but I can't remember what it was.  I mean, it was done back in

22 '99 and early 2000.

23    Q    Is there any documentation obligating Reserve

24 Foundation, L.L.C. to repay any sums of money or to pay any sums

25 of money to Reserve Foundation Trust?

103

1    A    I don't have any.

2    Q    Did you ever sign any?

3    A    Ted, I'm not sure.

4    Q    How about Norm; did he ever sign any?

5    A    I would have to ask Norm. I don't know.

6    Q    You don't know?

7    A    I do not know.

8    Q    You talked about the $200,000 alleged obligation is

9 a UCC filing relating to that; is there any other obligation that

10 you're aware of that Tranquil Options, L.L.C. has to Reserve

11 Foundation, L.L.C.?

12    A    The UCC filings and the two real estate

13 transactions is the only ones that I remember.  And there might

14 be two UCC filings; I don't remember if there is one note or two.

15 I'd have to look it up.  I don't have it with me.

16    Q    Had you ever prepared deeds of trust before?

17    A    No, sir.  It's just boilerplate material, just

18 filled in the dots.

19    Q    Have you ever prepared promissory notes before?

20    A    Yes.

21    Q    Who, in your experience, holds the original

22 promissory note, the lender or the maker?

23    A    The lender.  Yeah, the lender would be the bank, so

24 to speak, correct.

25    Q    And the lender in this case was Reserve Foundation,

104

1 L.L.C.?

2    A    That's correct.

3    Q    And are you telling me you gave the original

4 promissory notes to Mr. Dally?

5    A    That's correct.

6    Q    Did you and Mr. Dally discuss that?

7    A    I don't remember specifically discussing that, no.

8 But he has the files on them all.  Every one of them.

9         Would the originals be filed at the County, or

10 would that be copies?

11         (Deposition Exhibit 9 was marked for

12 identification.)

13    Q    (By Mr. Gardenswartz) What were you saying?

14    A    The originals may be at the County.  I mean, I

15 filed them, but I don't remember.  The originals would either be

16 at the County when these were filed or with Dally, Richard Dally.

17 I don't remember if the County keeps originals or not.  That's

18 the only time I did it.  I don't remember.

19    Q    Is there any kind of promissory note between

20 Reserve Foundation, L.L.C. and the Reserve Foundation Trust?

21    A    Not here, there isn't.

22    Q    I'm not asking here; is there such a thing?

23    A    I don't specifically remember signing anything like

24 that.  I don't specifically remember seeing anything like that.

25    Q    Let me show you Exhibit 9 and ask you if you can

105

1 identify that.

2    A    It's the warranty deed on the property in Redstone

3 to Tranquil Options from John Sanchez.

4    Q    Which piece of property is this?

5    A    This is a multifamily residential on Main Street in

6 Redstone.

7    Q    It's the same property referred to in Exhibit 8; is

8 that right?

9    A    That's correct.

10         MR. GARDENSWARTZ:  Why don't we take a few

11 minutes, here.

12         (A break was taken from 1:53 p.m. until 2:24 p.m.)

13         (Deposition Exhibit 10 was marked for

14 identification.)

15    Q    (By Mr. Gardenswartz) Take a look at Exhibit No.

16 10.  Can you identify that?

17    A    That looks like the organizational meeting for

18 Reserve Foundation, L.L.C.

19    Q    Who prepared Exhibit 10?

20    A    Marty O'Fallon.

21    Q    Exhibit 10 are the Reserve Foundation, L.L.C.

22 minutes of the organizational meeting?

23    A    That's correct.

24    Q    Who has the books and records for Reserve

25 Foundation, L.L.C.?

0401862



106

1   A   I do.

2   Q   Are there any other documents, organizational

3   documents or minutes for Reserve Foundation, L.L.C. other than

4   the documents in Exhibit 10?

5   A   I don't think so, but I'd have to look to make

6   sure.

7   Q   Where do you keep these records?

8   A   Marty O'Fallon would have some of this. The rest

9   would be at my apartment.

10   Q   Have you or Norm ever taken any compensation from

11   Reserve Foundation, L.L.C.?

12   A   We both borrowed money from them, but we haven't

13   taken any direct compensation, no.

14   Q   Do you get any benefits from Reserve Foundation,

15   L.L.C. such as health insurance, anything like that?

16   A   No, sir.

17       (Deposition Exhibit 11 was marked for

18   identification.)

19   Q   (By Mr. Gardenswartz) Mr. Harte, I'll show you

20   what's been marked as Exhibit 11, which appears to be a loan

21   application from New Frontier Bank.

22   A   Correct.

23   Q   Whose -- do you recognize that document?

24   A   Yes.

25   Q   And does your signature appear on the second page


107

1   of Exhibit 11?

2   A   Yes, it does.

3   Q   Did you prepare Exhibit 11?

4   A   The first two parts of the loan application I would

5   have prepared; Debbie would have done the financial on the back.

6   Q   Let's look at the handwriting on the first two

7   pages; is that your handwriting?

8   A   Yes, it is.

9   Q   About seven-eighths of the way down the first page

10   it says Present Employer. This is under you, Leon Francis Harte.

11   Present Employer: TRFT. Was that true?

12   A   Yes, it would have been true at that time.

13   Q   And when we went through your employment, which

14   we did at least a half a dozen times, every time I asked you, you

15   said you were not employed by TRFT.

16   A   Not true. I told you they compensated me $25,000

17   in 2000.

18   Q   It says here that your present gross monthly salary

19   is $5,000 that you wrote in there.

20   A   Uh-huh.

21   Q   Do you see that?

22   A   Yes, sir.

23   Q   Is that your present -- was that your present gross

24   monthly salary from TRFT?

25   A   When was this?


108

1   Q   December 1, 2000.

2   A   Yeah, that would have been about right.

3   Q   So you've been making $60,000 a year from TRFT?

4   A   No. At that time I got paid, like, the last three

5   or four months of 2000 from TRFT.

6   Q   It says your present gross monthly salary; did you

7   ever have a salary?

8   A   No.

9   Q   So that wasn't really true, was it?

10   A   Not as a salary, no.

11   Q   It says your present employer is TRFT and that

12   you've been employed there for two years. That wasn't really

13   true, was it?

14   A   Pretty close. I started on commission sales; I

15   started with TRFT in early '99.

16   Q   You had an employer/employee relationship with

17   TRFT, now, is that what you're telling me as we're here now at

18   2:30? You're now telling me you -- at some point in time you

19   were an employee of TRFT?

20   A   Not an employee.

21   Q   It says Present Employer, which would mean

22   employer/employee. Was that, in fact, inaccurate; you've never

23   had TRFT as your employer?

24   A   Well, it's commission sales, so technically my

25   employer they are not.


109

1   Q   Did you ever get any commission sales?

2   A   I got paid the $25,000 in 2000.

3   Q   So in the two years you've been working there you

4   made a total of $25,000?

5   A   Right.

6   Q   But yet you represented to New Frontier you made

7   $5,000 a month?

8   A   That's about what I was making at that time.

9   Seriously.

10   Q   And it says -- at the top it says your present

11   gross -- excuse me, total monthly income; do you see that?

12   A   Yes.

13   Q   No, here, $15,000.

14   A   That was Tranquil Options.

15   Q   That's the monthly income that Tranquil Options

16   received?

17   A   Yep, that's what we put in there. Yes.

18   Q   Where did Tranquil Options get 15,000 a month?

19   A   They grossed about 15,000 a month. It still does.

20   Q   But it owes, theoretically, under your notes,

21   30-some thousand dollars a month, correct?

22   A   Yeah.

23   Q   So total monthly income is a negative number,

24   correct?

25   A   Probably, yes. But you didn't put that down; you



110

1  put down $15,000 a month when you made this loan application to
2  New Frontier?
3      A      That's correct. The proceeds of this loan went
4  direct back into Reserve Foundation or to Tranquil Options.
5      Q      It says by TRFT, Sales, slash, Manager. Were you a
6  manager?
7      A      I'm managing the original accounts when I brought
8  them in.
9      Q      How many original accounts did you bring in?
10     A      Through TRFT, I personally didn't do that many. A
11  few. I don't remember off the top of my head. Again, that's
12  been a couple years ago.
13     Q      Then you attached to New Frontier the balance
14  sheet, which is the third page of Exhibit 11; is that correct?
15     A      That is correct, and that was prepared by Debbie
16  Harte.
17     Q      The question is you attached it and gave it to New
18  Frontier, correct?
19     A      Which Debbie Harte was very well aware of, correct.
20     Q      Did you attach the third page of Exhibit 11 when
21  you gave this document to New Frontier?
22     A      I'm sure I presented it, yes.
23     Q      And in presenting that to New Frontier, who were
24  you dealing with?
25     A      Larry Seastrom.

111

1      Q      How do you spell that?
2      A      S-e-a-s-t-r-o-m.
3      Q      The balance sheet dated December 1, 2000 shows
4  total equity of $4.7 million; do you see that?
5      A      Uh-huh.
6      Q      Yes, you see that?
7      A      Yes, I do.
8      Q      And was that, in fact, accurate as of December 1,
9  2000?
10     A      Before the liens were filed, yes. So technically,
11  no, I guess it never was accurate, was it? It never was
12  accurate.
13     Q      Did you tell Mr. Seastrom that the balance sheet
14  attached to Exhibit 11 was not accurate when you presented
15  Exhibit 11 to him?
16     A      I doubt it. I don't even remember giving him that,
17  but that's okay. No, I don't know if I presented it or Deb faxed
18  it to him, to be real honest.
19     Q      We don't see any of Deb's handwriting or anything
20  having to do with this loan application on Exhibit 11; is that a
21  fair statement?
22     A      Yep.
23     Q      And the borrowers, according to Exhibit 11, were
24  Tranquil Options, L.L.C. and you as the coborrower; is that
25  correct?

112

1      A      That's correct.
2      Q      What is your current net worth?
3      A      Mine personally? Probably minus 300,000.
4      Q      How do you get that? How do you calculate that?
5      A      Well, all the money I owe to everybody. And I
6  don't figure any of the four corporations I'm involved with --
7  they're all under zero assets anyhow, so there's no corporate
8  value. So I don't figure the four L.L.C.s in there.
9             (Deposition Exhibit 12 was marked for
10  identification.)
11     Q      (By Mr. Gardenswartz) Let me show you what I've
12  marked as Exhibit 12 and ask if you can identify that.
13     A      No, I can't. I don't particularly remember it.
14     Q      Who is Bernard Goldberg?
15     A      I don't know.
16     Q      He's writing a letter to you December 7, 2001
17  indicating that --
18     A      I've never seen this letter.
19     Q      -- indicating in Exhibit 12 that there's about $2
20  million, more or less, due, and it indicates that "as you've
21  advised, we shall receive both November 11, 2001 and December 11
22  payments on or before December 15." That's a month ago -- two
23  months ago,
24     A      I've never seen this before.
25     Q      Did you advise him that he would receive both the

113

1  November 1 and the December -- I'm sorry, November 11 and
2  December 11 payments?
3      A      No.
4      Q      Do you know what he's talking about?
5      A      No.
6      Q      Did Mr. Goldberg invest money in Reserve Foundation
7  Trust or any other entity which you're involved?
8      A      I don't know.
9      Q      You don't know?
10     A      No, I don't know. The name doesn't ring a bell.
11     Q      How about the address: San Jose, Costa Rica?
12     A      Doesn't ring a bell with me.
13            (Deposition Exhibit 13 was marked for
14  identification.)
15     Q      (By Mr. Gardenswartz) How about Exhibit 13?
16  Another letter from Mr. Goldberg?
17     A      I've never seen this.
18     Q      Have you ever heard of an offshore entity known as
19  Servicios Halcon Dorado?
20     A      No, I don't. Never heard of it.
21     Q      Is there any money owed to that entity as far as
22  you know?
23     A      Not that I'm aware of.
24     Q      Who would know?
25     A      Have to go over to the people in London or the

114

1 people in Saint Vincent, where all the contracts and everything
2 are.
3        Q        Is Reserve Foundation Trust still doing business?
4        A        They're trying to make money back to cover all the
5 investors, so they're trying to get an investment to work, yes.
6        Q        Who's doing that?
7        A        Peter Moss, at this point.
8        Q        How come you're not doing that?
9        A        Because I have so many lawsuits against me now,
10 nobody will touch me with a hundred-foot pole.
11       Q        Exhibits 12 and 13 appear to be addressed to you
12 and Mr. Schmidt with no CCs to Mr. Moss or anyone else.
13       A        I agree.  All I can say is maybe Norm talked to
14 them.  I've never talked to them.  I have no idea.  The name
15 doesn't ring a bell at all.
16       Q        You'd probably remember if Mr. Schmidt discussed a
17 $2 million obligation with someone, he would have brought that to
18 your attention as your friend and roommate?
19       A        No, it would have been in the Trust, it wouldn't
20 have been with me personally.  Thirteen or 14 million dollars, I
21 don't know the name of every person that's invested, sorry.
22       Q        How many do you know the names of?
23       A        Some.
24               (Deposition Exhibit 14 was marked for
25 identification.)

115

1        Q        (By Mr. Gardenswartz)  Take a look at Exhibit 14,
2 if you would.  Tell me if you can identify that.
3        A        Yeah.
4        Q        What is it?
5        A        Peter Moss wired us 19 -- $18,975.
6        Q        For what?
7        A        Personal loan.
8        Q        To whom?
9        A        Me.  And I put it right in the corporation.
10       Q        Which corporation did you put it in?
11       A        I think that went -- I'm not sure where that went,
12 to be real honest.  I don't know.
13       Q        Well, take a second to look at it.
14       A        I can't remember what it's for, to be real honest,
15 but it went into Tranquil Options' account, if what's written on
16 here is correct.
17       Q        What is it for?
18       A        Operating capital at Tranquil Options.
19       Q        And how did the money get there?
20       A        Peter Moss wired it.
21       Q        From?
22       A        Overseas Development Bank and Trust Company.
23       Q        And what's that?
24       A        Offshore bank in Nevis -- or where is it -- St.
25 Kitts, I guess.

116

1        Q        And does that have anything to do with Reserve
2 Foundation Trust?
3        A        We had an account there at one time.
4        Q        Reserve Foundation Trust did?
5        A        Reserve Foundation Trust had an account there.  As
6 a matter of fact, there still is one there, but approximately
7 $400,000 there or something.  The bank went broke.
8        Q        Where is the money now?
9        A        It's still there.
10       Q        Still where?
11       A        At this particular bank, Overseas Development Bank
12 and Trust.
13       Q        Who owns the money in that account?
14       A        Reserve Foundation Trust.  And I'm not sure what
15 account this came out of, I really don't know the account numbers
16 or any of that.  I never, ever talk to them down there.
17       Q        Where are you getting the money to pay your legal
18 fees in connection with all the lawsuits you're involved with?
19       A        Norm Schmidt's been paying them up to this point.
20       Q        Where is he getting all the money?
21       A        Different individuals, different investors.
22       Q        People are investing in your legal defense fund?
23       A        They're friends of Norm's, not mine.  I had nothing
24 to do with that deal.
25       Q        Somebody is representing you in these lawsuits,

117

1 right?
2        A        Yep.
3        Q        How are you paying your attorney?
4        A        I have never paid him a penny.
5               THE DEPONENT:  Is that correct?
6               MR. HERBERT:  That's correct.
7        Q        (By Mr. Gardenswartz)  And how do you anticipate
8 being able to pay him?
9        A        I have no idea at this point, unless I get one of
10 these contracts to work.
11       Q        Which contracts?
12       A        Well, not contracts, but one of the transactions to
13 work.  I'm still working on it as much as I can when I can and
14 trying to work part time in between.  And we're trying to make a
15 transaction work so we can make everybody whole again.
16       Q        What transaction are you trying to make work right
17 now?
18       A        Not a specific one.  I don't have a specific client
19 right now, but working with several of them, but I don't have one
20 that's . . .
21       Q        Who are you working with?  I'm just trying to get
22 an idea what you're doing with the money.
23       A        Peter Moss is handling 99 percent of it, sir.
24       Q        So you're not doing anything?
25       A        I'm helping Peter as much as I can.

0401865



118

1    Q    What are you doing?
2    A    Huh? Coaching. Comparing notes. This is a very,
3 very complex business we're trying to do, so we bounce ideas off
4 each other all the time. But I'm too out of it to be too
5 involved.
6    Q    Who are Michael and Janet Bergman?
7    A    Friends of mine out of Fort Collins, Colorado.
8    Q    Are they investors?
9    A    Were they investors in Reserve Foundation Trust,
10 yes. Not them personally, but through the structure. I can't
11 remember which structure. I think it was a family trust or
12 something like that.
13   Q    You talked earlier that you sold the Dodge van?
14   A    What's that?
15   Q    Earlier you mentioned you sold the Dodge van?
16   A    Yes, sir.
17   Q    Who did you sell it to?
18   A    A gentleman in San Diego, California by the name of
19 -- I've got it written down at home. I'd have to look it up and
20 give it to you. I don't know. I didn't do the transaction --
21 well, I delivered the van to him and I met him for like five
22 minutes. Bernard something. I can't remember his last name.
23   Q    Where is the title to the van?
24   A    Still at the bank.
25   Q    New Frontier?

119

1    A    That's correct. We owe 4,000 on the van; I only
2 sold it for 3,000, so I had to get the other grand. And I have
3 to get back to Denver today so I can pay it off tomorrow.
4    Q    Where are you getting that money from?
5    A    Norm Schmidt.
6    Q    A gift, loan, what?
7    A    I don't know. I never talked about it yet. It
8 would be a loan from Norm or one of his corporations.
9         (Deposition Exhibit 15 was marked for
10 identification.)
11   Q    (By Mr. Gardenswartz) Tell me what Exhibit 15 is,
12 please.
13   A    That is the articles of incorporation for American
14 Eagle Industries, L.L.C.
15   Q    And what is the status of American Eagle
16 Industries, L.L.C.?
17   A    Just a shell company. It's never been activated.
18   Q    It's never done anything?
19   A    Never done anything. Never had a bank account;
20 never had a tax number, nothing.
21        MR. HERBERT: Excuse me, I've got to go feed the
22 meter.
23        MR. GARDENSWARTZ: Okay.
24        (A break was taken from 2:50 p.m. until 3:11 p.m.)
25   Q    (By Mr. Gardenswartz) Mr. Harte, can you identify

120

1 for me any and all businesses or entities that you're currently
2 involved in?
3    A    Tranquil Options, L.L.C., Serenity Options, L.L.C.,
4 Peaceful Options, L.L.C., Reserve Foundation, L.L.C., American
5 Eagle Industries -- but it's just dormant. There's nothing else
6 I'm currently involved with.
7    Q    Are you involved in any other businesses, not as an
8 owner but working or trying to put together any deals or sales or
9 marketing or anything?
10   A    I've been helping Big Hole, L.L.C. try to buy and
11 sell equipment. And I'd load some equipment -- I'd do some
12 manual labor, I'd empty the garbage cans, little bit of
13 everything. But I'm not involved as an owner or anything like
14 that.
15   Q    Are you involved in any entities offshore?
16   A    No.
17   Q    None?
18   A    None. I was in 1999, I no longer am.
19   Q    What was that?
20   A    The Reserve Foundation Trust. I was originally a
21 beneficiary in 1999, but the law's changed first of 2000, so the
22 trustees changed it all at the end of 1999.
23   Q    Do you have any interest in any bank accounts that
24 you have not disclosed?
25   A    Me personally, no.

121

1    Q    Any entities that you're involved in or businesses
2 you're involved in?
3    A    No, sir, outside of my personal bank account at
4 Bank of Cherry Creek, which is disclosed in our documents here.
5    Q    Are you involved in any -- or do you have any
6 interest in any investments?
7    A    No, sir.
8    Q    Do you have any interest in any business dealings
9 that Peter Moss is working on?
10   A    Yeah. If he ever hits a home run, I'm going to get
11 paid, yes.
12   Q    Tell me about that.
13   A    There's nothing to tell. We're working on the same
14 thing I've been trying to work on since 1989. If we get the
15 right people and the right bank and institution, I will be paid a
16 commission.
17   Q    What will you be paid?
18   A    I have no idea, sir, because for several reasons.
19 Obviously every deal we work on is totally different, so I don't
20 know if which or any of them are ever going to hit.
21        MR. HERBERT: Why don't you explain a little more
22 how they work.
23        THE DEPONENT: Okay. The transactions that we're
24 trying to get are very large. The smallest one we're working on
25 is a hundred million dollars, the transaction to go in and buy

122

1  discounted paper that is handled through World Bank or IMF or
2  Federal Reserve; buy a paper Triple A at a deep discount and
3  return it through a client's account and flip it back through the
4  institution or to the Federal Reserve or to the open market.
5        MR. HERBERT: And these are all off-ledger things.
6  You don't see these if you've got -- is this permissible?
7        MR. GARDENSWARTZ: Sure.
8        MR. HERBERT: If you've got a statement from
9  CitiCorp. or Bank of America or whatever, you'd never see these
10  transactions.
11    A    They'd never show up. They're all off-ledger
12  transactions.
13    Q    (By Mr. Gardenswartz) And who are you working
14  with? Who are these people and what's this hundred million
15  dollar transaction?
16    A    A hundred million dollars. There's one right now
17  we're working on one with the German government, it's a venture
18  cap equal division of the government. I don't even know the
19  name.
20    Q    What are you doing? What are you doing with them?
21    A    Well, the object is to get them to deposit their
22  money into a bank that will do the trading for us on these banks
23  or on these reserves or on the notes.
24    Q    So you're trying to convince somebody to deposit a
25  lot of money into an offshore bank account?

123

1    A    Doesn't have to be -- well, they're all offshore
2  corporations anyhow. The bank account can be in London or the
3  U.S.
4    Q    They deposit the money into a bank account
5  somewhere?
6    A    Correct.
7    Q    And you convince them to do that, and then with
8  that money you go out and you acquire these bonds, Triple A
9  bonds?
10    A    Yeah. The bank actually handled --
11        MR. HERBERT: Or junk bonds?
12    Q    (By Mr. Gardenswartz) And you buy these Triple A
13  bonds --
14    A    At a discount.
15    Q    -- at a significant discount, and then you turn
16  around and either sell those back to the --
17    A    We can sell them to a brokerage house or a pension
18  fund. We can sell them back to the Federal Reserve on some
19  occasions or IMF.
20    Q    Why would they need you -- why can't they do that
21  themselves?
22    A    It's not a legal transaction if the bank does it
23  itself.
24    Q    To buy the Triple A bonds?
25    A    The bank cannot invest in unregistered paper. It's

124

1  not registered until it runs through private hands.
2    Q    So you just act as a middleman?
3    A    Exactly.
4    Q    You're the guy that puts the --
5    A    We never touch the money. We never do the
6  paperwork -- well, we do the paperwork.
7    Q    And you just -- excuse the connotation, but you
8  just launder this to make it legal -- not launder, you --.
9    A    They call it seasoning. We season it.
10    Q    You season it?
11    A    Right. And it's the first hand it passes through.
12    Q    And you really never hold it?
13    A    No.
14    Q    And it goes right through from one bank account
15  into the other?
16    A    That's correct.
17    Q    And then how do you get compensated?
18    A    Depending on what the margin is and what the client
19  was promised and what the contract is with the client, we'll get
20  -- we can get up to half a percent out of the middle. That
21  splits several ways.
22    Q    And who is "we"?
23    A    Well, in this particular transaction there would be
24  three people involved: Me and Peter Moss and Norm Schmidt.
25    Q    And what's your timing for this?

125

1    A    Sir, I've been working on it since 1989. I haven't
2  seen one work yet.
3    Q    What's your timing for the one you're currently
4  working on, if it all, working for you the way you want it to
5  work the way you hope it works?
6    A    If we get extremely lucky, 90 days.
7    Q    From now?
8    A    Yeah. I'd like to say it would be quicker than
9  that, but I'm never right when I say that.
10    Q    So you're working on that one that we talked about
11  with the German government?
12    A    A division of the German government.
13    Q    What other ones are you working on?
14    A    We're working on a transaction with the Chinese
15  government, the Royal Family of China. We've been working on it
16  for four years.
17    Q    Same scheme?
18    A    Exactly.
19    Q    Who is working on that one?
20    A    Peter does 99 percent of it at this point.
21    Q    So who benefits ultimately if that comes to
22  fruition?
23    A    All of us will split it.
24    Q    You, Norm, and Peter?
25    A    Yeah. And there's other people involved that I



126

1  don't even know about. I don't know who they are.
2          MR. HERBERT: Peter works -- as I understand it,
3  Peter works with people other than Leon. It's not an exclusive
4  relationship.
5      Q    (By Mr. Gardenswartz) You guys, being you, Peter
6  and Norm, are working on one with the Germans and one in China
7  and presumably Peter is working on the same idea with other
8  people?
9      A    That's correct.
10     Q    And if one of these hits, do you get anything?
11     A    Probably not. I mean, Peter is going to help me
12  out. Obviously we do a lot of things together, he's not
13  obligated to help me, but he knows the spot I'm in. We need to
14  get our investors back whole. I don't want to go to jail. I
15  don't want Deb to go to jail or Norm to go to jail.
16     Q    Why do you think you'll go to jail?
17     A    We're short paying back investors, the investments
18  weren't so astute, as you've pointed out. We need to liquidate
19  the assets and keep working until we get everybody 100 percent
20  paid back; or I guess -- I don't know the exact term we should be
21  using here, but all the principals back. That's a primary
22  concern, I've got to get the principal back to everybody or I'm
23  going to jail.
24     Q    Who told you that?
25     A    Well, it's getting pretty evident that's going on,

127

1  the investigation going on with me and the grand jury being
2  convened and the FBI checking around quite extensively.
3          (Discussion was held off the record.)
4      Q    (By Mr. Gardenswartz) When did Enderol (phonetic)
5  file bankruptcy?
6      A    Who?
7      Q    Enderol.
8      A    I don't know that they ever did.
9      Q    Who is Enderol?
10     A    Enderol was a company we were going to raise
11  investment capital for. Still a viable company, we just never
12  put the money together to help them. They're sitting in limbo.
13     Q    What's your involvement in that?
14     A    I was just trying to raise capital for them.
15  Actually, we were going to do an investment if I ever got any
16  money. Just never happened.
17     Q    In terms of like a private placement?
18     A    Yeah. You can do private placement. I mean, I
19  personally would like to invest in it, but obviously I don't have
20  any money. Reserve Foundation would like to invest in it because
21  it would show a very, very profitable return.
22     Q    How do you know what Reserve Foundation would like
23  to?
24     A    The two people are involved in it.
25     Q    Reserve Foundation L.L.C., not the trust?

128

1      A    Correct.
2      Q    What about Entertech?
3      A    Was a corporation we invested in a couple years
4  ago. They went in the tank. The stock is at point zero zero
5  something. The whole business idea that we invested in was
6  basically a hoax and was a very poor investment.
7      Q    And did Entertech file bankruptcy?
8      A    No, sir.
9          MS. TESTER: I thought you testified earlier they
10  did.
11          THE DEPONENT: No. Entertech?
12          MR. HERBERT: No, he explained that the stock was
13  worthless.
14     A    There's nothing there. There's nothing to give. I
15  think they're way late on the FCC filings. There's nothing
16  there. I don't think there's any asset of anybody anywhere at
17  Entertech. Everything was sold.
18     Q    (By Mr. Gardenswartz) Did Harold Jakel make
19  loans --
20     A    Did Harold Jakel make loans?
21     Q    -- to Tranquil Options?
22     A    Not to my knowledge. Tranquil Options made loans
23  Harold Jakel.
24     Q    How much?
25     A    Deb has the notes. Nine or probably 10- or

129

1  $11,000, I believe.
2      Q    And what happened to the race car that the Redstone
3  Castle helped sponsor?
4      A    Smitty's Racing Motor Sports still owned it.
5      Q    Who is that?
6      A    Smitty is Norm Schmidt and Scott Schmidt, I think.
7      Q    What are they -- do they own the race car?
8      A    Race car, yeah, truck and trailer and the car.
9      Q    Did Reserve Foundation Trust have any involvement
10  in that?
11     A    No, sir.
12     Q    Some of the money Norm borrowed from the Reserve
13  Foundation I'm sure was used to pay for the car and stuff like
14  that. And I gave him some money when we were up at the Castle
15  and we put the picture on the card as a sponsorship deal. I
16  don't think that was an extravagant amount, couple grand or five
17  grand. I don't remember what it was. That's been two years ago.
18  But I don't remember the dollar amount.
19     Q    And are you traveling around trying to make these
20  deals happen?
21     A    No, sir.
22     Q    How are you trying to make these deals happen?
23     A    Phone and computer, phone, fax and computer.
24     Q    What is the Diamond Cabaret?
25     A    It's a bar in Denver.

0401868



130

1    Q    Is that a place --
2    A    Supper club and bar.
3    Q    Is that a place you go to frequently?
4    A    Not anymore. I did for a while.
5    Q    And where were you getting the money to do that?
6    A    First couple times I was there I charged it to my
7 corporate credit card.
8    Q    Corporate credit card for which corporation?
9    A    Tranquil Options.
10   Q    And then what happened?
11   A    Well, if I go in there now I pay cash. I don't
12 have any credit cards left.
13   Q    Have you filed any loan applications or financial
14 statements other than the ones we looked at today in the last
15 five years?
16   A    The only one I can think of -- I mean, almost it's
17 pretty unusual that I filed that bank application, usually Deb
18 does that stuff. She's better at paperwork than I am. But yes,
19 Deb has record on every one except for I have a thousand-dollar
20 line of credit on my checking account which I started about a
21 year ago. I'm not even sure when I started it.
22   Q    Did you file a financial or loan application or --
23   A    Yeah, about a thousand dollars.
24   Q    Can you produce that?
25   A    I'd have to go to the bank and get it, yeah. I

131

1 suppose I can. I thought we did, actually. I thought it was in
2 that first paperwork we turned in. I thought I already had it,
3 yeah.
4        MS. TESTER: Which loan was that?
5    Q    (By Mr. Gardenswartz) What bank?
6    A    Bank of Cherry Creek. I think it's this in there,
7 Cindy. If you need it again, I'll get the bank to get me another
8 one. I may have a record of it at home.
9    Q    When you sell the van, what are you going to use
10 for a vehicle?
11   A    Right now I'm going to borrow a friend's car.
12   Q    Who's that?
13   A    John Miner. He's got a car I can use sometimes and
14 Scott Schmidt has a car I can use sometimes.
15   Q    Is Scott related to Norm?
16   A    Son. They've got a car dealership set up in Fort
17 Lupton. I'll probably end up working for them.
18   Q    When do you think you'll do that?
19   A    They're indicating to get something set up, they
20 thought they'd be open in December.
21   Q    Does Norm owe you any money?
22   A    No, I owe Norm money.
23   Q    How much do you owe him?
24   A    I don't know, he keeps track of it. I don't really
25 know what I owe Norm. Now, he's been a great help. He's the

132

1 only one feeding me for the last year and a half. I mean, I'm
2 fortunate enough that I've had friends that have helped me out.
3    Q    Assuming we go to trial in this divorce case, what
4 do you see happening?
5    A    I don't think there's a hell of a lot that can
6 happen, to be real honest. I think all the corporations should
7 be liquidated. If there's a penny left anywhere, it's community
8 property.
9    Q    And how do you think that liquidation can occur?
10   A    Well, it can't right now; the Castle can't be
11 liquidated at this point.
12   Q    Why not?
13   A    Because the lawsuits pending against it.
14   Q    If you go to court here, what do you think you're
15 going to ask Judge Ossola to do?
16   A    Sell everything and split it in half. I don't know
17 what else I can do. I mean, I'm not trying to beat anybody out
18 of anything here, folks. I know you think I am. I don't have a
19 damn thing. I've been borrowing money; every credit card I've
20 got is maxed out and cut up. Gary has been working for me more
21 than a year now, I haven't paid him a damn penny. I have
22 nothing. I know you don't believe that, but I have nothing.
23   Q    Why do you think I wouldn't believe that?
24   A    I don't know. We wouldn't have spent six hours
25 today if you would believe me. Everything I wrote in the paper

133

1 is correct. I don't have anything. Do I have a hope of having
2 something? Yes, I do. I hope and pray. I work my ass off
3 trying to get to that point. I'm in so deep I got to keep going.
4 I've got to get my investors whole or I'm going to jail.
5        So is money my major concern at this point? Hell,
6 no. Or marital assets? No, they're not. I need to get the
7 investors' money back in the Reserve Foundation Trust so they can
8 make every investor whole, or I'm probably going to end up in
9 prison. And that's public record.
10       MR. GARDENSWARTZ: I think I'm done. Let me take a
11 break. Why don't you guys give me a break, here, and we'll start
12 again.
13       THE DEPONENT: If I go to jail, Norm is going to
14 jail and Deb is probably going to jail with me.
15       MS. TESTER: Well, I take exception to that for the
16 record, but that's neither here nor there.
17       (A break was taken from 3:31 p.m. until 3:35 p.m.)
18       MR. GARDENSWARTZ: I think we want to conclude for
19 today, have you guys get us the documents we were talking about,
20 and then we'll get some more of the paperwork together and see if
21 we need to reconvene. But at least for now we're done.
22       MS. TESTER: I tried to keep track of the --
23 instead of having to read the whole deposition transcript, I
24 tried to keep track of the documents. There's about ten of them
25 is all.

134

1       MR. HERBERT: Do you want to get me a list?
2       MS. TESTER: Sure. I have it.
3       MR. HERBERT: I think I've got them, but I'd rather
4  rely on your list.
5       MS. TESTER: You can look at it right now, but I'll
6  write you a letter just in case.
7       MR. HERBERT: When did we mention e-mail
8  records?
9       MS. TESTER: That's when Ted was asking Leon
10 questions who he corresponds with.
11      MR. HERBERT: Did we say we were going to produce
12 this?
13      MS. TESTER: I believe Ted asked for any
14 correspondence presently and he had asked for e-mail and computer
15 records. That's why I wrote that down. Maybe I misunderstood.
16      MR. GARDENSWARTZ: If you want, maybe the thing
17 to do is we'll make you a list of stuff we want; if you object to
18 it --
19      MR. HERBERT: We'll comply to the extent we can.
20      MS. TESTER: You said you e-mailed to Peter, so if
21 you had, you know, what you believe to be non-privileged e-mails
22 to Peter, that's something I think might be relevant.
23      MR. GARDENSWARTZ: We'll put together a list.
24      MR. HERBERT: I think some of these are likely
25 impossible, just from what I know of the way they're doing

135

1  business. I mean, like notes of such recent transactions, we can
2  get the name of the guy in the Bahamas, we can get records of the
3  L.L.C., TRFT, bank records, court docs for Deals on Wheels.
4       THE DEPONENT: I can't do the records for TRFT,
5  Reserve Foundation Trust.
6       MS. TESTER: Okay. Maybe I'll just say the bank
7  records for the L.L.C. I just wrote TRFT.
8       MR. GARDENSWARTZ: The easiest thing to do is
9  give us a financial disclosure that we can send off -- on behalf
10 of you and Reserve Foundation, L.L.C., which you can do, and we
11 can send it off to the bank and get the records. Because my
12 guess is you aren't going to have all the records anyway, and so
13 the easiest thing to do is get them from the bank and get you to
14 sign them. I'll get a financial disclosure form down to Gary.
15      THE DEPONENT: That account has been closed in
16 excess of a year year and a half.
17      MR. GARDENSWARTZ: I understand that, but that
18 gives me the ability to --
19      THE DEPONENT: I don't know if I got them all or
20 not, but I can find out.
21      MS. TESTER: They usually keep them on microfiche
22 for seven years.
23      MR. GARDENSWARTZ: Let's go off the record unless
24 you have questions that you want to ask.
25      (Whereupon the deposition of Leon Harte concluded

136

1  at 3:40 p.m. on January 29, 2002.)

137

1                 REPORTER'S CERTIFICATE
2
3           I, ELIZABETH M. WHITTON, Registered Professional
4  Reporter and Notary Public within and for the State of Colorado,
5  do hereby certify that prior to the commencement of the
6  examination the witness was duly sworn by me to testify to the
7  truth; that said deposition was taken in shorthand by me at the
8  time and place hereinabove set forth and was thereafter reduced
9  to typewritten form under my supervision, as per the foregoing
10 transcript; that the same is a full, true, and correct
11 transcription of my shorthand notes then and there taken.
12          I further certify that I am not related to,
13 employed by, nor of counsel for any of the parties or attorneys
14 herein, nor otherwise interested in the event of the within
15 action.
16          My commission expires October 12, 2003, and I have
17 hereunto affixed my signature and seal this 13th day of February,
18 2002.
19
20
21                    _____
                      Elizabeth M. Whitton, RPR
22                    Roaring Fork Reporting, Inc.
                      P.O. Box 3192
23                    Glenwood Springs, CO 81602
                      (970)928-6747
24
25

0401870